04-3935    RECEIVED AUG - 4 2004

U.S. vs. Ronald Greve - Supression Hearing 7-22-04    Sheet 1

```
 1                                                              1
                                              FILED
                                         U.S. DISTRICT COURT
 2          IN THE UNITED STATES DISTRICT COURT
                                         CEDAR RAPIDS HDQTRS OFFICE
            FOR THE NORTHERN DISTRICT OF IOWA
                                         NORTHERN DISTRICT OF IOWA
 3                                                 AUG 0 4 2004

 4   UNITED STATES OF AMERICA,    )
                                  )           By: _____
 5            Plaintiff,          )                        DEPUTY
                                  )
 6            vs.                 )           NO. CR04-1008
                                  )
 7   RONALD GREVE,                )           TRANSCRIPT OF
                                  )           SUPPRESSION HEARING
 8            Defendant.          )
                                  )
 9

10

11          Transcript of suppression hearing, held before
     Chief Magistrate Judge John A. Jarvey at the United States
12   District Courthouse, 101 First Street SE, Cedar Rapids,
     Iowa, commencing at 2:32 p.m., July 22, 2004, before Tracy
13   A. H. Lamp, Certified Shorthand Reporter and Notary Public
     in and for the State of Iowa.
14

15
                              APPEARANCES
16

17   On behalf of Plaintiff:       Teresa Baumann
                                   Assistant United States
18                                    Attorney
                                   Mike Lyford
19                                 Law Student Intern
                                   401 First Street SE
20                                 Cedar Rapids, IA  52401

21
     On behalf of Defendant:       Wallace Taylor
22                                 Attorney at Law
                                   326 Higley Building
23                                 118 Third Avenue Se
                                   Cedar Rapids, IA  52401
24

25          Also present:  Defendant Ronald Greve
```

## Page 2

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Michael Dasso | Direct | 3 |
|  | Cross | 16 |
|  | Redirect | 23 |
| Gregory Egan | Direct | 24 |
|  | Cross | 34 |

| EXHIBIT | OFFERED | RECEIVED |
|---|---|---|
| Government's Exhibit Number 1 | 13 | 13 |
| Government's Exhibit Number 2 | 14 | 15 |
| Certificate of Shorthand Reporter |  | 44 |

## Page 3

THE COURT: The record can reflect that we're here in the matter of the United States of America versus Ronald Greve. This is criminal case 04-1008. He's present and represented by Wally Taylor. The Government's represented by Teresa Baumann and Mike Lyford. The defendant filed a motion to suppress evidence claiming that a confession was made without a valid waiver of Miranda warnings and that the statement was not voluntarily made in any event. We're here for an evidentiary hearing on that motion. The Government bears the burden of proof, so the Government may go forward.

MR. LYFORD: Your Honor, the Government calls Task Force Officer Mike Dasso to the stand.

THE COURT: Please come forward.

MICHAEL DASSO, witness herein, called as a witness by Plaintiff, after having been first duly sworn, was examined and testified as follows:

THE CLERK: Could you state your name and spell your last name for the record, please.

THE WITNESS: Michael Dasso. My last name is spelled D-a-s-s-o.

DIRECT EXAMINATION
BY MR. LYFORD:

Q. Special Agent Dasso, how are you employed?

## Page 4

A. I'm an agent with the Iowa Department of Public Safety, Division of Narcotics Enforcement, and I'm assigned to the DEA task force in Cedar Rapids.

Q. And how long have you been employed there?

A. I've been with the DEA task force since -- officially since January of 1995.

Q. And were you working on December 13th, 2002?

A. I was.

Q. What generally happened that day?

A. It was an enforcement action. It was to do a controlled delivery of monies for repayment of cocaine that had been fronted or given to the defendant the prior evening, and we had intercepted that cocaine and were attempting to corroborate where the cocaine came from.

Q. And where did this controlled delivery of cash take place?

A. It was on the north side of Dubuque just off of Highway 52 at a -- it's a park-like setting. There -- I don't remember the crosstreet, but there's a small pond or -- a small lake or a large pond there.

Q. Okay. And how many officers were involved in that controlled delivery?

A. Eight to ten.

Q. And what was your role in that action?

A. I serialized -- early on I serialized or

## Page 5

recorded the numbers of the monies that were to be used in part of this repayment, and then I was a surveillance officer, and ultimately I did interview Mr. Ron Greve.

Q. So at this controlled delivery of cash defendant arrived at the scene?

A. Are you speaking of this gentleman here (indicating)?

Q. Yes.

A. Yes, I am.

Q. And what kind of car was he driving?

A. It was a small Honda.

Q. And did he have a passenger in his car?

A. He did.

Q. And who was in his car?

A. First name Mike, last name I just don't recall.

Q. Okay. And what happened once Defendant arrived at the parking lot?

A. Mr. Greve got out of his vehicle, got into the vehicle that was occupied by Mr. Ruff, and the officer that was in charge of the operation at some point decided that enough time had elapsed or observed things that he decided that the officers that were assigned to this particular operation were to proceed to the vehicle that was occupied or the vehicles that were occupied and essentially

**Page 6**

1  do what is called a take-down.
2      Q.   What is a take-down?
3      A.   You essentially control the situation. You
4  cuff the people; you find out -- you eliminate any threats
5  for safety purposes and identify evidence, if possible; and
6  then after that decide what should be done.
7      Q.   So who did you and other officers detain, how
8  many people?
9      A.   There were three people that were involved;
10 Mr. Ruff, Mr. Greve, and this third individual whose first
11 name is Mike were the three people that were part of this
12 take-down.
13     Q.   So there were eight to ten agents detaining
14 three suspects?
15     A.   That is correct.
16     Q.   Did you have your gun drawn?
17     A.   No.
18     Q.   Did anyone have their gun drawn?
19     A.   Yes.
20     Q.   And is that standard for an officer to have
21 his gun drawn in this situation?
22     A.   Yes.
23     Q.   And when Defendant was detained, was he
24 handcuffed?
25     A.   Yes.

**Page 7**

1      Q.   And why was he handcuffed?
2      A.   It was part of police procedure. It's
3  designed to control the situation and eliminate any
4  possibility of harm or threat to either of the people -- the
5  officers that are involved or the other people that are
6  involved.
7      Q.   And did anyone search Defendant at that
8  point?
9      A.   I'm certain that he was searched; I wasn't
10 part of that.
11     Q.   And was he read his Miranda rights at that
12 point?
13     A.   I don't know.
14     Q.   When Defendant was searched, why would
15 Defendant have been searched at that juncture?
16     A.   It's, again, a safety issue. You want to
17 eliminate -- make sure that there's no threats to either the
18 individual or the officers that are present.
19     Q.   So can you describe to me what happened after
20 the defendant was detained.
21     A.   From the point of time he was brought out of
22 the car he was, as I recall, brought to the rear of the
23 vehicle; he was handcuffed; and, as you said, there was a
24 pat-down or a search. At some point in time he was lifted
25 off -- or brought back upright and brought back to me. I

**Page 8**

1  was positioned to the rear of all of this. It's not really
2  a driveway, it's a wider parking area, but I would be
3  immediately to the rear of all this and slightly uphill.
4      Q.   So he was taken to your car, and what
5  happened to Defendant's car?
6      A.   At what point?
7      Q.   After the defendant was taken to your car did
8  you transport him someplace or --
9      A.   I did, yes.
10     Q.   And where did you transport him?
11     A.   Initially we went to the Asbury Fire
12 Department; that's where I was directed to go, but as I
13 learned and as a matter of some frustration we were supposed
14 to go to the police department in Asbury which is a matter
15 of some six blocks, I guess; it's my estimation about six
16 blocks between the two, and we ultimately went to the police
17 department.
18     Q.   And how long was the defendant in the car
19 with you during this entire transporting?
20     A.   It would have -- over a half hour I would
21 say.
22     Q.   And did you speak to the defendant during
23 this time?
24     A.   Yes.
25     Q.   And what did you speak to him about?

**Page 9**

1      A.   The one thing that I do recall we talked
2  about, where he grew up and where he went to high school,
3  and that was Central High School in Dubuque, and the other
4  part of the conversation I remember it was a matter of some
5  reporting of the press about a project some of the students
6  there at the high school done; it was in regards to the
7  Tuskegee Airmen, and the local press had covered that quite
8  a bit, and it was a matter of interest to me, and we talked
9  about that.
10     Q.   Did you ever speak to Defendant in the car
11 about the drugs or money that was found at the scene?
12     A.   No.
13     Q.   Was Defendant's car taken to the police
14 station as well?
15     A.   I think it was, but that wasn't part of my
16 responsibility, so to give you an accurate answer, I can't
17 say for sure.
18     Q.   Okay. What happened once you arrived at the
19 police station?
20     A.   We went to a -- it's like a conference room.
21 It's a larger table, slightly larger than the one that
22 you're at. There would be an entrance to the rear of the
23 building. Off that conference room there's an entrance to
24 the front of the building, and there's also a door that goes
25 to another part of the building, I'm guessing in a westerly

**10**

1 direction, and that conference table that I described is
2 right in the center of it, and then just off the -- that
3 main room is a lavatory.
4     Q.    Are there windows in this room?
5     A.    Yes.
6     Q.    And comfortable chairs and --
7     A.    Yes.
8     Q.    Were the defendant's handcuffs removed at
9 this point?
10     A.    I think they were.
11     Q.    Was Defendant's movement constrained at all
12 while he was in this room?
13     A.    No.
14     Q.    Did he have access to a telephone?
15     A.    There was a -- I had a cell phone there, and
16 I'm sure police department had a telephone there.
17     Q.    And who was in the room with the defendant?
18     A.    It was myself, Mr. Greve, and Greg Egan who
19 is with the local Dubuque task force.
20     Q.    Was the defendant ever left alone in this
21 room?
22     A.    I don't think so.
23     Q.    Once he was in this room, before you read
24 Miranda rights to him did you talk to him about anything at
25 that point?

**11**

1     A.    Well, we did talk about the circumstances of
2 the case a little bit. I told him I was going to solicit
3 his cooperation on behalf of the Government. We did talk
4 about the sentencing guidelines, downward departure and how
5 that generally works. Subsequent to that we did go through
6 Miranda. He did give me a verbal response to every part of
7 that warning, and subsequent to that we went through a
8 Cooperation Statement, and he initialed and ultimately
9 signed that. I did read that along with him.
10     Q.    Okay. Now, did you make any promises to the
11 defendant while you were in this room?
12     A.    No. As a matter of fact, in paragraph 3 of
13 that Cooperation Statement it refers to that, no promises
14 expressed or implied.
15     Q.    You discussed the guidelines with him, you
16 didn't discuss any specifics about drug quantity or anything
17 like that?
18     A.    No.
19     Q.    Did you talk about any specific sentence that
20 he might receive?
21     A.    No.
22     Q.    Did you offer any leniency if he cooperated
23 with you?
24     A.    When you're explaining the guidelines,
25 substantial assistance and downward departure, if a person

**12**

1 decides to cooperate with the Government and they have a
2 history of assisting the investigation, all that's reported
3 to the U.S. attorney at some point, and he is the person --
4 or he or she, as it may be, authorizes at their discretion a
5 downward departure motion, and then ultimately the judge has
6 discretion as to how it's sentenced based on that.
7     Q.    And when you read him his Miranda rights, did
8 Defendant seem to understand those rights?
9     A.    He did.
10     Q.    And did he seem to be under the influence of
11 any controlled substance at that point?
12     A.    He was coherent.
13     Q.    Could he read and understand English?
14     A.    Yes.
15     MR. LYFORD: May I approach the witness, Your
16 Honor?
17     THE COURT: You may.
18 BY MR. LYFORD:
19     Q.    I'm showing you what is marked "Government
20 Exhibit 1." Do you know what that is?
21     A.    That is the Cooperation Statement, Ronald J.
22 Greve; it's initialed by him at -- on three occasions at the
23 first line of the statement. It is also -- excuse me, four
24 times, and it's also initialed on each of the other
25 sentences or paragraphs that are enumerated, and his

**13**

1 signature appears at the bottom. Also his initials appear
2 just below mine as to the reference of Miranda rights.
3     MR. LYFORD: Your Honor, Government moves to
4 admit Government Exhibit 1 into evidence.
5     MR. TAYLOR: No objection.
6     THE COURT: It's received.
7 BY MR. LYFORD:
8     Q.    In regard to this Exhibit 1, is there a
9 handwritten message at the bottom of the document?
10     A.    Yes.
11     Q.    And what does that say?
12     A.    It says "Miranda rights"; it's my
13 handwriting.
14     Q.    What does that refer to?
15     A.    That's the time that the Miranda rights were
16 waived. It's 1:54 p.m. on December 13th of year 2002.
17     Q.    And are those your initials next to that
18 note?
19     A.    Yes.
20     Q.    And you read this statement to Defendant, and
21 he understood every part of it?
22     A.    Yes.
23     Q.    So what happened after the defendant signed
24 this cooperation statement?
25     A.    We started the interview. Typically I'll do

**14**

1  -- ask questions that are biographical in nature and also
2  that would involve the person who is being interviewed,
3  their personal drug use or habits, if any, and then we'll
4  get the more detailed part of the interview as it applies to
5  the matter at hand.
6      Q.  And was there an audio or video recording
7  made of the interview?
8      A.  No.
9      Q.  And did you write a report after you
10 interviewed the defendant?
11     A.  Yes.
12          MR. LYFORD:  Your Honor, may I approach the
13 witness?
14          THE COURT:  You may.
15 BY MR. LYFORD:
16     Q.  I'm showing you what has been marked
17 "Government Exhibit 2."  Do you recognize that?
18     A.  Yes.
19     Q.  And what is that document?
20     A.  That is my report.  It's my report based on
21 the interview of Mr. Greve.
22          MR. LYFORD:  Your Honor, Government moves to
23 admit Government Exhibit 2 into evidence.
24          MR. TAYLOR:  I'm going to object, Your Honor;
25 it's hearsay, it's irrelevant, it's cumulative.

**15**

1          THE COURT:  Overruled.  2 is received.
2  BY MR. LYFORD:
3      Q.  How long did the interview take?
4      A.  I would say about an hour, perhaps a little
5  less.
6      Q.  And during that time did the defendant ever
7  even ask for a lawyer?
8      A.  No.
9      Q.  And did he ever ask to use the telephone?
10     A.  I think that he did, but it was more in
11 reference to his leaving, departing the Asbury Police
12 Department.  I'm not quite sure if his car was brought to
13 him or he was waiting for a ride or exactly how he departed,
14 but --
15     Q.  And he used the phone at that time; you
16 provided a phone?
17     A.  I'm not gonna be a hundred percent sure on
18 that, but I think he did.
19     Q.  And did you take any breaks during the
20 interview?
21     A.  I know he had one rest room break at least.
22 It seems to me he's a smoker and perhaps he took a break for
23 that, and then I remember drinking a pop, and if I was, I'm
24 pretty sure he was.
25     Q.  And the defendant left the police station

**16**

1  after the interview?
2      A.  Yes.
3          MR. LYFORD:  No further questions, Your
4  Honor.
5          THE COURT:  Mr. Taylor.
6          MR. TAYLOR:  Thank you.
7                  CROSS-EXAMINATION
8  BY MR. TAYLOR:
9      Q.  Mr. Dasso, were you present when the actual
10 take-down, as you call it, was made?
11     A.  Yes.
12     Q.  And it's my understanding from looking at the
13 videotape that as Mr. Greve got back in his car, two police
14 vehicles immediately came up behind his car, it looked like
15 five or six agents got out with their guns drawn at him; is
16 that correct?
17     A.  I know there were officers approaching those
18 vehicles, and they did have -- some of them did have their
19 guns drawn.
20     Q.  And Mr. Greve was taken out of his car and
21 handcuffed?
22     A.  Yes.
23     Q.  And put down on the ground?
24     A.  Yes.
25     Q.  And I think you testified that after he was

**17**

1  on the ground a while he was lifted up because he was still
2  in handcuffs, correct?
3      A.  Yes.
4      Q.  And he was placed in the police car.
5      A.  Not immediately but ultimately, yes.
6      Q.  And he was taken to the Asbury police station
7  ultimately.
8      A.  Ultimately, yes.
9      Q.  And he was still in handcuffs when you got to
10 the police station.
11     A.  Yes.
12     Q.  And he was taken inside the police station
13 into this conference room, and he was placed in a chair at
14 the table; is that right?
15     A.  I think the cuffs were removed, and I think
16 he had to take a break in the bathroom; I think that was the
17 first order of business.
18     Q.  And I would assume when he went to the
19 bathroom, one of you agents followed him to make sure he
20 didn't leave, right?
21     A.  The bathroom is right adjacent.  It's just --
22 I mean it's a door just like that (indicating).
23     Q.  I see.  It's kind of part of the same room.
24     A.  Yes.
25     Q.  All right.  But if the bathroom had been

**Page 18**

1  outside, you would have followed him to make sure he didn't
2  leave, correct?
3      A.   I guess it never occurred to me what I would
4  have done. I really don't -- I can't answer that
5  definitively, but the possibility exists, yeah.
6      Q.   And although you took the cuffs off of him in
7  that room, you two officers were still there near him,
8  correct?
9      A.   Yes. We were at the same table.
10     Q.   And did you do all the talking, or did
11 Officer Egan do some as well?
12     A.   I did the vast majority of the talking. I
13 don't recall Mr. Egan or -- Officer Egan did anything at
14 all. He may have, but it would be very, very small.
15     Q.   Okay. And were both you and Officer Egan
16 armed?
17     A.   I had a firearm, but it wasn't displayed.
18     Q.   And you made it clear to Mr. Greve you wanted
19 to talk to him, you wanted him to cooperate; isn't that
20 true?
21     A.   Very true.
22     Q.   And you did explain the federal sentencing
23 system to him, and you made it clear to him he was looking,
24 in your view, at 20 years to life; isn't that true?
25     A.   No, it is not true.

**Page 19**

1      Q.   You told him about what the sentence might
2  be. I mean you didn't state what it would be, but you told
3  him that's what he's looking at probably.
4      A.   No. I don't get into details like that.
5      Q.   But you made it clear to him he was looking
6  at a significant sentence if he didn't cooperate, correct?
7      A.   No, that was not the way it was characterized
8  at all.
9      Q.   But you explained to him if he cooperated, he
10 would get a lesser sentence or could get a lesser sentence,
11 correct?
12     A.   If he were found guilty of something and if
13 he did a particular federal offense, there is a prescribed
14 penalty for that. The only way from that prescribed penalty
15 is downward departure motion that is authorized by the U.S.
16 attorney, and that is usually authorized because of the
17 substantial assistance that a particular individual has
18 provided to the Government with respect to an investigation;
19 in many -- in some instances, many investigations.
20     Q.   But you made it clear to him that if he
21 didn't cooperate, he would be looking at a more serious
22 sentence; isn't that correct?
23     A.   It wasn't characterized that way. It was
24 characterized the way I just repeated it to you.
25     Q.   Now, Exhibit 1 which is the Cooperation

**Page 20**

1  Statement, is it your testimony that he signed that before
2  he gave you any statements?
3      A.   Yes.
4      Q.   And you had him at the police station, you
5  had two officers there, you've indicated to me that he was
6  probably not free to leave, yet you were able to make him
7  sign that he was not in custody; is that correct?
8      A.   I didn't make him sign anything. He signed
9  that on his own volition.
10     Q.   But he was in custody, wasn't he?
11     A.   At that point in time he was free to leave at
12 any time.
13     Q.   But you didn't tell him that, did you?
14     A.   When I read that to him, it's the first line,
15 paragraph 1, "I understand that I am not under arrest."
16     Q.   I understand what it says. My question is:
17 You had him initial that, that he was not in custody, even
18 though he was not free to leave; isn't that true?
19     A.   He was free to leave.
20     Q.   But didn't you tell me if he had gone outside
21 to the bathroom, you guys would have followed him to make
22 sure he didn't leave?
23     A.   The possibility exists I may have followed
24 him to see if he was disposing something down the toilet;
25 those possibilities do exist, but, sir, he was free to leave

**Page 21**

1  at any time.
2      Q.   So you arrest him at the scene, put him in
3  handcuffs, take him in a police car, take him down to the
4  police station, put him in this conference room at the
5  police station, and all of a sudden he's not in custody?
6      A.   He wasn't under arrest to begin with.
7      Q.   I didn't say "arrest," I said "custody."
8      A.   No, sir, the last sentence you said "arrest."
9      Q.   But you didn't specifically tell him he was
10 not in custody, did you, other than showing him this written
11 statement; is that right?
12     A.   That's --
13     Q.   You didn't overtly tell him "you're free to
14 leave," did you?
15     A.   When I read that to him, yes, I did.
16     Q.   But in the course of your general
17 conversation with him you didn't indicate to him he could
18 go.
19     A.   The first time that that came up was when I
20 read that to him, if that's what you're asking.
21     Q.   You made these statements to him about
22 federal sentencing system and cooperating and all that
23 before you even had him sign this statement; is that
24 correct?
25     A.   Yes, sir.

**Page 22**

1    Q. And didn't you tell Mr. Greve that if he
2 didn't cooperate, he would be going to jail immediately?
3    A. No.
4    Q. So it's your testimony that after going
5 through all of this effort to arrange this meeting between
6 Mr. Ruff and Mr. Greve and then arresting Mr. Greve, putting
7 him into handcuffs, taking him down to the police station
8 and all that, that you were just going to let him go in any
9 event?
10    A. He wasn't arrested, and, yes, that's true, he
11 could have gone; he could have walked out the door.
12    Q. At the end of the interview did Mr. Greve
13 indicate he was going to cooperate?
14    A. He was going to assist law enforcement with
15 the investigation, yes, he did. As a matter of fact, I
16 think he was going to talk or keep in contact with -- I
17 think at the time it was Sergeant Egan.
18    Q. And so he was allowed to leave after he
19 agreed to cooperate, correct?
20    A. That's when he left.
21    MR. TAYLOR: Thank you. That's all the
22 questions I have.
23    THE COURT: Mr. Lyford, do you have anything
24 else?
25    MR. LYFORD: Just one question, Your Honor.

**Page 23**

1    REDIRECT EXAMINATION
2 BY MR. LYFORD:
3    Q. Special Agent Dasso, did you ask the
4 defendant anything about drugs or money before he signed the
5 Cooperation Statement?
6    A. No.
7    MR. LYFORD: Nothing further.
8    THE COURT: How long did this interview
9 last?
10    THE WITNESS: I would guess about an hour.
11 It could have been a little less, could have been a little
12 more but about an hour.
13    THE COURT: How would you describe his
14 demeanor during the interview?
15    THE WITNESS: I think he would have liked to
16 have been someplace else. He was not unfriendly. He had a
17 difficulty remembering some of the names, but overall he was
18 straightforward and very coherent.
19    THE COURT: Do you have anything else,
20 Mr. Taylor?
21    MR. TAYLOR: No. Thank you, Your Honor.
22    THE COURT: Do you have anything else,
23 Mr. Lyford?
24    MR. LYFORD: No, Your Honor.
25    THE COURT: Thank you, sir.

**Page 24**

1    (The witness was excused.)
2    MS. BAUMANN: United States calls captain Greg
3 Egan.
4    GREGORY EGAN,
5 witness herein, called as a witness by Plaintiff, after
6 having been first duly sworn, was examined and testified as
7 follows:
8    THE CLERK: Could you state your name and
9 spell your last name for the record, please.
10    THE WITNESS: Gregory Egan, E-g-a-n.
11    DIRECT EXAMINATION
12 BY MS. BAUMANN:
13    Q. How are you employed?
14    A. With the Dubuque County Sheriff's Office.
15    Q. How long have you been with the sheriff's
16 office?
17    A. 16 years.
18    Q. What's your title?
19    A. Captain.
20    Q. What was your title in December 2002?
21    A. Sergeant.
22    Q. And at that time were you also on the drug
23 task force?
24    A. Yes, I was.
25    Q. Were you working on December 13th of 2002?

**Page 25**

1    A. Yes, I was.
2    Q. Were you involved in an investigation
3 involving Ronald Greve?
4    A. Yes.
5    Q. Do you see Mr. Greve in the courtroom today?
6    A. Yes, I do.
7    Q. Could you point him out and describe what
8 he's wearing for the Court.
9    A. Gentleman at the defense table with the blue
10 shirt, tan khakis, and brown shoes.
11    MS. BAUMANN: Your Honor, may the record
12 reflect the witness has identified the defendant?
13    THE COURT: It may.
14    MS. BAUMANN: Thank you.
15    Q. What generally took place on December 13th of
16 2002?
17    A. Officers with the Dubuque task force were
18 asked to assist Iowa Division of Narcotics Enforcement with
19 take-down of a suspect involved with a deal with the sale of
20 cocaine.
21    Q. What was your role in the operation?
22    A. My role was to act as a surveillance unit
23 with Special Agent Mike Dasso and then to assist or
24 accompany Special Agent Dasso in an interview with
25 Mr. Greve.

**26**

Q. And where did the controlled delivery take place?
A. At the Heritage Pond which is located just north of Dubuque.
Q. About how many officers were involved?
A. About ten.
Q. How did the transaction take place?
A. The exchange of money between Shawn Ruff and Mr. Greve was overheard via voice body transmitter. Once the transaction -- the exchange of money was -- had taken place, the signal was given for officers to move in and take down the suspects.
Q. And where were the suspects located at that time?
A. Mr. Greve and Mr. Ruff were in Mr. Ruff's vehicle.
Q. Was there also a third suspect?
A. Yes, there was.
Q. And where was he?
A. He was still in Mr. Greve's vehicle.
Q. What happened after the money changed hands?
A. Officers went in, apprehended all three of the subjects, and took them into custody.
Q. And describe that apprehension from your point of view.

**27**

A. The three of them would have been placed into handcuffs, separated, and put into different vehicles.
Q. Were firearms involved?
A. I believe so.
Q. Did you have your firearm drawn?
A. I don't believe so.
Q. And was the defendant placed in handcuffs?
A. Yes.
Q. Why was he placed in handcuffs?
A. Mostly for an officer safety type of an issue. Till we have control of the situation, at the very least we know that all three are secured.
Q. And you said you were involved in an interview. Did that interview take place at the heritage Trail Pond?
A. No, it did not.
Q. Where did it take place?
A. At the Asbury, Iowa, Police Department.
Q. And how did the group move from one place to another?
A. I believe Mr. Greve was taken by Special Agent Dasso in his vehicle. I went in a different vehicle and met with them later.
Q. Do you know if Mr. Greve was handcuffed during the transportation?

**28**

A. I don't know firsthand, but I believe he was.
Q. Why do you say you believe that?
A. It would be another officer safety type of issue. We have a suspect riding in a vehicle with an armed officer, and there's no cages in the vehicle; just for safety so they're not able to assault the officer or agent.
Q. About how much time passed between the time that Mr. Greve was detained in handcuffs and the time that you met with him at the police station?
A. I'd say probably an hour.
Q. And how far is it between those two points in terms of miles?
A. Three to four miles probably.
Q. What happened or where did you go once you got to the police station?
A. We went to the -- there's a large conference type room just off of the chief's office at the police department.
Q. What's in that room?
A. Essentially a large conference table. It's form -- formerly the police department had been city hall for the city of Asbury, and this room at one time had been the city council meeting room or chambers.
Q. So it's a table and several chairs?
A. Table and several chairs would be --

**29**

Q. Are there windows in that room?
A. Yes.
Q. When you were in that room, was the defendant in handcuffs?
A. I don't believe so.
Q. Was his movement restrained in any way?
A. No.
Q. Who was present in the conference room with you?
A. Myself, Special Agent Dasso, and Mr. Greve.
Q. When you were in that room, how would you describe your role?
A. Essentially as a witness.
Q. Did you do much talking?
A. No.
Q. Was there a video or audio recorder used?
A. No.
Q. What took place -- what was the first thing that happened once in that conference room?
A. At the outset Special Agent Dasso would have explained in general terms how the federal system works, how at sentencing there's a departure for cooperation downward on the sentencing scale, things of that nature, just in general terms.
Q. Did Special Agent Dasso ever promise the

**Page 30**

1 defendant anything?
2    A.   No.
3    Q.   Did you ever hear him mention any number in
4 terms of what a sentence of imprisonment might be?
5    A.   No.
6    Q.   Did he ever say the word "twenty" during that
7 conversation?
8    A.   Not that I recall.
9    Q.   How about "ten"?
10   A.   Not that I recall.
11   Q.   Did Special Agent Dasso discuss any
12 particular sentence?
13   A.   Not that I recall.
14   Q.   Did he discuss any particular amount of
15 drugs?
16   A.   I believe he may have talked in terms of the
17 payment that was made for the nine ounces of cocaine that
18 had been fronted, but outside of that, not in any larger
19 terms.
20   Q.   Did Special Agent Dasso say, Nine ounces of
21 cocaine will get you a certain amount of time in jail?
22   A.   No.
23   Q.   What happened after Special Agent Dasso
24 generally discussed the federal system with the defendant?
25   A.   He then proceeded to read him his rights per

**Page 31**

1 Miranda.
2    Q.   And when you say "read him his rights," was
3 he actually reading?
4    A.   Yes, he was.
5    Q.   Off of what?
6    A.   I believe it was a small card. Many officers
7 carry a small card that has the Miranda warnings typewritten
8 right on that card, and I believe he was reading right
9 directly from that card.
10   Q.   In terms of pace, was it a quick pace that
11 the Miranda warnings were read?
12   A.   No, he seemed to go through very slowly,
13 methodically point by point, after each point asking
14 Mr. Greve if he understood.
15   Q.   And what was the defendant's general demeanor
16 at that point?
17   A.   I'd say he was somewhat nervous.
18   Q.   Did the defendant do anything to make you
19 think he didn't understand the Miranda warnings?
20   A.   No.
21   Q.   Did he appear intoxicated?
22   A.   No, he did not.
23   Q.   Did he appear to be under the influence of
24 any drug?
25   A.   No.

**Page 32**

1    Q.   What happened after the Miranda warnings were
2 given to him?
3    A.   Mr. Greve stated that he understood those
4 warnings or his rights, and then Special Agent Dasso then
5 proceeded to read to him or with him the Cooperation
6 Statement.
7    Q.   What did the Cooperation Statement entail?
8    A.   Essentially it starts out, the first point
9 states that he's not under -- he understands you're not
10 under arrest, you're free to leave at any time, that the
11 agents or officers are not in any capacity to make any types
12 of deals or promises, things along those lines.
13   Q.   And did you see him sign the cooperation
14 statement?
15   A.   Yes, I did.
16   Q.   How long would you estimate did it take for
17 the Cooperation Statement from the time Special Agent Dasso
18 presented it to the time it was finished being signed; how
19 long a period was that?
20   A.   Say five -- between five and six minutes.
21   Q.   And it's a single-sheet document?
22   A.   Yes.
23   Q.   Did you also sign that document?
24   A.   Yes, I did.
25   Q.   When did you sign it?

**Page 33**

1    A.   Right after Special Agent Dasso had signed
2 it.
3         MS. BAUMANN: Your Honor, may I approach?
4         THE COURT: You may.
5 BY MS. BAUMANN:
6    Q.   I'm showing you the Cooperation Statement
7 which has been admitted as Exhibit 1. Where is your
8 signature on that document?
9    A.   Be just to the right of "Mike Dasso" on the
10 witness line.
11   Q.   And appears to be kind of a scribble?
12   A.   Yes.
13   Q.   After the cooperation statement was signed by
14 everyone, what happened at that point?
15   A.   Special Agent Dasso then proceeded to talk in
16 specific terms with Mr. Greve about his involvement in sales
17 of cocaine.
18   Q.   And you were present during the entire
19 interview?
20   A.   Yes.
21   Q.   Did the defendant take any breaks during the
22 interview?
23   A.   If my recollection serves me, I'm a smoker,
24 and I believe that I went outside on at least one occasion
25 with Mr. Greve to smoke. There's a bathroom just off to the

**34**

1 side of this conference room. We did have a break and --
2 was allowed at least one break in the rest room.
3     Q.    Did the defendant -- during the entire time
4 you were with him, did he ever ask to use the telephone?
5     A.    No.
6     Q.    Did he ever ask for an attorney?
7     A.    No.
8     Q.    Did he ever ask to stop the interview?
9     A.    No.
10    Q.    Prior to the time he was Mirandized did you
11 or Agent Dasso ask the defendant anything about the drugs or
12 money?
13    A.    No.
14    Q.    About how long did the interview take?
15    A.    I would say at the outside, an hour and a
16 half.
17    Q.    What happened after it was complete?
18    A.    Mr. Greve was allowed to leave in his
19 vehicle.
20         MS. BAUMANN: No further questions at this
21 time, Your Honor.
22         THE COURT: Mr. Taylor.
23         MR. TAYLOR: Thank you.
24                  CROSS-EXAMINATION
25 BY MR. TAYLOR:

**35**

1     Q.    It's my understanding from your testimony
2 that Mr. Greve was placed in handcuffs, put on the ground by
3 his car out there at Heritage Pond; is that correct?
4     A.    I know that he was put in handcuffs. I don't
5 know that I had a firsthand view of the actual take-down; I
6 don't recall anyhow.
7     Q.    But by "take-down" you mean put him down on
8 the ground, don't you?
9     A.    Well, I mean take him into custody.
10    Q.    And so he was taken into custody in
11 handcuffs, taken to the police station in Asbury, correct?
12    A.    Yeah.
13    Q.    And he was taken into this conference room,
14 correct?
15    A.    Correct.
16    Q.    The door was shut?
17    A.    There's a couple of doors. I guess they were
18 shut to the outside, glass doors.
19    Q.    And your plan was to have Mr. Greve stay
20 there and not leave, isn't that true, until you were done
21 talking to him?
22    A.    No.
23    Q.    You said you went outside to smoke or he did
24 and you went with him. That was so you could watch him so
25 he wouldn't leave, wasn't it?

**36**

1     A.    Not necessarily. We're at a public building;
2 police department. We were done -- at that point he hadn't
3 indicated he wanted to leave. I think his coat was still
4 inside; it was December. So I went out -- I probably wanted
5 to have a cigarette as well.
6     Q.    But my point is, the reason you went out,
7 aside from wanting to smoke yourself, was to make sure he
8 wouldn't leave, right?
9     A.    No, not necessarily.
10    Q.    Now, before he was read his Miranda rights,
11 it's my understanding that he was told about the federal
12 sentencing system, that he'd be looking at some serious
13 time, correct?
14    A.    He was told about the federal sentencing
15 system and the mechanisms for departure downward in the
16 sentencing.
17    Q.    But he was told, with or without any definite
18 time period, that he would do some serious time, right,
19 under the federal system?
20    A.    I don't recall that.
21    Q.    Possible?
22    A.    No.
23    Q.    And he was told that he could get a reduced
24 sentence if he cooperated, correct?
25    A.    There was that possibility but that we were

**37**

1 not in any capacity to make those types of promises or
2 deals.
3     Q.    And so he was told that he would be facing
4 federal sentencing, but if he cooperated, it could help him,
5 correct?
6     A.    Yes.
7     Q.    And that's when he signed his cooperation
8 statement and waived his Miranda rights, correct?
9     A.    Yes.
10    Q.    And while Mr. Greve was in the conference
11 room at the police station, you and Officer Dasso were right
12 next to him; is that correct?
13    A.    No; I was at the opposite end of the
14 conference table. Special Agent Dasso would have been
15 seated at the opposite end or at that area right next to the
16 corner --
17    Q.    Did you -- go ahead. I didn't mean to cut
18 you off.
19    A.    I can recall as Special Agent Dasso was
20 reading off the Cooperation Statement, he was reading it
21 along with Mr. Greve and was able to show it to him as they
22 read along.
23    Q.    But you were all around the table.
24    A.    Yes.
25    Q.    And you were basically on one side of

**Page 38**

Mr. Greve, and Agent Dasso was on the other side, correct?
A. At an opposite end of the table.
MR. TAYLOR: Thank you. That's all the questions I have.
MS. BAUMANN: Nothing further, Your Honor.
THE COURT: Thank you.
(The witness was excused.)
MS. BAUMANN: United States has no further evidence, Your Honor.
THE COURT: Mr. Taylor?
MR. TAYLOR: No evidence, Your Honor.
THE COURT: Do you have argument you'd like to make?
MS. BAUMANN: Just brief argument, Your Honor. The United States would urge the Court in examining the totality of the circumstances to consider Mr. Greve's prior criminal history. He had been arrested three times at least prior to this incident, so he was aware of the system. He was on probation at the time, so he knew about the system, he knew about lawyers, he knew about police officers before he was even involved in this incident. His statements were voluntary given the totality of the circumstances.
Special Agent Dasso carefully explained the federal sentencing guidelines but at no time said anything

**Page 39**

like, You're facing 20 to life, or any number for that matter as both officers have testified. Special Agent Dasso told him about his rights slowly and carefully. He read his Miranda rights off a card so as not to miss anything. He did not make any promises, and he did not threaten the defendant in any way.
The length of the detention totally was less than three hours. There was somewhere around an hour to an hour and a half between the time they were at the Heritage parking lot to the time they were at the police station and somewhere probably less than an hour and a half. Special Agent Dasso testified I think an hour; Sergeant Egan — excuse me, Captain Egan testified an hour and a half. So total of three hours involved; that is a relatively short detention, and it included the drive to the police station and some confusion on where to go. So it wasn't like Mr. Greve was being stared down by officers that entire three-hour period.
Finally, he was interviewed in a spacious room. He was allowed to go outside to smoke. It wasn't a tiny interview room with no windows like on the TV shows. He was given an opportunity to leave. He signed the statement before he made any admissions regarding his involvement in drug activity, it was witnessed by two law enforcement officers, and he was given the opportunity to

**Page 40**

leave.
He was only in handcuffs initially for officer safety purposes. This was an undercover vehicle, an undercover officer, there were no cages in the vehicle. The officers cannot ask someone questions in a parking lot. They had to take him to another place with a table and chairs in order to give him the opportunity to cooperate, and he did so voluntarily and knowingly.
THE COURT: Thank you. Mr. Taylor.
MR. TAYLOR: Thank you, Your Honor. It's clear here that Mr. Greve was confronted by several agents with their guns drawn, handcuffed, put to the ground, lifted up, taken to the police car, taken down to the police station; that's in custody. Whether he's officially under arrest, that's in custody. And then they get him down to the police station in this room, and I agree it apparently wasn't the little interrogation room we often see, but it still was a room in the police station with two officers there.
It was made clear by inference to Mr. Greve that he was not going to leave. He was there. The agents wanted to question him. They told him before they gave him his Miranda rights about the federal sentencing system, that if he cooperated, he could lessen his sentence, and to any rational person cooperation means waiving your rights,

**Page 41**

talking to the police, signing whatever they want you to sign, and that's exactly what he did.
And I think it's significant that here he is at the police station, hauled down there in handcuffs, and then they get him to say -- or at least initial a circled area on this form that he's not in custody. That indicates and shows that he was intimidated. He felt he was in custody. He was going to sign whatever they told him to sign even though they told him to sign something that said he was not in custody even though he was. So I think all that shows that the Miranda warnings were not voluntarily, intelligently waived and that any subsequent statement is not voluntary and is in violation of his rights.
THE COURT: Thank you. I find by the preponderance of the evidence that the Miranda warnings were given and were validly waived by the defendant, that the statement was a voluntary statement; in particular relying upon the testimony, of course, of Captain Egan and Agent Dasso. Government's Exhibit 1 shows the detail with which the police went through the defendant's rights, and Exhibit 2 shows a detail of information that the defendant gave up that to me is indicative of someone with some desire to cooperate. For all those reasons I believe that the defendant's motion to suppress should be denied.
I'll do a written report and recommendation

**42**

1  here in the next day or so. Thank you. We're in recess.
2       MR. TAYLOR: Your Honor, I'm sorry. I
3  thought there was going to be an arraignment at the end of
4  the Superseding Indictment.
5       THE COURT: Thank you. I forgot. Did you
6  get a copy of the Superseding Indictment?
7       MR. TAYLOR: Yes.
8       THE COURT: I'd read it verbatim unless the
9  formal reading be waived.
10      MR. TAYLOR: We'd waive that, Your Honor.
11      THE COURT: And how does he plead?
12      MR. TAYLOR: Not guilty.
13      THE COURT: Is there anything about the
14 Superseding Indictment that should change the August 16th
15 trial date?
16      MR. TAYLOR: I will plan to file a motion to
17 dismiss. I don't know how much time that's going to take to
18 resolve.
19      THE COURT: Okay. And the nature of the
20 motion, is it something that you'll demand an evidentiary
21 hearing on, or not?
22      MR. TAYLOR: Probably not. It's a legal
23 matter. The basis of the new Indictment is to try to comply
24 with Blakely, and I believe that what the Government has
25 done is charge a crime that's not a crime under any

**43**

1  congressional act.
2       THE COURT: I understand. We can resolve
3  that in the context of the time frame that we now have in
4  place.
5       MR. TAYLOR: Thank you.
6       THE COURT: Thank you.
7       (The hearing concluded at 3:23 p.m., July 22,
8  2004.)

**44**

CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter and Notary Public of the State of Iowa, do hereby certify that there came before me at the time, date, and place hereinbefore indicated, the proceedings named on the caption sheet hereof.

I further certify that the foregoing transcript is a true and correct transcript of my original stenographic notes.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and furthermore, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal this _____ day of August, 2004.

Tracy A. H. Lamp
Certified Shorthand Reporter
and Notary Public