IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA


UNITED STATES OF AMERICA,)
                        )
            Plaintiff,  )    CR 04-1008
                        )
VS.                     )    VOLUME I
                        )
RONALD GREVE,           )
                        )
            Defendant.  )

FILED
U.S. DISTRICT COURT
CEDAR RAPIDS HDQTRS OFFICE
NORTHERN DISTRICT OF IOWA

JAN 1 1 2005

By: _____ DEPUTY

APPEARANCES:

ATTORNEY TERESA BAUMANN, Assistant US Attorney,
Suite 400, 401 First Street S.E., P.O. Box
74950, Cedar Rapids, Iowa 52407-4950, appeared
on behalf of the United States.

ATTORNEY WALLACE L. TAYLOR, Suite 326, 118
Third Avenue S.E., Cedar Rapids, Iowa
52401-1408, appeared on behalf of the
Defendant.


JURY TRIAL,

held before the Hon. Linda R. Reade on the 17th

day of August, 2004, at the Federal Building,

101 First Street S.E., Cedar Rapids, Iowa,

commencing at 9:27 a.m.


Patrice A. Murray, CSR, RPR, RMR, FCRR
Federal Building
101 First Street S.E.
Cedar Rapids, Iowa 52401
(319) 286-2324

1  THE COURT: And then you would agree
2  that in the jury instructions, we should ask
3  the jury to make the determination on drug
4  quantity?
5  MR. TAYLOR: Yes, that's right.
6  THE COURT: All right. And if we do
7  that, then your motion to dismiss -- you don't
8  want to pursue your motion to dismiss; is that
9  fair to say?
10  MR. TAYLOR: Yes.
11  THE COURT: All right. Ms. Baumann,
12  what's your best thought on that? Can we do it
13  that way?
14  MS. BAUMANN: I think that's a safe
15  route. I think that reading the sentencing
16  notice may even be confusing to the jury given
17  that it cites to the sentencing guidelines, so
18  that's fine.
19  THE COURT: All right. Let's do
20  that. And at all times, let's just refer to
21  the charging document as an indictment, rather
22  than a superseding indictment, so that the jury
23  doesn't speculate as to what "superseding"
24  means or why -- I don't know if they're that
25  tuned in, but it always worries me. So let's

1  just say indictment.
2  All right. So that particular motion
3  then is withdrawn in light of the agreement
4  between the parties.
5  Now let's move on to the Defendant's
6  motion in limine, Docket 23, which has to do
7  with the tapes.
8  MR. TAYLOR: The basis of the motion,
9  Your Honor, is that after listening to the
10  tape, it's a fairly short conversation overall.
11  And I'm looking at Government Exhibit 10A, I
12  believe it is -- no, 12A, the transcript of
13  that conversation. And on page 2, toward the
14  end of the conversation, it notes "inaudible"
15  after Mr. Ruff says, "All right, sounds good."
16  If you listen to the tape, that
17  inaudible portion has a lot of noise for some
18  reason. And in the context of the lengthy
19  conversation, it's a fairly lengthy break in
20  the conversation. And it's right at a point,
21  it seems to me, where I move the Government's
22  going to argue that there was some conversation
23  about acquiring drugs or something of that
24  nature. And I think -- and we don't know what
25  the conversation was.

1  We don't know what Mr. Greve's
2  response may have been, and I think that in
3  light of the length of the total conversation,
4  the length of the break in the conversation,
5  and the point at which it occurs, that it's --
6  it's a significant omission and breaks the
7  context of the conversation inappropriately and
8  would leave the jury to speculate.
9  And in light of the Eighth Circuit
10  precedent on tape recordings, I think it -- it
11  makes the entire tape inadmissible.
12  THE COURT: Ms. Baumann?
13  MS. BAUMANN: Thank you, Your Honor.
14  Under the Bell test from United
15  States vs. Bell, the Eighth Circuit case from
16  1981, it states, as you know, that the Court
17  has discretion to determine whether a tape is
18  admissible and that the Court should look at
19  the totality of the tape to determine whether
20  the unintelligible portions are so substantial
21  as to make the tape untrustworthy.
22  In this case, as you can see from
23  looking at the exhibit that Mr. Taylor pointed
24  out, there's much conversation that's clearly
25  audible. In fact, I believe it's more audible

1  than most tapes that we receive involving
2  controlled transactions. And there's just a
3  seven-second, I believe, portion of it where
4  the equipment kind of fuzzes out, if you will,
5  where it's not audible.
6  The Government does not intend to
7  make any argument about what was said during
8  that inaudible portion. I believe it's
9  admissible in the totality, it's a trustworthy
10  tape.
11  THE COURT: All right. And if they
12  don't make any argument or try to present any
13  evidence of what happened in that seven-second
14  inaudible section, Mr. Taylor, does that
15  relieve your concerns somewhat?
16  MR. TAYLOR: No, it doesn't, Your
17  Honor. And I want to make clear, I'm not
18  suggesting that the rest of the tape is
19  inaudible or inadmissible. It's the fact that
20  there's a significant break in the tape there,
21  and I think it just leaves the jury to
22  speculate at an important point in the tape as
23  to what the conversation is. And without
24  knowing what it was, it just, I think, leaves a
25  lot of room for the jury to speculate.

1    And there may have been some
2 conversation in there that would have been
3 exculpatory, but we just don't know, and
4 without that, I think it's just improper to
5 bring in the tape when there's such a
6 significant omission.
7    THE COURT: Certainly if you want to
8 present evidence as to what happened in that
9 seven-second interval, you're free to do that.
10 You know that. I am going to allow the tape
11 in. I believe that there is enough audible --
12 there are enough audible portions of the tape
13 to provide the jury with the gist of the
14 conversation. And I will give defense counsel
15 and Defendant every opportunity they would like
16 to clear up whatever ambiguity there is during
17 that seven-second pause or machine problem.
18    All right. So the motion to exclude
19 the tape is denied.
20    Let's move then to the last motion,
21 which is the Government's motion in limine,
22 Docket 25.
23    MS. BAUMANN: Your Honor, I apologize
24 for interrupting, just to clarify, that -- the
25 order that you just gave pertains to both the

1 audiotape and the videotape?
2    THE COURT: Yes.
3    MS. BAUMANN: Thank you.
4    THE COURT: And let's move, then, to
5 Docket 25, the motion in limine filed by the
6 United States with regard to the polygraph.
7    MS. BAUMANN: Thank you, Your Honor.
8    The Government moves to exclude any
9 testimony or evidence about the polygraph exam,
10 which was administered on Shaun Ruff. Shaun
11 Ruff is not a Government witness. He will not
12 be testifying. Therefore, the Government
13 believes it's even more urgent that the
14 polygraph evidence be excluded.
15    As you know, in the Eighth Circuit,
16 it's deemed unreliable and not admissible. And
17 for that reason, we would move to exclude any
18 evidence pertaining to the polygraph.
19    THE COURT: All right. Mr. Taylor?
20    MR. TAYLOR: Thank you, Your Honor.
21    I think the fact that Mr. Ruff is not
22 testifying now does relieve some of my
23 concerns. It's going to depend on, I think, to
24 what extent the Government tries to get his
25 information or his statements in through some

1 other route. And I still may need to question
2 the officers about, you know, whether their
3 reliance on his statements is justified in
4 light of his, Mr. Ruff's, four different
5 statements that he gave and the polygraph
6 failure.
7    And I think that from my research, as
8 I've tried to set out in my brief, the Eighth
9 Circuit juris prudence on it is not exactly as
10 clear on it as it might be. But I think
11 certainly for impeachment purposes and
12 certainly to test the officer's justification
13 of relying on Mr. Ruff's statements, at this
14 point, I think it's fair game. And if we need
15 to at least indicate that Mr. Ruff did take a
16 polygraph and there were some concerns about
17 his truthfulness, I think that is relevant, if
18 the circumstances warrant that being presented
19 to the jury.
20    So I -- I guess at this point, I'm
21 not sure that the Court is able to make a final
22 ruling until we see what evidence comes in, but
23 certainly if Mr. Ruff is not testifying, I
24 think certainly the evidence is a little less
25 important.

1    THE COURT: All right. I will make a
2 ruling now, and then if something happens
3 during the course of the trial that you want me
4 to revisit it and rethink it, I'll be happy to
5 listen to your arguments outside the presence
6 of the jury at that time. But I am making the
7 ruling that the motion in limine filed by the
8 United States with reference to the polygraph,
9 Docket 25, is granted, and we will not discuss
10 or refer to, directly or indirectly, the
11 results -- or the fact that a polygraph was
12 given to Mr. Ruff and the results of that
13 polygraph.
14    And then, Mr. Taylor, if you feel
15 something comes up in the evidence that
16 suggests the Court should rethink that, let me
17 know and we'll hear some more about it.
18    All right. I will give you written
19 rulings on Exhibits 23 -- I'm sorry, Motions 23
20 and 25, and then 18 will just be shown as
21 withdrawn on our minute sheet at the clerk's
22 office in view of the agreement between the
23 parties.
24    Let's talk just a minute. I want to
25 make sure in this conspiracy that I have a

1 clear understanding of who the alleged
2 co-conspirators of Mr. Greve are. Shaun Ruff,
3 anybody else?
4     MS. BAUMANN: Other names that I
5 think will be mentioned are Bert Carner, who is
6 also a Government witness; Joe Harris; Trevor
7 Deutmeyer. I believe that's it.
8     THE COURT: All right. And only
9 Mr. Carner is going to testify?
10    MS. BAUMANN: That's correct, Your
11 Honor.
12    THE COURT: Is he testifying under a
13 cooperation agreement or what's his --
14    MS. BAUMANN: He is not, Your Honor.
15 He has no formal agreement with the United
16 States. He was prosecuted in state court in
17 2003. He was convicted and pled and served
18 some time in a halfway house. He did not enter
19 into any cooperation agreements, although he
20 did proffer with Special Agent Tyler Mower from
21 the DNE, he did cooperate and work proactively.
22 And in fact, he's still doing that in pending
23 federal cases.
24    THE COURT: Does he have an immunity
25 agreement or --

1     MS. BAUMANN: He does not, Your
2 Honor.
3     THE COURT: All right.
4     MS. BAUMANN: I have a couple more
5 things with regard to Bert Carner. He
6 testified and provided much information about
7 the Defendant's methamphetamine involvement. I
8 was surprised that there wasn't a motion in
9 limine on that.
10    The Government does not intend to get
11 into anything regarding methamphetamine due to
12 the fact that Mr. Greve is not charged with
13 anything regarding methamphetamine. I believe
14 that's something we should probably discuss at
15 pretrial and I would ask for a sidebar prior to
16 Mr. Taylor getting into anything in that realm.
17    THE COURT: All right.
18    MR. TAYLOR: Thank you, Your Honor.
19    It's my understanding from
20 Mr. Carner's grand jury testimony he did have a
21 cooperation agreement with state authorities,
22 and that was the basis on which he was giving
23 his grand jury testimony, according to the
24 grand jury testimony itself, just to clarify
25 that.

1     THE COURT: All right. So he is --
2 he has no federal immunity, he has no federal
3 agreement, but as part of his state plea
4 agreement, he agreed to cooperate with the fed,
5 is that how --
6     MS. BAUMANN: That's right. And the
7 state agreement, we have been very -- we tried
8 to find something. We've been unable to find
9 any documents which he signed. He believes it
10 was just an oral agreement with the County
11 Attorney that wasn't put down into writing, so
12 we don't have anything on paper. Although he
13 did testify, as Mr. Taylor says, that there was
14 some cooperation agreement.
15    THE COURT: I don't think that's all
16 that uncommon in state court. They don't put a
17 lot of their plea agreements in writing.
18    Mr. Taylor.
19    MR. TAYLOR: That's right. And as
20 far as the methamphetamine issue, I didn't file
21 a motion because, based on the representations
22 made in the pretrial statement, it didn't
23 appear Mr. Carner was going to testify about
24 any of that. And if he did, of course, I would
25 pop up and object. It's my understanding he's

1 just going to testify about a phone
2 conversation he had with Mr. Greve and that's
3 the extent of it.
4     THE COURT: All right. So both
5 parties are in agreement that we're not going
6 to talk about what Mr. Greve and Mr. Carner may
7 know about methamphetamine or methamphetamine
8 dealing; fair to say?
9     MS. BAUMANN: That's correct, Your
10 Honor.
11    MR. TAYLOR: Yes.
12    THE COURT: All right. Ms. Baumann,
13 you indicated you had a couple other things you
14 wanted to talk about.
15    MS. BAUMANN: With regard to Bert
16 Carner, I would ask for a sidebar if Mr. Taylor
17 intends to ask Mr. Carner about any -- any
18 cooperation he's done with regard to other
19 individuals. As I mentioned, he is the
20 confidential informant in a couple of pending
21 federal cases, and he has not been identified
22 yet as the confidential informant. So we would
23 request that that be kept confidential.
24    It's not relevant. The Government
25 doesn't believe it's relevant to this case. Of

1  course, any cooperation Bert Carner has done
2  with regard to Mr. Greve is certainly grounds
3  for cross-examination.
4  THE COURT: What's your thought,
5  Mr. Taylor?
6  MR. TAYLOR: I have no problem with
7  that, Your Honor.
8  THE COURT: All right. Very fine, so
9  we'll not talk about other cases. If something
10  happens during the course of the trial,
11  Mr. Taylor, that you feel requires that you get
12  into that in order to represent your client,
13  just ask for a sidebar and we'll step to the
14  side and talk about it.
15  Anything else, Ms. Baumann, that you
16  were thinking we ought to talk about this
17  morning?
18  MS. BAUMANN: I have a few more
19  issues, Your Honor. I intend to -- Shaun Ruff
20  is not a witness; however, I believe we should
21  somewhat discuss his name at least during voir
22  dire. His father owns a business, and his name
23  is probably pretty well-known up in the Dubuque
24  area. I don't know if you want me to list him
25  as a potential witness. I'm certainly willing

1  to do that when I'm listing my other witnesses.
2  THE COURT: I think what I usually do
3  is I ask the parties to state the names of
4  potential witnesses, or names that may come up
5  in the course of the testimony --
6  MS. BAUMANN: Okay.
7  THE COURT: -- so I think that's
8  all-inclusive. I think you can do it then.
9  MS. BAUMANN: Thank you. I will also
10  be mentioning -- Misty Kloubek from my office
11  is a legal assistant. She won't be here during
12  voir dire, but she's going to run our equipment
13  later on, so I plan to mention her, with the
14  Court's permission.
15  THE COURT: All right.
16  MS. BAUMANN: And finally, the
17  transcription software, I don't believe
18  Mr. Taylor has seen it, and actually I'd be
19  willing to show him that prior to beginning
20  with the evidence. I would like to play it, as
21  I mentioned in my trial memo, during the trial,
22  rather than handing out the paper transcripts.
23  THE COURT: All right. Why don't
24  you, Mr. Taylor, take a look at that, and if
25  there's a problem, it's really -- you just have

1  the transcript up on the screen instead of
2  handing out transcripts, right?
3  MS. BAUMANN: Yes.
4  THE COURT: Okay. And if Mr. Taylor
5  objects to that, we'll have a discussion about
6  it.
7  MR. TAYLOR: I think I've seen it
8  before, Your Honor.
9  THE COURT: And no problem?
10  MR. TAYLOR: No.
11  THE COURT: All right. And before we
12  get into the tapes, I'll give the cautionary
13  instruction about tapes and transcripts, and
14  kind of draw the jurors's attention to that.
15  MS. BAUMANN: Your Honor, one final
16  thing by the Government. Yesterday, as you
17  know, I was advised that we're going to try to
18  go until five o'clock today. One of my
19  witnesses, Agent Tyler Mower, is unable
20  physically to be here. He was in St. Louis
21  yesterday, and going to Springfield, Illinois,
22  and he will not be here until tomorrow. So I'm
23  not positive I can fill all of the space, but
24  I'll do the best I can.
25  THE COURT: All right. I appreciate

1  you trying to do that at the last minute. I
2  had a sentencing this afternoon, and we were
3  not able to apprehend the Defendant and get her
4  back here in time, so it left kind of a big
5  gap. We'll go as long as we can. We'll go
6  ahead and take a lunch break today, and that
7  will -- that will probably work out. We'll
8  probably go for a good share of the afternoon.
9  And then your witness will be tomorrow morning,
10  and then if Mr. Taylor wishes to present any
11  evidence, we'll do that tomorrow.
12  Do you know at this point,
13  Mr. Taylor, if you are going to present any
14  evidence?
15  MR. TAYLOR: Yes, we will, Your
16  Honor. And that brings up a point I was going
17  to raise with the Court.
18  THE COURT: All right.
19  MR. TAYLOR: We subpoenaed a man
20  named Marvin Kimball, and there's a possibility
21  that Mr. Kimball may choose to disobey the
22  subpoena. And I didn't know what your feeling
23  was on that.
24  THE COURT: Where does he live?
25  MR. TAYLOR: East Dubuque.

1    THE COURT: Okay. Do you -- why do
2    you think he might disobey it? Just your
3    defense attorney instincts?
4        MR. TAYLOR: That was part of it, but
5    then he actually called me yesterday afternoon
6    and said he wouldn't be here, so I can take a
7    hint.
8        THE COURT: Yeah, it sounds like --
9        MR. TAYLOR: And my concern is, you
10   know, the Government has many ways to get a
11   witness to court, but the defense has only a
12   subpoena. And if the subpoena isn't honored
13   and enforced, we're left in a bad situation.
14       THE COURT: He made the direct
15   statement to you that he would not appear?
16       MR. TAYLOR: Yes.
17       THE COURT: All right. I wonder if
18   that's enough to put a warrant out on him now.
19       MR. TAYLOR: How we left the
20   conversation was, I said, "I'm sorry, but
21   you've been subpoenaed and you need to be
22   there," and that's about the end of the
23   conversation.
24       So I guess I don't feel comfortable
25   saying he absolutely won't be here, but I

1    wanted to at least bring that to the Court's
2    attention.
3        THE COURT: Well, I'll ask my clerk
4    to let the United States Marshal's Service know
5    that we're going to be looking for Marvin
6    Kimball. And can you give me the addresses for
7    him?
8        MR. TAYLOR: 772 Harbor Drive in East
9    Dubuque.
10       THE COURT: 772 --
11       MR. TAYLOR: -- Harbor.
12       THE COURT: H-A-R-B-O-R?
13       MR. TAYLOR: Correct. And I have him
14   subpoenaed for nine o'clock tomorrow morning.
15       THE COURT: All right. Well, I would
16   say we better give the marshals a heads-up that
17   they're probably going to be over there in East
18   Dubuque looking for him. It's really an
19   undesirable situation to have to keep everybody
20   waiting while we look for these witnesses.
21       Did that happen to you and I before,
22   and it went about two days?
23       MR. TAYLOR: No, but I heard about
24   it.
25       THE COURT: Yeah, it went about two

1    days looking for this witness and then he took
2    the Fifth. So is there any indication that
3    this man has potential exposure? Should I have
4    a stand-by attorney ready for him to talk to?
5        MR. TAYLOR: I'm not aware of any. I
6    know he has a possession of marijuana charge on
7    his record or possession of some sort of drug,
8    but beyond that, I don't -- I don't have any
9    information that he is actively involved in
10   anything with -- I don't know if the Government
11   would have a better idea than I.
12       THE COURT: All right. Do you know
13   him, Ms. Baumann?
14       MS. BAUMANN: We have a little bit of
15   information. Law enforcement had a couple of
16   controlled buys on him in '99 and 2000, and he
17   does have a criminal history, as Mr. Taylor has
18   indicated. So it may be a good decision to
19   have someone ready to represent him if he is
20   apprehended by the marshals.
21       THE COURT: All right. Well, I think
22   we can take someone at their word that they're
23   not going to appear. What do you think?
24       MS. BAUMANN: I guess I -- if
25   Mr. Taylor said, you know, "You will be here,"

1    that's happened a zillion times to the
2    Government where somebody says we're not going
3    to come, and then we say, "You will," and then
4    they do show up. I would suggest waiting until
5    nine tomorrow, although that is going to
6    probably delay the trial.
7        THE COURT: All right. What we will
8    do, then, is we will have a warrant -- we'll be
9    ready to issue a warrant promptly at nine
10   tomorrow morning if he's not here, and we'll
11   have the marshals on standby to go give him a
12   ride from East Dubuque.
13       MR. TAYLOR: Thank you.
14       THE COURT: Hopefully it won't be
15   necessary. I appreciate you letting me know
16   about that problem, potential problem.
17       Anything else that the lawyers think
18   we ought to visit about before the jury comes
19   in at ten?
20       MS. BAUMANN: No, Your Honor.
21       MR. TAYLOR: Maybe I'm jumping the
22   gun, but you did fax us some proposed jury
23   instructions.
24       THE COURT: Yes.
25       MR. TAYLOR: With respect to page 22,

1  I'm not familiar with the Vinton trial, and I
2  didn't know what -- and I had no way to go and
3  find anything about that. I just had some
4  questions about that proposed instruction, and
5  I don't know if this is the time or if we
6  should do that later.
7      THE COURT: Yeah, if you and
8  Ms. Baumann don't want that extra paragraph,
9  we'll just X it out.
10      MR. TAYLOR: Well, the entire
11  instruction I have a problem with.
12      THE COURT: Oh, okay.
13      MR. TAYLOR: I just -- I think it is
14  confusing, and I guess it asks the jury things
15  that I'm not sure they need to decide, although
16  with the -- the instructions need to find a
17  specific quantity. I'm not sure how this plays
18  out. I'm not really sure, but I did have a
19  question about that instruction.
20      And then as far as the verdict form,
21  I think we're all in agreement that the jury
22  needs to decide specific quantity. I'm
23  concerned about the way the verdict form sets
24  it out with the entire table of the quantities
25  from the guidelines. And I think it might be

1  better, more clearer, simpler, for the jury,
2  and less confusing, if we just say, "Please
3  find the quantity," have a blank.
4      THE COURT: Fill in the blank.
5      MR. TAYLOR: Fill it in and leave it
6  at that, and the Court can certainly make
7  that --
8      THE COURT: That was my gut reaction
9  when I looked at it too, that it might be
10  easier just to have them have one blank and
11  they put in the amount.
12      MS. BAUMANN: I guess I would -- I
13  was just following what has been happening in
14  other trials across the country. Based on my
15  research, they've listed all of the guidelines.
16  Either way, I think it's fine probably. It
17  gives them a better idea of what ranges we're
18  looking at if we provide the whole guideline.
19      THE COURT: All right. I'll think
20  about that. And why don't you two talk about
21  the instruction at 22, and see if you can agree
22  as to how that should be changed. We have some
23  time to take a look at that and I'll look at it
24  too.
25      I think under conspiracy law, even

1  without the guidelines, a co-conspirator is
2  responsible for all the controlled substances
3  that the conspirators dealt. Even if he or she
4  was not the one who actually distributed or
5  agreed to distribute, even if the
6  co-conspirator didn't even know anything about
7  it, they're still responsible under conspiracy
8  law, so we'll take a look at that.
9      All right. And I am assuming that --
10  just for the record, I'm not trying to talk you
11  in or out of anything, but Mr. Greve, you did
12  have -- did you have a plea offer made to you
13  by the United States through your attorney?
14      THE DEFENDANT: Yes, I did.
15      THE COURT: All right. And you
16  decided not to accept that; is that so?
17      THE DEFENDANT: Right.
18      THE COURT: And you did that based on
19  your own decision after visiting with your
20  attorney, correct?
21      THE DEFENDANT: That's correct.
22      THE COURT: All right. Anything
23  else?
24      MS. BAUMANN: No, Your Honor.
25      THE COURT: All right. Why don't you

1  relax for five minutes, and the jury will be
2  here ready to go at ten, hopefully.
3      (Whereupon, the jury was impaneled
4  and opening statements were given. The
5  following was held in open court.)
6      DARRELL SIMMONS,
7  called as a witness, being first duly sworn,
8  was examined and testified as follows:
9      THE COURT: Please be seated.
10      DIRECT EXAMINATION
11  BY MS. BAUMANN:
12  Q.  Special Agent Simmons, please state your
13  name and spell your last name for the record.
14  A.  Darrell Simmons, S-I-M-M-O-N-S.
15  Q.  How are you currently employed?
16  A.  I'm a special agent with the Iowa
17  Division of Narcotics Enforcement.
18  Q.  How long have you been a special agent?
19  A.  Since November of 1999.
20  Q.  What did you do before that?
21  A.  I was a special agent with the Iowa
22  Division of Criminal Investigations.
23  Q.  And how long have you been in law
24  enforcement?
25  A.  Since 1995.

1 Q. Prior to beginning your work as a law
2 enforcement officer, did you receive training
3 at the state academy?
4 A. Yes, I did.
5 Q. And you successfully completed that
6 training?
7 A. Yes, I did.
8 Q. Have you been to specialized narcotics
9 training since that time?
10 A. Yes, I have.
11 Q. What does that entail?
12 A. I have gone through the forty-hour DEA
13 school, forty-hour clandestine lab
14 certification school, forty-hour drug
15 identification course, and -- a forty-hour drug
16 identification course.
17 Q. So you maintained all continuing
18 education requirements?
19 A. Yes, I have.
20 Q. And you're fully certified as a law
21 enforcement officer?
22 A. Yes, ma'am.
23 Q. Are you the case agent in Ronald Greve's
24 case?
25 A. Yes.

1 Q. Do you see Mr. Greve in the courtroom
2 today?
3 A. Yes, I do.
4 Q. Could you point him out and describe what
5 he's wearing?
6 A. He's sitting to my left, in a blue,
7 long-sleeve shirt.
8 MS. BAUMANN: Your Honor, may the
9 record reflect the witness has identified the
10 Defendant?
11 THE COURT: Yes.
12 MS. BAUMANN: Thank you.
13 BY MS. BAUMANN:
14 Q. Are you familiar with a person named
15 Shaun Ruff?
16 A. Yes, I am.
17 Q. What is his role in this investigation?
18 A. My partner at the time, Special Agent
19 Tyler Mower, was acting in an undercover
20 capacity and purchased narcotics from Mr. Ruff.
21 Q. Were there also controlled phone calls
22 involved?
23 A. Yes, there were.
24 Q. What are Shaun Ruff's two phone numbers
25 at that time?

1 A. His cell phone number was 5 --
2 MR. TAYLOR: Objection, Your Honor.
3 THE COURT: I'm sorry?
4 MR. TAYLOR: That's hearsay, Your
5 Honor.
6 THE COURT: Overruled.
7 A. His cellular phone number was
8 563-580-7000. And his home number was 563-773,
9 I believe it's 8651 (sic). I need to see my
10 records to verify the home number, though.
11 Q. Would it help you remember the number if
12 I showed you your records?
13 A. Yes, please.
14 MS. BAUMANN: Your Honor, may I
15 approach the witness?
16 THE COURT: Yes.
17 BY MS. BAUMANN:
18 Q. Do you now remember the number after
19 looking at your records?
20 A. Yes.
21 Q. I'll take that from you. What was that
22 number?
23 A. 773-8671.
24 Q. During the course of your career, about
25 how many drug cases have you been involved in

1 investigating?
2 A. Several hundred.
3 Q. During your involvement in those cases,
4 what was your role?
5 A. Primarily, evidence collection. We do
6 entries for search warrants, we deal with
7 confidential informants, we make controlled
8 buys, we make controlled phone calls.
9 Q. Have you ever provided grand jury
10 testimony?
11 A. Yes, I have.
12 Q. Have you previously testified as an
13 expert in state cases?
14 A. Yes, I have.
15 Q. How about federal cases?
16 A. Yes, I have.
17 Q. Have you been involved in narcotics cases
18 which involve cocaine and marijuana?
19 A. Yes, I have.
20 Q. All of those cases we've talked about,
21 what area of the world were they in?
22 A. Primarily, Northeast Iowa.
23 Q. Any outside of the state of Iowa?
24 A. No.
25 Q. Have you been involved in arrests in

1 cocaine cases?
2 A.   Yes, I have.
3 Q.   How about marijuana cases?
4 A.   Yes.
5 Q.   What is cocaine?
6 A.   Cocaine is a stimulant.  Primarily, it
7 comes in a powder form.
8 Q.   Are there other names for cocaine?
9 A.   Snow, blow, coke, those are the main
10 ones.
11 Q.   Are there scientific names for it?
12 A.   Salt of cocaine or isomers.
13 Q.   And how is cocaine ingested?
14 A.   Primarily, it is snorted, is the primary
15 way for ingesting cocaine.
16 Q.   What effect does it have on the user?
17 A.   It gives you a high.  Depending on how
18 much you use, it can last for several hours.
19 Increases your heart rate, and it can raise
20 your body temperature.
21 Q.   In Eastern Iowa, in the high end of the
22 market, what quantities of cocaine are sold at
23 one time?
24 A.   Multiple-ounce quantities.
25 Q.   And as it trickles down through the

1 market to the street-level dealer, what type of
2 quantities are involved?
3 A.   Most street dealers are dealing anywhere
4 from quarter gram up to maybe a couple grams to
5 an 8 ball size.  An 8 ball would be 3 and a
6 half grams.
7 Q.   And what type of quantities would a drug
8 user typically purchase?
9 A.   Most users are going to typically
10 purchase quarter grams, again, up to possibly
11 an 8 ball, which is 3 and a half grams.
12 Q.   What is marijuana?
13 A.   Marijuana is a depressant.  It's a plant.
14 Also can refer to it as cannabis.  And it is
15 smoked.
16 Q.   What -- are there other names for
17 marijuana?
18 A.   Weed, whacky tobacco.  There's several
19 street names for it.
20 Q.   Are there other methods of use other than
21 the smoking you already referred to?
22 A.   Smoking is the primary way.
23 Q.   And what effect does marijuana use have
24 on a user?
25 A.   It's a depressant.  It slows down your

1 thinking process, your reaction time.  Users
2 often refer to it -- it gives them the
3 munchies.  They get really hungry after a
4 while.
5 Q.   What type of quantities would drug
6 dealers sell at the high end of the market here
7 in Eastern Iowa?
8 A.   Multiple-pound quantities.
9 Q.   As it trickles down through the market,
10 what would the street-level dealer sell?
11 A.   Maybe dime bags, up to an ounce.
12 Q.   What is a dime bag?
13 A.   It's just a small amount of marijuana
14 that you can buy for $10.  It's basically one
15 or two uses worth of marijuana.
16 Q.   And so a drug user, a marijuana user,
17 might purchase that quantity as well?
18 A.   Correct.
19 Q.   What does a pound of cocaine look like?
20 A.   If it comes in a brick form, it's about
21 the size of a romance novel, maybe a little bit
22 larger than a romance novel.
23 Q.   How about a pound of marijuana?
24 A.   Again, it would be a little bit larger,
25 because it's not packed quite so tight, so

1 maybe like the Old Testament Bible, a little
2 larger.
3 Q.   And is it always in the compact form?
4 A.   No.  Sometimes it -- the marijuana can be
5 all leafed out, and it can be rather large.  It
6 can take up like a full gallon-size Ziploc bag.
7 Q.   In Eastern Iowa, how much would a person
8 typically pay for a pound of marijuana?
9 A.   An average cost would be about $1,000.
10 Q.   How about a pound of cocaine?
11 A.   Depending on the source and how close
12 they were, it could be anywhere from 5 to 7
13 thousand dollars for a pound.
14 Q.   What do you mean, depending on how close
15 they were to the source?
16 A.   As drug distributors sell to other
17 people, they have to make money.  So an
18 individual who is buying a pound of cocaine in,
19 say, California, that's the primary source
20 state, they may be able to buy it for 4 or 5
21 thousand dollars there.  However, to transport
22 it to the Midwest, they're going to incur not
23 only gas but whatever it takes to get here, but
24 also the risk of getting it here.  So by the
25 time it makes it from California to the Midwest

1 here in Iowa, they're going to charge more for
2 it than you would, say, in California.
3      So depending on how close you are to
4 the source is going to determine part of how
5 much you're paying for the cocaine.
6 Q.   And these quantities of drugs are
7 packaged for distribution. You mentioned a
8 Ziploc baggie. Is that the typical method of
9 packaging?
10 A.   For larger quantities, yes.
11 Q.   Are there any other purposes of packages
12 that you've seen used?
13 A.   Oftentimes, they will try to disguise the
14 drugs by wrapping them in tin foil to try to
15 cover up the smell. So if an individual would
16 get stopped by law enforcement, if there was a
17 drug dog in the area, they would try to cover
18 up the smell by wrapping it up in other
19 containers to try to conceal the smell.
20 Q.   How would a quantity of drugs be packaged
21 for -- at the user end of the distribution
22 chain?
23 A.   Oftentimes, they're still referred to as
24 Ziploc bags, but they're very small bags, maybe
25 one-by-one or one-by-two inch in diameter.

1 Other times they'll take a plastic Ziploc
2 sandwich bag and then tie up the corners of it.
3 Q.   And during the course of your career,
4 have you been involved in arresting drug users?
5 A.   Yes, I have.
6 Q.   How many times, approximately?
7 A.   Several hundred times.
8 Q.   Can you describe what items are commonly
9 associated with those arrests?
10 A.   Users often have some type of
11 paraphernalia. And paraphernalia would be
12 items used to ingest the drugs. Such as
13 marijuana, they may have a pipe on them. If
14 it's cocaine or methamphetamine, they may have
15 a snort tube, or they may have some other type
16 of glass pipe that they use to smoke
17 methamphetamine. And sometimes they have
18 large quantities of cash, and sometimes they
19 don't.
20 Q.   And you've been involved in arrests
21 involving drug dealers?
22 A.   Yes, I have.
23 Q.   How many times typically -- or excuse me,
24 approximately?
25 A.   Seventy-five to a hundred times.

1 Q.   What type of items are found typically
2 during those arrests?
3 A.   Oftentimes, we find scales. Scales are
4 used to weigh out the drugs before they sell
5 them. Also packaging materials, as I described
6 earlier, the small Ziploc bags, maybe large
7 quantities of sandwich bags that have the
8 corners missing out of them. Those are
9 typical, most common ways of distributing.
10 Q.   Do you ever find cash?
11 A.   Yes.
12 Q.   How about weapons?
13 A.   Yes.
14 Q.   Do drug dealers ever possess the drug
15 paraphernalia that you've discussed?
16 A.   Yes. A lot of drug dealers are often
17 drug users, and sometimes they'll pass the cost
18 on to their customers so they get their drugs
19 for free.
20 Q.   What types of places in the community are
21 typically used to distribute drugs?
22 A.   Everywhere. It happens in parking lots.
23 It happens in people's residences. It happens
24 in bars, restaurants, virtually anywhere.
25 Q.   What's the most common method of payment

1 for drugs?
2 A.   Cash. Usually people take cash in trade
3 for the narcotics. Other times they can trade
4 other personal things, like stereo equipment
5 and stuff like that.
6 Q.   How do drug dealers typically communicate
7 with each other?
8 A.   Phones and cellular phones are very
9 popular.
10 Q.   How do drug dealers typically identify
11 themselves?
12 A.   Many of them have street names.
13 Sometimes they will only go by a first or a
14 last name, because they don't necessarily want
15 the other person to know too much about them.
16 They like to keep their identity somewhat
17 concealed, so oftentimes they'll just use a
18 first name, a last name, or a street name.
19 Q.   You previously mentioned confidential
20 informants. What is a confidential informant?
21 A.   A confidential informant is someone who
22 is cooperating with law enforcement. They can
23 be doing it for a couple of reasons. They can
24 be doing it for consideration of charges that
25 they may be facing. And some people will -- if

1    they know somebody else is dealing drugs, they
2    may do it and help us with the case and then
3    they get paid in cash for helping us.
4    Q.    You also mentioned controlled
5    transactions.  What is that?
6    A.    That is where the cooperating individual,
7    he'll come in, he'll meet with law enforcement,
8    they are briefed, their person is searched to
9    make sure they don't have any drugs on their
10   person so they can't set up a person, they
11   don't have large sums of cash on their person,
12   anything like that.  They are searched and they
13   are then given a body transmitter to allow law
14   enforcement to listen to the conversation.
15         Once that is done, oftentimes a
16   recorded phone call is made by the cooperating
17   individual to said target.  The arrangement is
18   made.  Sometimes the cooperating individual can
19   drive themselves; other times, they are driven
20   there by law enforcement, if they are going to
21   someone's house or a public meeting place.
22         Once that is done, the whole
23   conversation between the cooperating individual
24   and the target is recorded by law enforcement.
25         Once the transaction is completed,

1    the cooperating individual will return back
2    with law enforcement, provide the substances
3    purchased, and any money that may be left over
4    would again be returned to law enforcement,
5    through -- a body transmitter is recovered from
6    the cooperating individual, and then the person
7    again is searched to make sure that no
8    contraband is being hidden on their person.
9    Q.    Can a controlled transaction occur
10   without a confidential informant?
11   A.    Yes, it can.
12   Q.    How does that happen?
13   A.    A lot of times an undercover law
14   enforcement officer will do the same thing as a
15   cooperating individual, except they are not
16   searched.  But they will wear a body
17   transmitter, and they are also given money to
18   buy the drugs with.
19   Q.    And tell me more about that money, how is
20   that handled in a controlled transaction?
21   A.    We provide the currency.  Whether it's an
22   undercover agent or a cooperating individual,
23   we provide the money.  We document the
24   currency, list whether we use hundred dollar
25   bills, fifty dollar bills.  We write down the

1    serial numbers and the dates, and that money is
2    then given to either the agent or the
3    cooperating individual.
4          And the purpose for that is later on,
5    if the person is arrested or a search warrant
6    is executed, if we go through their belongings
7    and we find large sums of currency, we can go
8    back and check that currency that is in the
9    target's possession with currency that we've
10   used to buy narcotics from them.  And that ties
11   them to the drug transaction, the drug trade.
12   Q.    And you mentioned recorded telephone
13   calls.  Is there a certain telephone that's
14   often used when you make controlled calls with
15   confidential informants?
16   A.    We have a phone in our office that we
17   primarily use.  Oftentimes, we're out in the
18   field, so sometimes we have to substitute our
19   cell phones.  But primarily we try to use a
20   phone that's located in our office, and that
21   phone is recorded.
22   Q.    Do you know the phone number on that
23   phone?
24   A.    Not off the top of my head, no.
25   Q.    If I showed you your reports, would it

1    refresh your recollection?
2    A.    Yes.
3    Q.    After having looked at your report, is
4    your recollection refreshed?
5    A.    Yes, the number was 563-556-4413.
6    Q.    During this investigation, did you have
7    an opportunity to investigate the Defendant's
8    employment records?
9    A.    Yes, we did.
10         MS. BAUMANN:  Your Honor, may I read
11   a stipulation into the record?
12         THE COURT:  Yes.
13         MS. BAUMANN:  "United States versus
14   Ronald Greve.  Parties' stipulation regarding
15   admissibility of Workforce Development records.
16         "United States of America and the
17   Defendant, Ronald Greve, stipulate and agree
18   that the following facts are true and may be
19   considered by the Court and the jury without
20   further evidence or testimony being offered:
21         "One, Jan Mertz, who is employed as a
22   Workforce advisor with the Iowa Workforce
23   Development, an agency of the State of Iowa,
24   Des Moines, Iowa, provides and maintains
25   records of employment in the State of Iowa.

1    Ms. Mertz generated a report using Ronald

2    Greve's social security number.

3         "Two, the report is an admissible

4    business record pursuant to Federal Rules of

5    Evidence 803(6) and 902(11). The report dated

6    August 5, 2004, is attached hereto."

7         It is signed by all parties and dated

8    on today's date.

9         Your Honor, pursuant to the

10   stipulation, may I publish the records to the

11   jury?

12        THE COURT: Yes.

13   BY MS. BAUMANN:

14   Q.   Special Agent Simmons, I am placing

15   page 1 of Government Exhibit 17 onto the

16   overhead projector. What does this document

17   show?

18   A.   **These are the detailed wage information**

19   **on Mr. Ron Greve.**

20   Q.   And how much does it show that he earned

21   in 2001?

22   A.   **For the fourth quarter in 2001, it**

23   **indicates that he made $77.22.**

24   Q.   And who did he work for?

25   A.   **APAC Customer Services, Incorporated.**

1    Q.   Placing page 2 of that document on the

2    overhead projector, what does this page show?

3    A.   **Again his wage information. This would**

4    **be from the second quarter of 2002. His wages**

5    **indicated that he made $15, and that he worked**

6    **for Miracle Dubuque.**

7    Q.   Placing page 3 on the projector, what

8    does that document show?

9    A.   **His wage information again. This would**

10   **be for the third quarter, 2002. His wages were**

11   **$110.25, and his employer was Tandem Tire and**

12   **Auto Service.**

13   Q.   And finally, page 4 of the document

14   that's Government Exhibit 17, what does that

15   show?

16   A.   **This is the final page of his wage**

17   **information. This would cover the fourth**

18   **quarter of 2002 and the first quarter of 2003.**

19   **The fourth quarter of 2002, it's a little**

20   **blurry. I believe it's $196.98. And the first**

21   **quarter of 2003 is $55.36 when he worked for**

22   **Genesco, Incorporated.**

23        MS. BAUMANN: Your Honor, pursuant to

24   the parties' stipulation, the Government moves

25   to admit Government Exhibit 17.

1         MR. TAYLOR: May we approach the

2    bench just a moment, Your Honor?

3         THE COURT: Yes.

4         (The following was held out of the

5    presence of the jury at a sidebar.)

6         MR. TAYLOR: I just wanted to make it

7    clear, I have no problem with the foundation,

8    but we have a relevancy objection. I don't

9    mean to misstate the stipulation. I didn't

10   think I did.

11        THE COURT: Okay.

12        MR. TAYLOR: We just waived the

13   business records.

14        THE COURT: All right. You can make

15   the objection now, if you want to, and I'll

16   rule on it.

17        MR. TAYLOR: All right. I would make

18   my objection based on relevancy.

19        THE COURT: Overruled.

20        MR. TAYLOR: Okay.

21        (The following was held in open

22   court.)

23        THE COURT: Exhibit 17 is received in

24   evidence.

25        (Whereupon, Exhibit No. 17 was

1    received.)

2    BY MS. BAUMANN:

3    Q.   Special Agent Simmons, during your years

4    as a drug investigator, have you had an

5    opportunity to interview any suspects?

6    A.   **Yes, I have.**

7    Q.   Approximately how many interviews have

8    you conducted?

9    A.   **Approximately seventy-five to a hundred.**

10   Q.   And are all those formal interviews?

11   A.   **No, not all of them.**

12   Q.   What does that mean?

13   A.   **A lot of times we'll just interview**

14   **someone there on the scene who may have some**

15   **minor information about things that may have**

16   **happened at a residence or people they're**

17   **involved with.**

18   Q.   During the course of your interviews, has

19   a suspect ever voluntarily admitted that they

20   were involved in drug dealing?

21   A.   **Yes.**

22   Q.   Is it a common or uncommon occurrence?

23   A.   **It's a very common occurrence for someone**

24   **who is caught with narcotics or large sums of**

25   **money to admit to their illegal activities.**

1  Q.   Thank you.
2       MS. BAUMANN:  No further questions at
3  this time, Your Honor.
4       THE COURT:  Cross-examination.
5       MR. TAYLOR:  Thank you.
6       CROSS-EXAMINATION
7  BY MR. TAYLOR:
8  Q.   You talked about cooperating individuals.
9  And basically, for those facing federal
10 charges, cooperation can reduce their sentence;
11 can it not?
12 A.   **Yes, sir, it can.**
13 Q.   And it's correct that only the Government
14 or the US Attorney's Office can make a motion
15 for reduction in sentence; is that your
16 understanding?
17 A.   **That is correct.**
18 Q.   Thank you.
19      MR. TAYLOR:  That's all the questions
20 I have, Your Honor.
21      THE COURT:  Ms. Baumann, anything
22 else?
23      MS. BAUMANN:  Nothing further, Your
24 Honor.
25      THE COURT:  Thank you, sir.  You may

1  step down.
2       MS. BAUMANN:  United States calls
3  Jackson County Sheriff's Deputy Steve
4  Schroeder.
5       THE COURT:  Hello, sir.  Please raise
6  your right hand.
7       STEVE SCHROEDER,
8  called as a witness, being first duly sworn,
9  was examined and testified as follows:
10      THE COURT:  Please come to the
11 witness stand.
12      DIRECT EXAMINATION
13 BY MS. BAUMANN:
14 Q.   Officer Schroeder, please state and spell
15 your name for the record.
16 A.   **Steve Schroeder, S-C-H-R-O-E-D-E-R.**
17 Q.   How are you currently employed?
18 A.   **By the Jackson County Sheriff's Office.**
19 Q.   And are you on a task force?
20 A.   **Yes, I am, the Bear Creek Narcotics Task**
21 **Force.**
22 Q.   How long have you been with the Sheriff's
23 Office?
24 A.   **Fifteen years.**
25 Q.   How about the task force?

1  A.   **Nine years.**
2  Q.   How long have you been a law enforcement
3  officer?
4  A.   **Fifteen years with the Sheriff's**
5  **Department in Jackson County, and I was a**
6  **military policeman three years prior to that**
7  **for the United States Army.**
8  Q.   Prior to beginning your work as a law
9  enforcement officer, were you trained at the
10 state academy?
11 A.   **Yes, I was.**
12 Q.   And did you also receive military
13 training?
14 A.   **Yes, I did.**
15 Q.   You successfully completed both of those
16 trainings?
17 A.   **Yes, I did.**
18 Q.   Have you been to specialized narcotics
19 training since that time?
20 A.   **Yes, I have.**
21 Q.   And have you maintained all continuing
22 education requirements?
23 A.   **Yes, I have.**
24 Q.   Were you involved in the investigation of
25 Ronald Greve?

1  A.   **Yes, I was.**
2  Q.   Do you see him in the courtroom today?
3  A.   **Yes, I do.**
4  Q.   Could you point him out and describe what
5  he's wearing.
6  A.   **It would be the gentleman to the left of**
7  **the attorney in the suit.  He's wearing a**
8  **long-sleeve, blue pinstripe shirt.**
9       MS. BAUMANN:  Your Honor, may the
10 record reflect the officer has identified the
11 Defendant?
12      THE COURT:  Yes.
13      MS. BAUMANN:  Thank you.
14 BY MS. BAUMANN:
15 Q.   Officer Schroeder, when did your
16 investigation of the Defendant begin?
17 A.   **July 24 of 2002.**
18 Q.   Were there also -- were there controlled
19 transactions in this case?
20 A.   **Yes, there were.**
21 Q.   How many of them?
22 A.   **There were six controlled transactions**
23 **and one controlled cash delivery.**
24 Q.   When did those transactions occur?
25 A.   **The first one, July 24 of 2002; the**

1  second one, August 19, 2002; the third one,
2  August 29 of 2002; the fourth one, October 5,
3  2002; the fifth one, November 20 -- correction,
4  November 19 of 2002; and the sixth transaction
5  was December 12 of 2002.
6  Q.    Did something also occur on December 13?
7  A.    Yes. On December 13 of 2002, there was a
8  controlled cash delivery.
9  Q.    Who were involved in all of these
10  transactions you've told us about?
11  MR. TAYLOR: Your Honor, I'm going to
12  object to any testimony or evidence regarding
13  any transactions prior to December 13 on the
14  basis of foundation, relevancy, speculation,
15  and also violation of Rule 403.
16  THE COURT: All right. I'll hear
17  from the lawyers outside the presence of the
18  jury. Come to sidebar, please.
19  Mr. Greve, you can come forward.
20  (The following was held out of the
21  presence of the jury at a sidebar.)
22  MS. BAUMANN: Your Honor, the
23  Government intends to tie this up at the end.
24  I would ask that you make a preliminary ruling,
25  if anything, and make a final ruling at the end

1  of the Government's case.
2  We believe that the transactions that
3  did not directly involve Mr. Greve will be tied
4  up. His co-conspirators were involved. He is
5  charged with a cocaine and marijuana
6  conspiracy. And these transactions were all
7  extremely relevant to that conspiracy.
8  MR. TAYLOR: Your Honor, I think at
9  this point there's no evidence that Mr. Greve
10  had any involvement or even knew anything about
11  the prior transactions; that they were before
12  even -- the Government's evidence, as I
13  understand it, it was before Mr. Greve even
14  knew Shaun Ruff, and so, therefore, it's
15  irrelevant and there's no foundation for it,
16  without Mr. Ruff testifying.
17  MS. BAUMANN: The law in the Eighth
18  Circuit, as I understand it, is that the
19  Defendant doesn't have to have knowledge about
20  the conspiracy members or the specific acts
21  that take place prior to his entering into the
22  agreement so long as there's one conspiracy
23  member and he later joins the conspiracy
24  voluntarily.
25  THE COURT: But what would be the

1  relevance of these -- well, I think I'm going
2  to send the jury out. I think this is going to
3  be a long conversation, so let's just go back
4  to our chairs.
5  (The following was held in open
6  court.)
7  THE COURT: Members of the jury, this
8  looks like a long conversation that I need to
9  have on an objection made, so I'm going to let
10  you go back and have a little early break this
11  afternoon. Why don't you plan on coming back
12  to the courtroom at three o'clock, and enjoy
13  your break.
14  Please remember the admonitions of
15  the Court, and we'll see you in just a few
16  minutes.
17  (Whereupon, the jury exited the
18  courtroom.)
19  THE COURT: We're outside the
20  presence of the jury for the purpose of
21  discussing this issue more completely.
22  Mr. Greve is personally present, of course, as
23  he has been at all sidebars with his counsel,
24  Mr. Taylor.
25  All right. We were talking about

1  these controlled transactions. Who was
2  involved in these original transactions that
3  were in 2002?
4  MS. BAUMANN: The first couple, the
5  first three, actually, transactions involve Ed
6  Michel, who was a confidential informant, and
7  Shaun Ruff. Ruff was obviously selling to
8  Michel. The latter transactions involved --
9  one of them involved Michel and undercover
10  agent Tyler Mower, who will be testifying
11  tomorrow, and Shaun Ruff. And the Defendant
12  was involved on December 13, 2002.
13  THE COURT: All right. And the
14  Government's position is that Defendant joined
15  an ongoing drug conspiracy that had originated
16  back in 2002. I think your indictment charges
17  that the conspiracy actually went back as far
18  as 2001.
19  MS. BAUMANN: That's correct, Your
20  Honor.
21  THE COURT: All right. Mr. Taylor.
22  MR. TAYLOR: Thank you, Your Honor.
23  I don't think conspiracy law extends
24  that far. I think it has to be something that
25  Defendant would be reasonably expected to know

1 about. And the evidence, as I understand it
2 was going to be, is that at the very most,
3 Mr. Greve didn't even know Shaun Ruff until the
4 latter part of October of 2002.
5 There's -- there's no evidence that
6 Mr. Greve had anything to do with any of the
7 transactions, other than the one on the 13th.
8 Even if Agent Mower testifies about the last
9 two or three that he was involved in, there's
10 no evidence that Mr. Greve was involved in any
11 of those except perhaps the December 12, at
12 most. And it just seems to me that the lack of
13 foundation, particularly without anybody who
14 was involved in the transactions in the first
15 three or four, the relevance, to something that
16 there's no connection to Mr. Greve about, the
17 jury would have to speculate on the
18 Government's argument that somehow Mr. Greve
19 was involved in those earlier transactions.
20 And I think finally, on the basis of
21 Rule 403, we've got extremely prejudicial
22 information here or evidence with very little
23 relevance or admissible basis, and so I think
24 it should not come in.
25 THE COURT: Was Agent Schroeder

1 involved in these transactions? Was he
2 personally present?
3 MS. BAUMANN: He was in the first
4 two, Your Honor, and those are the only two
5 he's going to testify about in any detail. The
6 latter ones, Special Agent Mower is going to
7 testify about and present the bulk of the
8 evidence regarding those.
9 MR. TAYLOR: My understanding, Your
10 Honor, is Officer Schroeder was not actually
11 personally involved in the first two, was he?
12 He was just --
13 MS. BAUMANN: He was the handler of
14 the confidential informant in both of those, so
15 he was present, although not face-to-face with
16 Shaun Ruff.
17 THE COURT: All right. And so all he
18 can testify to is that someone went in, they
19 were -- they were searched, they went in, they
20 came out with drugs?
21 MS. BAUMANN: Essentially, Your
22 Honor, yes.
23 THE COURT: I'm going to
24 conditionally admit it and let the Government
25 get into this. If they are unable to tie these

1 transactions to the conspiracy, then I will
2 entertain a motion to strike that evidence and
3 tell the jurors to disregard it at the close of
4 the Government's case. But I'll allow it to
5 come in.
6 All right. Let's go ahead and take
7 our break, then, until three o'clock when the
8 jury comes back, and I'll overrule the
9 objection, then we'll pick it up. Let's have
10 the witness in the stand at three, then, and be
11 ready to go.
12 (Whereupon, a brief recess was
13 taken.)
14 THE COURT: We're ready to continue
15 with the case of *United States of America*
16 *versus Ronald Greve*. Agent Schroeder is on the
17 stand, and he is on direct examination, still
18 under oath.
19 There was an objection made, and the
20 objection is overruled.
21 And you may proceed, Ms. Baumann.
22 MS. BAUMANN: Thank you.
23 BY MS. BAUMANN:
24 Q. Officer Schroeder, prior to the break,
25 you listed several transactions which occurred

1 in this case; is that correct?
2 A. Correct.
3 Q. Who were involved in those transactions?
4 A. Members of the Bear Creek Narcotics Task
5 Force, confidential informant Michel, Shaun
6 Ruff.
7 Q. Who is Ed Michel?
8 A. He would be the informant who actually
9 made the transactions with Mr. Ruff.
10 Q. And who is Mr. Ruff?
11 A. Mr. Ruff would be the individual that the
12 narcotics were purchased from.
13 Q. And what does Shaun Ruff have to do with
14 the Defendant?
15 MR. TAYLOR: Objection, Your Honor,
16 calls for speculation; no foundation.
17 THE COURT: I'll sustain it and ask
18 you to ask another question.
19 BY MS. BAUMANN:
20 Q. Were you involved in the transactions
21 which occurred -- the transaction, excuse me,
22 which occurred on July 24 of 2002?
23 A. Yes, I was.
24 Q. What was your role in that transaction?
25 A. I was the case agent.

1  Q.    And what does that mean?

2  A.    That means I'm in charge of the

3  confidential informant, in this case,

4  Mr. Michel. I'm in charge of lining up

5  officers, making sure surveillance is done,

6  that the individual is patted down, he's

7  searched, his vehicle's searched, the currency

8  is documented that we use during the

9  transaction. When the transaction is

10  completed, I take the narcotics from the

11  confidential informant, get a statement from

12  the informant, and do my paperwork.

13  Q.    So what happened on July 24 of 2002?

14  A.    Members of the Bear Creek Narcotics Task

15  Force purchased one-half pound of narcotics

16  from Shaun Ruff.

17  Q.    And who did that, which person?

18  A.    Ed Michel.

19  Q.    How much was paid for the marijuana?

20  A.    I'm thinking $575.

21  Q.    Where did the transaction occur?

22  A.    It occurred in the old school parking lot

23  in St. Donatus, Jackson County, Iowa.

24        MS. BAUMANN: May I approach, Your

25  Honor.

1        THE COURT: Yes.

2  BY MS. BAUMANN:

3  Q.    Officer Schroeder, I'm showing you what

4  has been marked as Government Exhibit 1. Do

5  you recognize that?

6  A.    Yes, I do.

7  Q.    What is it?

8  A.    This would be the one-half pound of

9  marijuana purchased on July 24, 2002.

10  Q.    And other than having been repackaged by

11  the laboratory, is it in the same condition as

12  it was in when you took it into custody on

13  July 24, 2002?

14  A.    Yes.

15        MS. BAUMANN: Your Honor, Government

16  moves to admit Government Exhibit 1.

17        MR. TAYLOR: We object, Your Honor,

18  on the basis previously urged; foundation,

19  relevance, speculation, and Rule 403.

20        THE COURT: All right. And the Court

21  will admit it conditionally.

22        (Whereupon, Exhibit No. 1 was

23  received conditionally.)

24  BY MS. BAUMANN:

25  Q.    Agent Schroeder, were you involved in the

1  investigation of -- or the transaction which

2  occurred on August 19 of 2002?

3  A.    Yes, I was.

4  Q.    What was your role that day?

5  A.    I was the case agent, once again.

6  Q.    So your duties were the same as on the

7  24th of July?

8  A.    Yes, they were.

9  Q.    And what happened on that day?

10  A.    On that date, members of the Bear Creek

11  Narcotics Task Force purchased 1 pound of

12  marijuana from Shaun Ruff.

13  Q.    And who was involved in purchasing it?

14  A.    Ed Michel.

15  Q.    How much was paid?

16  A.    For the marijuana?

17  Q.    Yes.

18  A.    Approximately $1200.

19  Q.    And where did that transaction take

20  place?

21  A.    The old school parking lot in

22  St. Donatus, Jackson County, Iowa.

23        MS. BAUMANN: Your Honor, may I

24  approach the witness?

25        THE COURT: Yes.

1  BY MS. BAUMANN:

2  Q.    Showing you what has been marked as

3  Government Exhibit 2. Do you recognize that?

4  A.    Yes, I do.

5  Q.    What is it?

6  A.    This would be the 1 pound of marijuana

7  purchased from Shaun Ruff.

8  Q.    And other than having been repackaged by

9  the laboratory, is it in the same condition as

10  it was in when you received it on August 19 of

11  2002?

12  A.    Yes.

13        MS. BAUMANN: Your Honor, Government

14  moves to admit Government Exhibit 2.

15        MR. TAYLOR: Objection, Your Honor,

16  on the same basis as Exhibit 1.

17        THE COURT: All right. Same ruling.

18  It's conditionally admitted.

19        (Whereupon, Exhibit No. 2 was

20  received conditionally.)

21  BY MS. BAUMANN:

22  Q.    Officer Schroeder, during the

23  transactions you've just described on July 24

24  and August 19 of 2002, did you and other

25  officers use standard procedures in conducting

1  those controlled transactions?
2  **A.  Yes, we did.**
3  **Q.  Were you involved in the transaction**
4  **which occurred on December 12 of 2002?**
5  **A.  Yes, I was.**
6  **Q.  What was your role on that day?**
7  **A.  Along with other agents, my role was part**
8  **of the takedown team and surveillance report.**
9  **Q.  What do you mean, part of the takedown**
10 **team?**
11 **A.  On December 12, when that transaction**
12 **occurred, we had a large number of people for**
13 **safety reasons.  We had an arrest team**
14 **basically or a takedown team to -- once the**
15 **transaction was to the point of apprehending**
16 **the individual and detaining him, I was on that**
17 **team that actually detained.**
18 **Q.  And who was the individual who was**
19 **detained?**
20 **A.  Mr. Ruff, Shaun Ruff.**
21 **Q.  What happened following the transaction?**
22 **A.  Shaun Ruff was Mirandized and**
23 **interviewed.**
24 **Q.  And what did you do after the**
25 **transaction?**

1  **A.  I patted down Mr. Ruff.  Mr. Ruff was**
2  **visibly shaken.  He was upset, crying, and I**
3  **attempted to calm him down, and eventually**
4  **interviewed him in the front seat of his**
5  **vehicle.**
6  **Q.  And what happened following the**
7  **interview?**
8  **A.  He was Mirandized and I told Mr. Ruff**
9  **that we were seeking his cooperation to further**
10 **our investigation.  Mr. Ruff stated that he**
11 **wished to cooperate --**
12 MR. TAYLOR:  Objection, Your Honor,
13 hearsay.
14 THE COURT:  Do you agree it's
15 hearsay?
16 MS. BAUMANN:  Yes, I do, Your Honor.
17 THE COURT:  All right.  Does any
18 exception apply?
19 MS. BAUMANN:  I don't believe so,
20 Your Honor.
21 THE COURT:  All right.  Then the last
22 part of the answer as to what someone may have
23 said is stricken and will be disregarded by the
24 jury.
25 You may ask another question.

1  MS. BAUMANN:  Thank you.
2  BY MS. BAUMANN:
3  **Q.  What happened following the interview**
4  **that evening?**
5  **A.  A consent to search was performed at**
6  **Mr. Ruff's residence, and --**
7  **Q.  What happened following the search?**
8  **A.  After the search, Mr. Ruff was requested**
9  **to go down to the Bellevue Police Department**
10 **for a more in-depth interview.**
11 **Q.  And what happened after that interview?**
12 **A.  Mr. Ruff, after the interview,**
13 **subsequently placed a telephone call.**
14 **Q.  What was your role in that telephone**
15 **call?**
16 **A.  I monitored the telephone call.  My**
17 **telephone, my cellular telephone, was utilized**
18 **during the recorded phone call.**
19 **Q.  And what was the number on your**
20 **telephone?**
21 **A.  My telephone number is area code**
22 **563-357-2761.**
23 **Q.  What does it mean that you "monitored the**
24 **call"?**
25 **A.  The phone number that was dialed -- I**

1  used my cell phone, and I dialed the number
2  that was to be called, hooked up the recording
3  device, and then handed the cell phone to Mr.
4  Ruff.
5  **Q.  What time, approximately, did that phone**
6  **call take place?**
7  **A.  1:26 a.m.**
8  **Q.  And that was on what date?**
9  **A.  That would have been December 13, 2002.**
10 **Q.  Who dialed the phone number from your**
11 **phone?**
12 **A.  I did.**
13 **Q.  And what number did you dial?**
14 **A.  Area code 563-495-5614.**
15 MS. BAUMANN:  Your Honor, may I
16 approach the witness?
17 THE COURT:  Yes.
18 BY MS. BAUMANN:
19 **Q.  Showing you what has been marked as**
20 **Government Exhibit 10 and Government Exhibit**
21 **10A, do you recognize those items?**
22 **A.  Yes, I do.**
23 **Q.  What is Government Exhibit 10?**
24 **A.  Government Exhibit 10 would be a CD of**
25 **the first phone call placed to that telephone**

1 number.

2 Q. And that's a phone call you've just

3 described?

4 A. Yes, it is.

5 Q. How do you know that CD contains that

6 phone call?

7 A. I listened to this CD, Call Number 1, and

8 I initialed the exterior casing and the CD

9 itself with my initials that I listened to it.

10 Q. Have there been any changes, additions,

11 or deletions made to the CD since the

12 conversation was recorded?

13 A. No.

14 Q. Was the recording preserved in a specific

15 manner?

16 A. Yes.

17 Q. And what manner was that?

18 A. The recording was taped onto an audio

19 cassette tape and held in evidence.

20 Q. Were the tabs broken out of that tape?

21 A. Yes, they were.

22 Q. What is the item that has been marked as

23 Government Exhibit 10A?

24 A. A transcript. Conversation that took

25 place that evening at 1:26 a.m.

1 Q. Does it accurately reflect the names of

2 the speakers on the CD that has been marked as

3 Government Exhibit 10?

4 A. Yes.

5 Q. Does it accurately reflect the

6 conversation that took place?

7 A. Yes.

8 MS. BAUMANN: Government moves to

9 admit Government Exhibit 10 and 10A into

10 evidence?

11 MR. TAYLOR: Objection, Your Honor,

12 foundation and hearsay.

13 THE COURT: All right. 10 is

14 admitted. 10A is, I'm assuming, is just a

15 demonstrative exhibit, you're not asking that

16 it be admitted into evidence?

17 MS. BAUMANN: Just for demonstrative

18 purposes, Your Honor, thank you.

19 THE COURT: All right. And by that I

20 mean, it will not go back to the jury. Just

21 those that are admitted go to the jury.

22 MS. BAUMANN: May I publish

23 Government Exhibit 10 to the jury by using the

24 transcription software?

25 THE COURT: Yes. I want to give the

1 jurors a little instruction before we hear the

2 tape and look at the transcript.

3 Members of the jury, you are about to

4 hear an audio recording of a conversation. The

5 conversation was legally recorded and you may

6 consider the recording just like any other

7 evidence. The recording will be accompanied by

8 a typed transcript, which will be projected up

9 on the screen as the tape plays.

10 The transcript undertakes to identify

11 the speakers engaged in the conversation. You

12 will be permitted to view the transcripts for

13 the limited purpose of helping you follow the

14 conversation as you listen to the audio

15 recording and also to help you keep track of

16 the speaker or speakers.

17 The transcript, however, is not

18 evidence. An audio recording itself is the

19 primary evidence of its own contents.

20 You are specifically instructed that

21 whether a transcript correctly or incorrectly

22 reflects the conversation is entirely for you

23 to decide, based upon what you have heard here

24 about the preparation of the transcript and

25 upon your own examination of the transcript in

1 relation to what you heard on the recordings.

2 If you decide that a transcript is in any

3 respect incorrect or unreliable, you should

4 disregard it to that extent.

5 Differences in meaning between what

6 you hear in the recording and read in the

7 transcript may be caused by such things as the

8 inflection in the speaker's voice. You should,

9 therefore, rely on what you heard -- or what

10 you hear rather than what you read when there

11 is a difference.

12 As far as the transcript, I don't

13 think we've had any testimony yet about who the

14 speakers are, and so you need to lay that

15 foundation, I think, before we do that.

16 MS. BAUMANN: Thank you, Your Honor.

17 BY MS. BAUMANN:

18 Q. Agent Schroeder, who are the speakers on

19 the tape that is Government Exhibit 10?

20 MR. TAYLOR: Objection, Your Honor,

21 no foundation that this witness would know.

22 THE COURT: I believe he was there

23 when the call was placed. He can at least

24 testify to one of them, I believe. Overruled.

25 MS. BAUMANN: Okay.

1  A.    The individuals on this recording here
2  would be Shaun Ruff and Ron Greve.
3          MS. BAUMANN: Thank you. Your Honor,
4  Government moves to admit Government Exhibit
5  10.
6          THE COURT: I don't know that you
7  have established that the other speaker is the
8  Defendant, Ms. Baumann.
9          MS. BAUMANN: Your Honor, the
10  number -- may I ask another question?
11         THE COURT: Yes.
12  BY MS. BAUMANN:
13  Q.    You said that the number that was called
14  was 563-495-5614; is that right?
15  A.    Yes.
16  Q.    And you dialed that number?
17  A.    Yes, I did.
18  Q.    Who does that number belong to?
19         MR. TAYLOR: Objection, Your Honor,
20  calls for hearsay and speculation.
21         THE COURT: I don't think there's
22  foundation to ask him that. Sustained.
23         You may ask another question.
24         MS. BAUMANN: Your Honor, may we
25  approach the bench?

1          THE COURT: Yes.
2          (The following was held out of the
3  presence of the jury at a sidebar.)
4          THE COURT: We're outside the hearing
5  of the jury.
6          MS. BAUMANN: During the course of
7  Investigator Schroeder's investigation, he
8  researched that number and it belongs to the
9  Defendant. I don't believe it's hearsay.
10  Based on his investigation, that is the records
11  he has found.
12         MR. TAYLOR: If they can lay that
13  foundation, that's fine. Then we reach the
14  problem that does he know who was on the end of
15  the number.
16         THE COURT: Exactly. But do you
17  remember that testimony and has that testimony
18  come in? I don't remember it, that they
19  researched it and that phone number belonged to
20  Greve.
21         MR. TAYLOR: I don't think so.
22         MS. BAUMANN: No, it has not.
23         THE COURT: Okay.
24         MS. BAUMANN: I can have it come in,
25  but --

1          THE COURT: Yeah, I think that's part
2  of what you have to do in terms of foundation
3  before we get into this tape.
4          MS. BAUMANN: Okay.
5          (The following was held in open
6  court.)
7  BY MS. BAUMANN:
8  Q.    Officer Schroeder, during the course of
9  your investigation, did you investigate who the
10  phone number that you called belonged to?
11  A.    I did not personally do a phone toll on
12  that number, no.
13  Q.    Are you aware that a phone toll was
14  conducted?
15  A.    I'm unaware.
16  Q.    Were you otherwise involved in the
17  investigation on December 13, 2002, in this
18  case?
19  A.    Yes, I was.
20  Q.    What happened other than the first
21  recorded phone call on that day?
22  A.    The next morning, I met with Shaun Ruff
23  in St. Donatus, Iowa, and we proceeded to go to
24  Dubuque to perform a controlled cash delivery.
25  Q.    When did your workday begin?

1  A.    Approximately 7:45 in the morning.
2  Q.    And what happened starting at 7:45?
3  A.    I drove to St. Donatus, met Mr. Ruff. We
4  then went to Dubuque. He drove himself; I
5  followed him. He was directed to go stay at a
6  location, and I told him that contact would be
7  made through cell phones. I would contact him
8  if I needed him on the cell phone.
9  Q.    What happened next?
10  A.    I contacted Mr. Ruff a short while later,
11  requested that he meet me down at the Burger
12  King parking lot down by the Fed Ex main
13  terminal. He did meet me down there. And the
14  reason for that was for him to show me the
15  residence of Mr. Ron Greve.
16  Q.    And did you go by a residence?
17  A.    Yes, we did.
18  Q.    What happened?
19  A.    Mr. Ruff identified the address of 2805
20  Central Avenue in Dubuque, Dubuque County,
21  Iowa, as the address of Mr. Ron Greve.
22  Q.    Did he point anything else out for you?
23  A.    Yes. There were two vehicles in front of
24  that residence.
25  Q.    Did you take down the numbers on those

1 vehicles?

2 A. Yes, I did. The first plate that I took

3 down was 591 Lincoln, Queen, Queen. And the

4 second plate taken down was 534 Lincoln, Queen,

5 Paul, both Iowa registration.

6 Q. Did you investigate those registrations?

7 A. Yes, I did.

8 Q. Who were the vehicles registered to?

9 A. One vehicle was -- one vehicle was

10 registered to Babette Long. The second vehicle

11 was registered to Brandon Birch, both of 2805

12 Central Avenue, Dubuque, Dubuque County, Iowa.

13 Q. What happened after you drove by that

14 residence?

15 A. We returned back to the Burger King

16 parking lot. I telephoned Mr. Ruff a short

17 while later. We then met again and made a

18 recorded telephone call.

19 Q. And you also monitored that call?

20 A. Yes, I did.

21 Q. What phone was used to make that call?

22 A. My cell phone was used again.

23 Q. And what number was called?

24 A. 563-495-5614.

25 Q. Who dialed the number?

1 A. I did.

2 Q. I'm showing you what has been marked --

3     MS. BAUMANN: Or excuse me. Your

4 Honor, may I approach the witness?

5     THE COURT: Yes.

6 BY MS. BAUMANN:

7 Q. Showing you what has been marked as

8 Government Exhibit 11 and Government Exhibit

9 11A, do you recognize those documents?

10 A. Yes, I do.

11 Q. What is what's been marked as Government

12 Exhibit 11?

13 A. This is a second phone call to the

14 telephone number of 563-495-5614, a recorded

15 telephone call.

16 Q. What's it recorded on?

17 A. The same microcassette, with the tabs

18 broken.

19 Q. What do you have in your hand?

20 A. I've got a CD.

21 Q. And how do you know it's that recorded

22 phone call?

23 A. I listened to the CD and I initialed both

24 the paper carrying case and the CD itself.

25 Q. Have there been any changes, additions,

1 or deletions made to the CD since the

2 conversation was recorded?

3 A. No.

4 Q. Was the recording preserved in a specific

5 manner?

6 A. Yes, it was.

7 Q. What is the item that's marked as

8 Government Exhibit 11A?

9 A. 11A is a transcript of the conversation.

10 Q. Does it accurately reflect the names of

11 the speakers on the compact disk?

12 A. Yes.

13 Q. And you were able to observe one of those

14 speakers; is that correct?

15 A. Yes.

16 Q. Who is the speaker that you observed

17 speaking?

18 A. Shaun Ruff.

19 Q. And does it accurately reflect the

20 conversation as you heard it?

21 A. Yes, it does.

22 Q. After that controlled telephone call,

23 what happened next?

24 A. I went back to the office and telephoned

25 Mr. Ruff a short while later. Told him that I

1 would meet him at his location, which would be

2 the Burger King parking lot.

3     At that time, I had two other

4 officers with me. His vehicle was searched by

5 another task force officer. And another phone

6 call was placed.

7     We then left that location to a

8 secondary meeting location at the Dubuque

9 Shooting Gallery. One of the task force

10 officers rode in Mr. Ruff's vehicle, while

11 myself and another task force officer followed

12 in my vehicle.

13 Q. What was the purpose of having someone

14 ride in Mr. Ruff's vehicle?

15 A. Mr. Ruff's person had not been searched

16 yet, although his vehicle had, and we needed to

17 make sure that Mr. Ruff did not plant anything

18 in his vehicle after it had been searched.

19 Q. What happened next?

20 A. We went to the Dubuque Shooting Gallery,

21 which is where another phone call was made.

22 Mr. Ruff was given a monitor, a recording

23 device, to wear on his body to record the

24 conversation and transaction that was about to

25 occur, take place.

1   Q.   What happened next?

2   A.   We departed the Dubuque Shooting Gallery,

3   en route to Heritage Trail Park. Once again,

4   task force officers rode with Mr. Ruff in his

5   vehicle to that location. Myself and another

6   task force officer followed in my vehicle.

7        We arrived at the Heritage Trail

8   Pond. The task force officer exited Mr. Ruff's

9   vehicle and got into my vehicle. I then exited

10  my vehicle and entered Mr. Ruff's vehicle.

11  Another recorded -- another telephone call was

12  placed at that time to the same number. And

13  Mr. Ruff was given a roll of cash that was

14  preserialized.

15  Q.   Who gave him that cash?

16  A.   I did.

17  Q.   And how much cash was it?

18  A.   There was $3,000.

19  Q.   How was it rolled up, as you've described

20  it?

21  A.   It was rolled up into a cylinder shape

22  with the bills rolled end to end, which would

23  make it difficult to count.

24  Q.   And what happened after you handed him

25  the cash?

1   A.   After the cash was handed to Mr. Ruff, we

2   departed and then went to our surveillance

3   location.

4   Q.   And can you describe where Heritage Trail

5   Pond is with regard to Dubuque?

6   A.   It's on the north side of Dubuque up in

7   the John Deere area. It's a pond on the west

8   side of the highway.

9   Q.   What happened next after you left Shaun

10  Ruff's vehicle?

11  A.   A short while later, I observed a

12  red-colored small car, it appeared to be a CRX,

13  turn off of Highway 52 into the intersection --

14  or into the road that goes to Heritage Trail

15  Pond.

16  Q.   And what happened next?

17  A.   I couldn't see for sure what took place

18  at that time until I was given the signal, the

19  takedown signal, by the officers that were in

20  locations to monitor and surveil what was going

21  on. And once the signal was given, officers

22  moved in.

23  Q.   What happened? What was your role in

24  moving in?

25  A.   When the signal was given, I pulled in

1   behind the vehicles with my undercover vehicle,

2   blocked the vehicle so it could not leave,

3   exited my vehicle, and we took two individuals

4   out of the red-colored CRX.

5   Q.   Who were those individuals?

6   A.   One individual was Ron Greve and the

7   second individual was a Michael Wussing

8   (phonetic).

9   Q.   And what happened next?

10  A.   I was by Mr. Greve. I patted Mr. Greve

11  down for safety reasons to make sure he had no

12  weapons or contraband on him. During the

13  course of the pat-down search, I found a small

14  one-hitter pipe, most generally used for the

15  ingestion of marijuana, and found a small

16  amount of marijuana and $350 cash.

17       MS. BAUMANN: Your Honor, may I

18  approach the witness?

19       THE COURT: Yes.

20  BY MS. BAUMANN:

21  Q.   Officer Schroeder, I'm showing you what

22  have been marked as Government Exhibit 15 and

23  Government Exhibit 16.

24       Do you recognize Government

25  Exhibit 15?

1   A.   Yes, I do.

2   Q.   What is it?

3   A.   This would be the ceramic one-hit pipe

4   that was found on the person of Ron Greve.

5   Q.   Other than having been packaged for

6   evidentiary purposes, is it in the same

7   condition as it was in on December 13 of 2002?

8   A.   Yes, it is.

9   Q.   And what has been marked as Government

10  Exhibit 16?

11  A.   Government Exhibit 16 is three $100 bills

12  and one $50 bill.

13  Q.   And is that the same currency that you

14  seized from Mr. Greve?

15  A.   Yes, it is.

16  Q.   How do you know that?

17  A.   Photocopies of each bill was made after

18  the -- after the money was seized, and the

19  serial numbers match on the currency.

20       MS. BAUMANN: Your Honor, Government

21  moves to admit Government Exhibit 15 and 16

22  into evidence.

23       MR. TAYLOR: No objection.

24       THE COURT: Exhibits 15 and 16 are

25  received in evidence.

1    (Whereupon, Exhibit Nos. 15 and 16
2  were received.)
3    MS. BAUMANN: Your Honor, may I read
4  a stipulation into the record at this time?
5    THE COURT: Yes.
6    MS. BAUMANN: "United States of
7  America versus Ronald Greve, stipulation
8  regarding admissibility of cell phone records.
9    "United States of America and the
10  Defendant, Ronald Greve, stipulate and agree
11  that the following facts are true and may be
12  considered by the Court and the jury without
13  further evidence or testimony being offered:
14    "Iowa Wireless cell phone number
15  563-495-5614 was assigned to the Defendant,
16  Ronald Greve, in 2002, beginning on September
17  13 of 2002.
18    "Number 2, Defendant's Exhibit A is a
19  copy of the record of calls made from and
20  received by cell phone number 563-495-5614 from
21  September 13, 2002, through December 30, 2002.
22    "Three, Defendant's Exhibit A is an
23  admissible business record pursuant to Federal
24  Rule of Evidence 803(6) and 902(11).
25    "Four, the phone numbers 563-580-7000

1  and 563-773-8671, which appear on Exhibit A
2  were numbers assigned to Shaun Ruff during the
3  time period reflected in Exhibit A."
4    Signed by all parties and dated on
5  August 17, 2004.
6    THE COURT: All right.
7    MS. BAUMANN: Your Honor, may I now
8  seek to admit Government Exhibit 10 and
9  Government Exhibit 11, and Government Exhibit
10  10A and 11A for demonstrative purposes?
11    THE COURT: Any objection?
12    MR. TAYLOR: Yes, Your Honor. We
13  still haven't identified all of the parties on
14  the call. We've identified it by phone
15  numbers, but that doesn't identify the parties.
16    THE COURT: All right. So you have a
17  relevance and foundation objection?
18    MR. TAYLOR: Yes.
19    THE COURT: The Court overrules the
20  objection and admits Exhibits 10 and 11 into
21  evidence. And the jury may see 10A and 11A in
22  the courtroom as demonstrative aids, but they
23  will not be available back in the jury room.
24    MS. BAUMANN: Thank you, Your Honor.
25  May I publish Government Exhibit 10

1  and 10A to the jury at this time?
2    THE COURT: Yes.
3    (Whereupon, the tape was played.)
4  BY MS. BAUMANN:
5  Q.   Officer Schroeder, approximately what
6  time again did that telephone call take place?
7  A.   **Approximately 1:26 a.m.**
8  Q.   And it was following what event?
9  A.   **Following the interview with Mr. Shaun**
10  **Ruff.**
11  Q.   There was also a second phone call that
12  you referred to earlier in your testimony?
13  A.   **Yes, there was.**
14  Q.   And what time did that take place?
15  A.   **Approximately 10:45 a.m.**
16    MS. BAUMANN: Your Honor, the
17  Government would ask to publish Government
18  Exhibit 11 and 11A to the jury.
19    THE COURT: You may.
20    (Whereupon, the tape was played.)
21    MS. BAUMANN: No further questions
22  for the witness at this time.
23    THE COURT: Cross-examination.
24    MR. TAYLOR: Thank you.
25

1    CROSS-EXAMINATION
2  BY MR. TAYLOR:
3  Q.   On December 13 at the Heritage Trail
4  parking lot, am I correct that you're the one
5  who took Mr. Greve into custody and handcuffed
6  him?
7  A.   **Mr. Greve was never taken into custody.**
8  **He was detained.**
9  Q.   Are you aware that a judge has already
10  ruled that he was taken into custody?
11  A.   **Okay, then he was taken into custody, I**
12  **guess.**
13  Q.   And he was handcuffed?
14  A.   **I believe so, yes.**
15  Q.   Did you do that?
16  A.   **Yes, I believe so.**
17  Q.   And he was forced down onto the ground,
18  correct?
19  A.   **He was placed in the prone position.**
20  Q.   Which means on the ground?
21  A.   **Yes.**
22  Q.   On his stomach?
23  A.   **Yes.**
24  Q.   His hands cuffed behind his back?
25  A.   **Yes.**

1  Q.  And how long was he on the ground?
2  A.  I would say approximately three to five
3  minutes.
4  Q.  And then he was grabbed and lifted up?
5  A.  He was lifted, correct.
6  Q.  And placed in one of the law enforcement
7  vehicles, correct?
8  A.  Correct.
9  Q.  Did you go to the Asbury Police Station
10 or not after --
11 A.  Yes, I did.
12 Q.  Did you -- are you the one who actually
13 took Mr. Greve to the police station?
14 A.  No, I did not.
15 Q.  What did you do at the police station?
16 A.  I interviewed Mike Wussing.
17 Q.  Did you have any further contact with
18 Mr. Greve?
19 A.  No.
20 Q.  And as you were handcuffing Mr. Greve,
21 putting him on the ground, didn't he say that
22 he was just borrowing money?
23 A.  I don't recall.
24 Q.  Possible?
25 A.  It's possible.

1  Q.  The $350 that was taken from Mr. Greve,
2  did that match any previously marked money that
3  was used in any controlled buys?
4  A.  Not that I'm aware of.
5  Q.  Thank you.
6         MR. TAYLOR:  That's all the questions
7  I have, Your Honor.
8         THE COURT:  Anything else for this
9  witness?
10        MS. BAUMANN:  Thank you, Your Honor.
11        REDIRECT EXAMINATION
12 BY MS. BAUMANN:
13 Q.  Officer Schroeder, what's the purpose of
14 placing a subject on the ground during an
15 arrest?
16 A.  For safety reasons, they're placed --
17 Q.  I'm sorry.  Is it uncommon to place a
18 subject on the ground during an arrest?
19 A.  No.
20 Q.  And how many arrests have you been
21 involved in during your career?
22 A.  Hundreds.
23 Q.  Out of those arrests, following a
24 trans -- controlled transaction, how many of
25 them have involved placing someone in the prone

1  position?
2  A.  Pretty much everyone.
3  Q.  Thank you.
4         MS. BAUMANN:  No further questions.
5         THE COURT:  Anything else,
6  Mr. Taylor?
7         MR. TAYLOR:  No, Your Honor.
8         THE COURT:  Thank you.  You may step
9  down.
10        We're ready for the Government's
11 additional evidence.
12        MS. BAUMANN:  United States calls
13 Bert Carner.
14        THE COURT:  Mr. Carner, please raise
15 your right hand.
16        BERT CARNER,
17 called as a witness, being first duly sworn,
18 was examined and testified as follows:
19        THE COURT:  Please come to the
20 witness stand.
21        DIRECT EXAMINATION
22 BY MS. BAUMANN:
23 Q.  Please state your name and spell your
24 last name for the record.
25 A.  Bert Carner, C-A-R-N-E-R.

1  Q.  Actually, please state your -- or excuse
2  me, spell your first name as well.
3  A.  B-E-R-T.
4  Q.  How old are you, Mr. Carner?
5  A.  Twenty-two.
6  Q.  Are you currently employed?
7  A.  Yes.
8  Q.  Where are you employed?
9  A.  Scott Runde Construction.
10 Q.  How long have you been employed there?
11 A.  About a month.
12 Q.  Were you employed in 2002?
13 A.  No, I wasn't.
14 Q.  Do you have a criminal history?
15 A.  Yes, I do.
16 Q.  What does that include?
17 A.  In 2000, I was convicted of possession
18 with intent of methamphetamines.
19 Q.  What sort of punishment did you receive?
20 A.  Twenty-five years suspended sentence with
21 five years probation, and $5,000 fine.
22 Q.  Do you have any other convictions on your
23 record?
24 A.  Yes, I do.  In 2003, I was convicted of
25 controlled substance, 1 pound of marijuana.

1  Q.   And what sort of punishment did you
2  receive for that?
3  A.   **Five years suspended sentence, five years**
4  **probation, and a year in a halfway house.**
5  Q.   Do you have any other convictions on your
6  record?
7  A.   **No, I don't.**
8  Q.   Your 2003 conviction, what was the --
9  when was the offense, when did the offense
10  occur that resulted in that conviction?
11  A.   **2000.**
12  Q.   Was there a time when you began
13  cooperating with law enforcement officers?
14  A.   **Yes.**
15  Q.   When was that?
16  A.   **2002.**
17  Q.   And how did that cooperation begin?
18  A.   **Just with going down to the DNE.**
19  Q.   What's the DNE?
20  A.   **Like the Drug Task Force --**
21  Q.   What happened?
22  A.   **-- their office.  I met with Agent Mower.**
23  **He -- I was just honest about, like, all my**
24  **actions with drugs.**
25  Q.   So you told them about all your drug

1  dealing?
2  A.   **Yes.**
3  Q.   And that's how your cooperation started?
4  A.   **Yeah.**
5  Q.   And you began cooperating in order to
6  work off the 2003 charge; is that correct?
7  A.   **Yes.**
8  Q.   Did you receive any leniency in your own
9  punishment in exchange for your cooperation?
10  A.   **Yes.**
11  Q.   And did you enter into any sort of
12  agreement, formal agreement, with the federal
13  government?
14  A.   **No, I did not.**
15  Q.   Any informal agreement?
16  A.   **No.**
17  Q.   Have you ever used illegal drugs?
18  A.   **Yes.**
19  Q.   What drugs have you used?
20  A.   **Marijuana, cocaine.**
21  Q.   When did you last use a drug?
22  A.   **Probably about fifteen, sixteen.**
23  Q.   When you were fifteen or sixteen years
24  old?
25  A.   **Yes.**

1  Q.   So several years ago?
2  A.   **Yes.**
3  Q.   Did you ever have treatment for a drug
4  addiction?
5  A.   **Yes.**
6  Q.   What did that consist of?
7  A.   **Going to SASC.**
8  Q.   What is that?
9  A.   **Substance Abuse Services Center.**
10  Q.   Did you successfully complete that
11  treatment?
12  A.   **Yes, I did.**
13  Q.   Do you know someone named Ronald Greve?
14  A.   **Yes, I do.**
15  Q.   How did you first meet Ronald Greve?
16  A.   **We've known each other since about**
17  **childhood.**
18  Q.   Grew up together?
19  A.   **Yeah.**
20  Q.   Do you see Mr. Greve in the courtroom
21  today?
22  A.   **Yes, I do.**
23  Q.   Could you point him out and describe
24  where he's --
25  A.   **Blue shirt.**

1       MS. BAUMANN:  Your Honor, may the
2  record reflect the witness has identified the
3  Defendant?
4       THE COURT:  Yes.
5  BY MS. BAUMANN:
6  Q.   Mr. Carner, was there a time when you
7  came to know Mr. Greve better or --
8  A.   **Yeah, about 2000, he started dating my**
9  **sister.**
10  Q.   Who is your sister?
11  A.   **Nora Carner.**
12  Q.   And anything else happen around that time
13  which --
14  A.   **Well, we -- we all moved in together.  We**
15  **all moved into an apartment.**
16  Q.   And who's "we all"?
17  A.   **Me, Ron, and Nora.**
18  Q.   You shared an apartment together?
19  A.   **Yeah.**
20  Q.   Where was that apartment?
21  A.   **On University.**
22  Q.   And is that in Dubuque?
23  A.   **Yeah.**
24  Q.   And you said you were convicted for
25  distributing about a pound of marijuana?

1  A.    Yeah.

2  Q.    Who did that marijuana come from?

3  A.    From Ron.

4  Q.    He provided it to you?

5  A.    Yes.

6  Q.    How did that incident begin?

7  A.    Ron and my sister Nora was talking to

8  some guys from Guttenberg, and one of them

9  wanted a pound of marijuana.

10          MR. TAYLOR:  Objection, Your Honor,

11 calls for hearsay.

12          THE COURT:  Overruled.

13 A.    And he called them and asked them if he

14 could get them a pound of marijuana.  And Ron's

15 the one that could get it.  And they -- they

16 asked me if I'd give it to them because they

17 didn't know about him; they didn't know how

18 trustworthy he was or whatever.

19 BY MS. BAUMANN:

20 Q.    Who asked you if --

21 A.    Ron and my sister.

22 Q.    They asked you if you could give the

23 marijuana to someone else?

24 A.    To the -- to the guy that was buying it.

25 Q.    And that guy was from Guttenburg?

1  A.    Yeah.

2  Q.    How did they ask you if you would do

3  that?

4  A.    Well, they were just talking about how he

5  wanted a pound of marijuana and they were all

6  nervous about it because they didn't know him.

7  Q.    They didn't know the person who was going

8  to be buying the marijuana?

9  A.    Yeah.

10 Q.    And what happened then after they asked

11 you to do that for them?

12 A.    Well, I got the marijuana from Ron, the

13 pound.  Me and him drove to Wal-Mart from my

14 house in my sister's black Cavalier.

15 Q.    When you say you got the marijuana from

16 the Defendant, what did the marijuana look

17 like?

18 A.    Just a pound in a Ziploc bag.

19 Q.    What is a pound, approximately, what size

20 is a pound?

21 A.    About like that.

22 Q.    And the court reporter can't see your

23 hands.

24 A.    Sorry.

25 Q.    Can you compare it to something that's

1  commonly known?

2  A.    About the size of, like, a twelve pack.

3  Q.    And it was in a Ziploc bag?

4  A.    Yeah.

5  Q.    What did you do with the marijuana when

6  he gave it to you?

7  A.    Well, I -- I had it tucked under my

8  shirt.

9  Q.    And where did Mr. Greve get the marijuana

10 from?

11 A.    Joe Harris.

12 Q.    How do you know that?

13 A.    I've seen him make buys at my house

14 before.

15 Q.    What do you say -- what do you mean when

16 you say "seen him make buys"?

17 A.    Joe Harris has come to my house.

18 Q.    What did he do at your house?

19 A.    Give Ron marijuana and Ron's bought it.

20 Q.    Do you know for a fact that the exact

21 marijuana that you distributed came from Joe

22 Harris?

23 A.    Yes.

24 Q.    And what happened after you tucked the

25 marijuana under your shirt that day?

1  A.    We -- we got in my sister's car, Nora's,

2  like I said.  We drove to Wal-Mart.

3  Q.    How far is Wal-Mart from --

4  A.    About three, four miles, somewhere

5  between there.

6  Q.    If you can let me finish -- it's easier

7  for the court reporter if I can finish my

8  question first.

9  A.    Okay, sorry about that.

10 Q.    So your apartment and the Wal-Mart are

11 how far apart?

12 A.    Three to four miles.

13 Q.    So you drove there with the Defendant?

14 A.    Yeah.

15 Q.    Who actually drove the vehicle?

16 A.    Ron.

17 Q.    And where were you seated?

18 A.    In the passenger seat.

19 Q.    Was anybody else present?

20 A.    No.

21 Q.    What happened once you got to Wal-Mart?

22 A.    We pulled in the parking spot.  We -- we

23 looked for the description of the vehicle that

24 the guy from Guttenburg gave us.  I got out of

25 the vehicle, jumped in the truck with that guy,

1  exchanged the marijuana for $1,100. I got out,
2  and got back into our vehicle and we left.
3  Q.   And what did you do with the $1,100?
4  A.   We split it.
5  Q.   Did you split it in half?
6  A.   It was, like -- I believe it was, like,
7  $400 for me.
8  Q.   Why did you keep $400?
9  A.   Because that was the agreement, I was
10 going to get money out of it.
11 Q.   Who made that agreement with you?
12 A.   Me and Ron.
13 Q.   Was Nora also involved in that agreement?
14 A.   Yes.
15 Q.   And so what happened with the remaining
16 part of the $1,100 that you did not keep?
17 A.   It went to Ron.
18 Q.   Did you hand it directly to him?
19 A.   Yeah.
20 Q.   And you said there was a guy from
21 Guttenburg. Have you found out who that guy
22 was after the fact?
23 A.   Yeah.
24 Q.   Who is that?
25 A.   Agent Mower.

1  Q.   And how did you find that out?
2  A.   Because I got served with papers.
3  Q.   What does that mean?
4  A.   Police papers saying that I sold it to an
5  undercover cop.
6  Q.   And that's how you were convicted in
7  2003?
8  A.   Yep.
9  Q.   Other than that incident, have you ever
10 obtained marijuana from the Defendant?
11 A.   No.
12 Q.   Have you ever obtained any other drug
13 from the Defendant?
14 A.   No.
15 Q.   You mentioned a person named Joe Harris.
16 Who is Joe Harris?
17       MR. TAYLOR: Objection, Your Honor.
18 This is getting far afield from the facts in
19 this case. It's irrelevant.
20       THE COURT: Overruled. You may
21 answer.
22 A.   I didn't know him much. He's just --
23 he's from out of town.
24 BY MS. BAUMANN:
25 Q.   And you said you saw him come to your

1  apartment on a couple of occasions?
2  A.   Yes.
3  Q.   How many occasions were there?
4  A.   From what I seen, like two.
5  Q.   And what did you see?
6  A.   Him come to the house, sell marijuana to
7  Ron.
8  Q.   Did you actually see the marijuana?
9  A.   Yeah.
10 Q.   What did it look like?
11 A.   Just little bricks.
12 Q.   What do you mean when you say "brick"?
13 A.   Just compacted.
14 Q.   On your -- based on your experience, how
15 much would those bricks weigh?
16 A.   1 to 2 pounds.
17 Q.   And did you see any money change hands?
18 A.   Yeah.
19 Q.   What did you see?
20 A.   I seen him exchange the money for it,
21 by --
22 Q.   Who is "him"?
23 A.   Ron.
24 Q.   You saw Ron give Joe money?
25 A.   Yeah, for the marijuana.

1  Q.   Did you see how much money?
2  A.   No.
3  Q.   And where did the transactions occur?
4  A.   Just at my house, like in the kitchen.
5  Q.   Were you in the kitchen with them when
6  they conducted the transactions?
7  A.   Yeah.
8  Q.   Have you ever heard the Defendant brag
9  about dealing drugs at all?
10 A.   I wouldn't say brag, just flash a lot of
11 money all the time.
12 Q.   What's a lot of money?
13 A.   I don't know, like, carried around like
14 6, 7 hundred dollars.
15 Q.   In cash?
16 A.   Yeah.
17 Q.   Have you ever known the Defendant to work
18 at a job?
19 A.   No.
20 Q.   I'm sorry?
21 A.   No.
22 Q.   The entire time you've known him, you've
23 never known him to work?
24 A.   No.
25 Q.   Has he ever been in school?

1   **A.**   **No.**

2   **Q.**   Did you do any proactive work with law

3   enforcement officers with regard to the

4   Defendant?

5   **A.**   **Yes.**

6   **Q.**   And when did that occur?

7   **A.**   **2002.**

8   **Q.**   What month?

9   **A.**   **December.**

10   **Q.**   What happened in December of 2002?

11   **A.**   **Made a controlled call.**

12   **Q.**   And where did you go to make that call?

13   **A.**   **To the DNE center, office.**

14   **Q.**   What phone did you use?

15   **A.**   **Theirs, their office phone, their**

16   **undercover phone.**

17   **Q.**   It was a hard line?

18   **A.**   **Yeah.**

19   **Q.**   Who did you call?

20   **A.**   **Ron.**

21   **Q.**   Do you remember what number you called?

22   **A.**   **No, I don't.**

23   **Q.**   At that time, did you know the number you

24   were calling?

25   **A.**   **Yes.**

1   **Q.**   And what was -- whose number was it?

2   **A.**   **Ron's.**

3   **Q.**   Did you ever reach Ron?

4   **A.**   **Yes.**

5   **Q.**   About what time of day was it when you

6   reached him?

7   **A.**   **Early evening.**

8   **Q.**   What sort of statements did he make to

9   you, if any?

10   **A.**   **We just talked about what we were going**

11   **to be doing later, what he was going to be**

12   **doing later, and just about his troubles that**

13   **he got into.**

14   MS. BAUMANN: Your Honor, may I

15   approach the witness?

16   THE COURT: Yes.

17   BY MS. BAUMANN:

18   **Q.**   I'm showing you two items that have been

19   marked as Government Exhibit 18 and Government

20   Exhibit 18A. Do you recognize those items?

21   **A.**   **Yes.**

22   **Q.**   What is Government Exhibit 18?

23   **A.**   **A compact disk.**

24   **Q.**   And what's it a compact disk of?

25   **A.**   **Our conversation on the phone.**

1   **Q.**   On -- in December of 2002?

2   **A.**   **Yes.**

3   **Q.**   Who is "our" conversation?

4   **A.**   **Mine and Ron's.**

5   **Q.**   How do you know that's the same

6   conversation that you remember?

7   **A.**   **I listened to it today and initialed the**

8   **disk.**

9   **Q.**   What is Government Exhibit 18A?

10   **A.**   **Transcript.**

11   **Q.**   I'm sorry?

12   **A.**   **Transcript.**

13   **Q.**   A transcript?

14   **A.**   **Yeah.**

15   **Q.**   Does that accurately reflect the

16   conversation that you had with Mr. Greve in

17   December of 2002?

18   **A.**   **Yes.**

19   **Q.**   Does it accurately reflect the speakers

20   that are on the CD?

21   **A.**   **Yeah.**

22   **Q.**   And who are the voices on the compact

23   disk?

24   **A.**   **Me and Ron.**

25   **Q.**   Have there been any changes, additions,

1   or deletions made to the compact disk since

2   that conversation was recorded?

3   **A.**   **No.**

4   **Q.**   Did it truly and accurately reflect the

5   conversation that you had?

6   **A.**   **Yes.**

7   MS. BAUMANN: Your Honor, Government

8   moves to admit Government Exhibit 18 and

9   Exhibit 18A for demonstrative purposes only.

10   MR. TAYLOR: No objection.

11   THE COURT: Exhibits 18 -- Exhibit 18

12   is received in evidence. And Exhibit 18A may

13   be used for demonstrative purposes in the

14   courtroom.

15   (Whereupon, Exhibit No. 18 was

16   received.)

17   MS. BAUMANN: May I publish Exhibit

18   18 by using the transcription software?

19   THE COURT: You may.

20   (Whereupon, the tape was played.)

21   BY MS. BAUMANN:

22   **Q.**   Mr. Carner, there's a reference to weed

23   in Government Exhibit 18. What is weed?

24   **A.**   **Marijuana.**

25   **Q.**   And what does "personal" mean in the drug

1  world?

2  **A.  It's just when someone buys drugs to do**

3  **instead of distribute.**

4  **Q.**  And when you say "to do," that means to

5  use?

6  **A.  Yes.**

7  **Q.**  And you used a lot of profanity in that

8  tape. What's the purpose of that?

9  **A.  Just occurs a lot.**

10  **Q.**  That's just how you are?

11  **A.  Yes.**

12  **Q.**  After you made the telephone call in

13  December of 2002, did you do any additional

14  work with law enforcement regarding the

15  Defendant?

16  **A.  No.**

17        MS. BAUMANN: No further questions at

18  this time, Your Honor.

19        THE COURT: Cross-examination,

20  Mr. Taylor.

21        MR. TAYLOR: Thank you.

22        CROSS-EXAMINATION

23  BY MR. TAYLOR:

24  **Q.**  Mr. Carner, as I understand your

25  testimony, you're claiming that you were

1  present when Ron asked you to deliver some

2  drugs to a guy from Guttenburg?

3  **A.  Yeah.**

4  **Q.**  And the guy from Guttenburg turned out to

5  be Agent Mower?

6  **A.  Yeah.**

7  **Q.**  Okay. And so Agent Mower was there, and

8  you were there, and Mr. Greve was there,

9  correct?

10  **A.  No. You mean at the time that I had --**

11  **it was sold to him?**

12  **Q.**  At the time you transferred the drugs to

13  Agent Mower.

14  **A.  Yes, yes.**

15  **Q.**  Okay. Were you arrested at that point?

16  **A.  No.**

17  **Q.**  And that was in 2000, right?

18  **A.  Yes.**

19  **Q.**  And you didn't tell the agents anything

20  about Mr. Greve, did you?

21  **A.  No.**

22  **Q.**  Okay. I'm sure they asked, didn't they?

23  **A.  Not at the time of the exchange.**

24  **Q.**  Well, didn't they interview you as to who

25  you got your drugs from?

1  **A.  Oh, after I got -- when I got in trouble?**

2  **Q.**  In 2000.

3  **A.  Yeah.**

4  **Q.**  And you didn't tell them Ron Greve was

5  your source, did you?

6  **A.  No.**

7  **Q.**  You knew in 2000, when you were busted,

8  that you needed to help yourself, didn't you?

9  **A.  Yes.**

10  **Q.**  And you still didn't tell them that Ron

11  Greve was your source, correct?

12  **A.  Yes.**

13  **Q.**  That's correct?

14  **A.  I did.**

15  **Q.**  I thought you told us earlier you didn't?

16  **A.  I was getting it mixed up.**

17  **Q.**  Now, I think you said after 2000, you

18  never had any knowledge of Ron being involved

19  in drugs again after that, correct? Isn't that

20  what you said on direct examination?

21  **A.  With like, what, marijuana, or what?**

22  **Q.**  Yeah.

23  **A.  I'm not for sure.**

24  **Q.**  Okay.

25  **A.  If he did or not, because after we moved**

1  out, we didn't -- we didn't always talk a lot.

2  **Q.**  And you've never seen Ron sell cocaine,

3  have you?

4  **A.  No.**

5  **Q.**  Now, your first drug felony, a

6  conviction, was in January of 2000, does that

7  sound right?

8  **A.  Right.**

9  **Q.**  And that was for possession of

10  methamphetamine with intent to deliver --

11  **A.  Yeah.**

12  **Q.**  -- correct?

13        And you got a suspended sentence, you

14  were placed on probation?

15  **A.  Yeah.**

16  **Q.**  And then right after you were sentenced

17  on January 10, a few days later, you got

18  arrested again, didn't you, on the marijuana

19  charge?

20  **A.  I didn't get arrested then. They didn't**

21  **serve me with papers until two years later.**

22  **Q.**  But that's when it occurred, wasn't it?

23  **A.  Yeah.**

24  **Q.**  And so then you struck a deal with the

25  state authorities, correct?

1 A. Yes.

2 Q. And as a result, your probation on that

3 twenty-five-year sentence was not revoked, was

4 it?

5 A. Right.

6 Q. And you got probation again, correct?

7 A. Right.

8 Q. And that was the deal, that you would set

9 Ron up and you'd stay on probation and not do

10 any prison time, correct?

11 A. I didn't set Ron up.

12 Q. Well, you made a phone call to him,

13 didn't you?

14 A. A phone call, but that wasn't to buy

15 drugs or nothing.

16 Q. But it was to --

17 A. The meaning of the phone call was Agent

18 Mower was with me at the DNE, he made -- had me

19 make a phone call to Ron to see if he would say

20 anything about his self getting in trouble.

21 Q. So the purpose of the phone call was to

22 try to get Ron to say something that would

23 sound like he was admitting to selling drugs,

24 correct?

25 A. No, just to say something about him

1 getting busted, and it wasn't getting him to

2 say he sells drugs or nothing.

3 Q. So all he was talking about in this phone

4 call was that the agents had arrested him,

5 taken him down and questioned him and offered

6 him a deal for cooperating, right?

7 A. Yeah, right, right.

8 Q. Okay. And that's the extent of the

9 conversation, correct?

10 A. Right.

11 Q. All right. But you were also asked, were

12 you not, to set him up so that you would try to

13 get him to say he would get some drugs for you?

14 A. No, I just threw that in there when -- to

15 go along with, like, everything was normal.

16 Q. And he didn't bite on that, did he?

17 A. No.

18 Q. And it's your testimony Ron's never had a

19 job?

20 A. That I knew of.

21 Q. And he's never been in school?

22 A. No.

23 Q. He didn't go to Northeast Iowa Community

24 College or whatever it is up there?

25 A. Not that I know of.

1 Q. Thank you.

2 MR. TAYLOR: That's all the questions

3 I have.

4 THE COURT: Anything else,

5 Ms. Baumann?

6 MS. BAUMANN: No, Your Honor, thank

7 you.

8 THE COURT: Thank you, sir. You may

9 step down. Ready for the Government's next

10 witness.

11 MS. BAUMANN: United States calls

12 Special Agent Mike Dasso.

13 THE COURT: Hello, Mr. Dasso, please

14 raise your right hand.

15 MICHAEL DASSO,

16 called as a witness, being first duly sworn,

17 was examined and testified as follows:

18 THE COURT: Please come to the stand.

19 DIRECT EXAMINATION

20 BY MS. BAUMANN:

21 Q. Please state your name and spell your

22 name for the record.

23 A. My name is Michael Dasso, last name is

24 D-A-S-S-O.

25 Q. How are you currently employed?

1 A. I'm a special agent with the Iowa

2 Department of Public Safety, Division of

3 Narcotics Enforcement, and I'm a --

4 Q. I'm sorry.

5 A. And I'm assigned to the DEA Task Force

6 here in Cedar Rapids.

7 Q. How long have you been a special agent?

8 A. Since March of 1979.

9 Q. And how long have you been on the DEA

10 Task Force?

11 A. Officially, since January of 1995.

12 Q. And prior to beginning your work as a law

13 enforcement officer, did you receive training

14 at the state academy?

15 A. I did.

16 Q. And you're fully certified as a law

17 enforcement officer?

18 A. Yes, ma'am.

19 Q. And have you had specialized narcotics

20 training since that time?

21 A. Yes.

22 Q. What does that consist of?

23 A. In 1980, the first narcotics training I

24 had with the state, other than general

25 information, would have been with the DEA

1  two-week academy. There was a lot of schools,
2  some of which I can't even remember anymore.
3  But one of -- one of the more notable ones was
4  a financial conspiracy, two-week class, that
5  was at Glenco, Georgia. And another one was
6  the drug unit commander's academy at Quantico,
7  Virginia.
8  Q.    Were you involved in the investigation of
9  Ronald Greve?
10 A.    I was.
11 Q.    Do you recognize Mr. Greve, if you saw
12 him?
13 A.    Yes, I do.
14 Q.    Do you see him in the courtroom today?
15 A.    Yes, I do.
16 Q.    Could you point him out and describe what
17 he's wearing?
18 A.    He's seated at the defense table, and
19 he's wearing a blue open-neck shirt, button up
20 front, with some pinstripes.
21       MS. BAUMANN: Your Honor, may the
22 record reflect the witness has identified the
23 Defendant.
24       THE COURT: Yes.
25 BY MS. BAUMANN:

1  Q.    Special Agent Dasso, what was your role
2  in the investigation of Mr. Greve?
3  A.    Initially, I prepared in part a list of
4  recorded serial numbers off a list of money
5  that was going to be used at a proposed payment
6  for drugs.
7  Q.    And how much -- how much money was
8  involved?
9  A.    I think altogether, it was about $3,000.
10 Q.    What -- did you have any other roles in
11 the investigation?
12 A.    I did. I was -- it -- it wasn't directly
13 assigned at the time, but I knew I was going to
14 be interviewing persons with respect to the
15 events of December 13 of 2002.
16 Q.    And during your career, about how many
17 interviews have you conducted?
18 A.    Hundreds certainly. I don't know if it
19 would approach a thousand, but it's a great
20 number.
21 Q.    Do you follow a standard procedure when
22 you conduct interviews following a controlled
23 transaction?
24 A.    Yes.
25 Q.    And what is that procedure?

1  A.    I will solicit the cooperation of the
2  Defendant or the witness. Part of that is case
3  specific, but usually it involves an
4  explanation of the federal system, generally,
5  and we talk about the sentencing guidelines.
6        Before we ask any questions, we go
7  through Miranda warnings. And once those are
8  waived, we go through what is called a
9  "Statement of Cooperation," or cooperation
10 statement. It's a prepared form by the US
11 Attorney's Office that I've used for a number
12 of years, and enumerates things that a witness
13 should be aware of during -- if they are
14 contemplating cooperating with the Government.
15 Q.    You mentioned Miranda warnings. What is
16 a Miranda warning?
17 A.    It's essentially a right to counsel.
18 Q.    And that is read to a suspect?
19 A.    Yes. The way I do it, I go through it
20 and require a verbal response. And in this
21 particular instance, a written verification as
22 well.
23 Q.    And what happened following the
24 transaction on December 13, 2002?
25 A.    I responded to the immediate scene. I

1  was probably one of the last officers. I
2  was to the rear of what was going on.
3        Two persons -- or three persons had
4  been handcuffed and were on the ground. At
5  some point, a person ultimately was, Mr. Greve,
6  was brought back to me. He was handcuffed.
7  And we stood there at the door of my vehicle,
8  or next to my vehicle, for a period of time.
9  And then I was assigned to do that interview.
10 And I was directed to go to the Asbury Fire
11 Department to do the interview. And at the
12 time -- it was Sergeant Greg Egan who was
13 assigned to assist me.
14 Q.    You mentioned three persons were
15 handcuffed. Who are the other two people?
16 A.    Shaun Ruff was one of them, and then
17 there was a third person. His first name is
18 Mike.
19 Q.    And where did the transaction take place
20 on December 13, 2002?
21 A.    It's on the north side of Dubuque. It's
22 near a body of water they call Heritage Pond.
23 It's just west of Highway 52 as you're leaving
24 Dubuque, and there's a crossroad there, and I
25 just -- I don't know the name of that

1  crossroad.
2  Q.   How far then is it from the pond to the
3  Asbury Fire Department?
4  A.   I've not accurately recorded the mileage,
5  but it would be my guess about five miles,
6  perhaps a little bit more.
7  Q.   And did the Defendant ride with you to
8  the Asbury Fire Department?
9  A.   He did.
10 Q.   What happened there?
11 A.   There was apparently some mixup in the
12 directions that I was given.  It -- initially,
13 we were supposed to use the -- oh, it's a
14 training room there at the fire department for
15 the interview.  But for whatever reason, that
16 wasn't available to us.  And I didn't find that
17 out until after I had gotten there.  And I
18 spent the majority of my time trying to contact
19 somebody that knew where I was supposed to go.
20       And then ultimately, I was told that
21 we were to go to the Asbury Police Department,
22 which was a mere matter of about six or so
23 blocks away.
24 Q.   Did you proceed to the police department
25 then?

1  A.   I did.
2  Q.   And what happened at the police
3  department?
4  A.   Once we were there, I met Sergeant Egan.
5  We were given a conference room to use for the
6  interview.  I believe Mr. Greve had to use the
7  facilities, and he did so.  We began, as I
8  said, with an explanation or a bit of
9  information about the federal system.  Once we
10 were through with that, we went through the
11 Miranda warnings, and then ultimately we went
12 through the Statement of Cooperation, which
13 we've spoken about.
14 Q.   And can you describe the conference room
15 where this interview was held?
16 A.   It's a -- the actual building, I guess,
17 would be the better description.  It's about
18 the size of an old schoolhouse, and the eastern
19 end of it had been partitioned off and was used
20 as a, I think at one point in time, a chambers
21 or a city council chambers.  There was a larger
22 table towards the middle of the room.
23       As I remember, there's windows to the
24 back.  There's a partitioned area with half
25 glass to the front.

1        As you're looking to the north or
2  towards the front of the building, off to the
3  left and to the rear is the door to the
4  facilities.  Through the forwardmost door and
5  to the west, you enter a lobby area, and then
6  back into an office structure, but it's -- it's
7  not a real big building.
8  Q.   And during the interview, was the
9  Defendant in handcuffs?
10 A.   Yes, up until the time we arrived at the
11 police department, he was in handcuffs.
12 Q.   And when you arrived at the police
13 department, the handcuffs were taken off?
14 A.   That's correct.
15 Q.   You mentioned a cooperation statement.
16 How many pages is that document?
17 A.   It's a single-page document.
18       MS. BAUMANN:  Your Honor, may I
19 approach the witness?
20       THE COURT:  Yes.
21 BY MS. BAUMANN:
22 Q.   I'm showing you what has been marked as
23 Government Exhibit 14.  Do you recognize that
24 document?
25 A.   I do.

1  Q.   Is this the cooperation statement you
2  referred to earlier in your testimony?
3  A.   Yes, ma'am.
4  Q.   And in this particular case, was a
5  cooperation statement signed?
6  A.   Yes.
7  Q.   And it was signed by who?
8  A.   Myself, Mr. Greve.  It was also signed by
9  Sergeant Egan.  And there's a notation at the
10 bottom with respect to the Miranda rights, and
11 there's initials there, with my own initials
12 and Mr. Greve's initials as well.
13       MS. BAUMANN:  Your Honor, Government
14 moves to admit Government Exhibit 14 into
15 evidence.
16       MR. TAYLOR:  No objection.
17       THE COURT:  It's received.
18       (Whereupon, Exhibit No. 14 was
19 received.)
20       MS. BAUMANN:  May I publish it to the
21 jury, Your Honor?
22       THE COURT:  You may.
23 BY MS. BAUMANN:
24 Q.   Special Agent Dasso, I'm placing the
25 cooperation statement, which is Government

1 Exhibit 14, onto the overhead projector. Could
2 you read the first line of that statement?
3 A.    It says, "I understand that I am or I am
4 not under arrest; that I am or am not in
5 custody; and that I am or am not free to leave
6 at any time."
7 Q.    Have any handwritten notations been made
8 to that line?
9 A.    Yes, ma'am.
10 Q.    And what do those consist of?
11 A.    There are three circles circling the
12 first provision or purpose, which says "am not
13 under arrest"; the second would be "am not in
14 custody"; and the third, "am free to leave at
15 any time." Those are all initialed by
16 Mr. Greve, and also there's a parentheses prior
17 to the enumeration, and there is a --
18 Mr. Greve's initials there as well.
19 Q.    And did you or Sergeant Egan force
20 Mr. Greve to sign this statement?
21 A.    I did not, and I'm certain that Sergeant
22 Egan did not.
23 Q.    Moving the document up on the screen, is
24 your signature on this document that's
25 Government Exhibit 14?

1 A.    Yes, it is.
2 Q.    And where does that appear?
3 A.    Directly below the signature of
4 Mr. Greve --
5 Q.    Is there --
6 A.    -- and, excuse me, just to the left of
7 Sergeant Egan's.
8 Q.    Is there also a handwritten statement on
9 the very bottom of Government Exhibit 14?
10 A.    Yes, there is.
11 Q.    And what is that?
12 A.    It says, "Miranda rights." It quotes a
13 time of 1:54 p.m., on December 13, of the year
14 2002. My initials appear at the top and then
15 at the end of that notation, and below that are
16 Mr. Greve's initials.
17 Q.    Thank you.
18        What happens after the Defendant
19 waived his rights and signed this statement?
20 A.    We began an interview.
21 Q.    And what happened then?
22 A.    We do a -- I usually start an interview
23 with some biographical information, and it
24 generally consists of information pertinent to
25 that person's drug use. And, in this case,

1 Mr. Greve indicated that it had started for him
2 about the age of twelve, when he started using
3 marijuana. And then it wasn't until he was
4 about seventeen years of age that he became --
5 or tried some different drugs to include LSD,
6 methamphetamine, and cocaine.
7 Q.    What happened after he made admissions
8 regarding his own drug use?
9 A.    We continued by some -- with some
10 questions about what he had observed as far as
11 quantities. In the case of methamphetamine, it
12 was just gram quantities. In the case of LSD,
13 the largest that he had ever saw was twenty --
14 or about twenty dosage units of LSD. And I
15 believe he -- that was a blotter form, it's a
16 paper form of LSD. And on one occasion, he saw
17 about two years prior to our interview about 10
18 ounces of cocaine at a person's house.
19 Q.    And those were quantities he admitted
20 that he had just --
21 A.    Observed.
22 Q.    Observed, which means that he saw other
23 people with them?
24 A.    Yes.
25 Q.    And did he make any admissions about

1 drugs that he had ever purchased?
2 A.    He did. We -- I asked him who his
3 supplier was, and he identified him as a person
4 by the name of "Fifty," whose real name was
5 Anthony or Adam, who was from, by his
6 knowledge, from Rockford, Illinois, and who was
7 his supplier of cocaine and he thought crack
8 cocaine and perhaps heroin.
9 Q.    Did the Defendant make any admissions
10 about specific quantities of drugs he had
11 purchased from Fifty?
12 A.    He did. It was for his own personal use.
13 This would have been quarter-gram, half-gram,
14 up to a gram quantities, and all -- all the
15 cocaine that he bought would have come from
16 this person he identified as Fifty.
17 Q.    Did he make any admissions about selling
18 any drugs?
19 A.    Later on, he did. It was after he had
20 met a person by the name of Shaun.
21 Q.    Did he know Shaun's last name?
22 A.    He didn't articulate that to me.
23 Q.    Let me back up just a minute. Did he
24 describe what Fifty looked like?
25 A.    He did. A black male, about twenty-seven

1  years of age. He was approximately six-two,
2  and by his estimation, 160 pounds, and he
3  referenced a tattoo on his right forearm, what
4  he called a tribal tattoo.
5  Q.  Did he provide any other information
6  about Fifty?
7  A.  He described a vehicle that he observed
8  him in. It was a -- excuse me, a Yukon-style
9  vehicle.
10 Q.  Did he make any other statements about
11 Fifty?
12 A.  I think he made reference to a person
13 that was a relative of Fifty's that he had met
14 a few times, and that was a fellow by the name
15 of Memphis Kimball.
16 Q.  Did he ever make any statements about
17 places where he had met Fifty to purchase the
18 personal use quantities you talked about?
19 A.  Yes. He identified three places. The
20 most recent would have been in the suburb of
21 Dubuque, south side, it's Key West, at the
22 Dairy Queen. Previous times they had met at
23 the A&W store on First in Dubuque. And one
24 other place was at the Amoco Station in Galena,
25 Illinois.

1  Q.  How did he communicate with Fifty?
2  A.  Initially, he had been given a pager,
3  and -- but apparently after just a couple of
4  months, that pager was disconnected or wouldn't
5  work. But after that, it was a matter of Fifty
6  would call him, and he would get a -- the phone
7  call, but he would never get the number on the
8  indicator on the phone. It would come up
9  private message or something of that effect.
10 Q.  Did he -- did the Defendant state why
11 Fifty was calling him?
12 A.  Well, they -- apparently after he had met
13 this Shaun, Shaun wanted to know if he could
14 get cocaine. And ultimately, there was a
15 relationship where he was acquiring quantities
16 of cocaine from Fifty and providing it to
17 Shaun. And there were -- on a couple of
18 occasions, there were 8 ounce quantities; on
19 one occasion it was a 4 ounce quantity; on a
20 single occasion, it was a 2 ounce quantity.
21 Q.  Did he make any other statements about
22 these ounce quantities he was obtaining?
23 A.  Yes. He talked about price, what it cost
24 him and what he -- what he was providing it to
25 Shaun for. The 2 ounce quantities was about --

1  was $1800. The 4 ounce was 3200 and the 8
2  ounce was 6500. And he was in turn charging
3  Shaun 6800 for the 8 ounce quantities, 3400 for
4  the 4 ounce quantities, and 1800 for the 2
5  ounce quantities.
6  Q.  When did he meet Shaun Ruff for -- or
7  Shaun, excuse me, for the first time?
8  A.  About a month and a half prior to our
9  conversation, on the 13th, that was --
10 Q.  Did --
11 A.  That was his estimate.
12 Q.  Did he make any other admissions
13 regarding drugs?
14 A.  That he had been offered -- or Fifty had
15 offered him heroin, but he declined; he didn't
16 acquire any of that.
17 Q.  How long did you speak with the Defendant
18 on that day?
19 A.  In the -- after Miranda, it would have
20 been approximately one hour.
21 Q.  And how did the interview end?
22 A.  Mr. Greve left the police department, and
23 I'm uncertain as to whether he drove away or
24 was picked up; but I know he left the police
25 department there in Asbury.

1  Q.  Why wasn't he taken into custody
2  following the interview?
3  A.  He wasn't under arrest.
4  Q.  Is it common to release someone or not
5  arrest them following an interview like that?
6  A.  Yes.
7  Q.  Why is that?
8  A.  For a variety of reasons. Most of which
9  involved a consultation with a US Attorney's
10 Office.
11       MS. BAUMANN:  I have no further
12 questions at this time, Your Honor.
13       THE COURT:  Cross-examination,
14 Mr. Taylor.
15       MR. TAYLOR:  Thank you.
16             CROSS-EXAMINATION
17 BY MR. TAYLOR:
18 Q.  Following up on the last question, isn't
19 it true that people that you believe will
20 cooperate would be much less effective if they
21 were under arrest or in custody or formally
22 charged; isn't that true; as long as they're
23 out, they can still do some work?
24 A.  Yes, if -- if you're in custody, it's
25 very difficult to assist the Government.

1 Q. And if I understand your testimony
2 correctly, when Mr. Greve mentioned Shaun, he
3 didn't give you a last name, did he?
4 A. That is correct.
5 Q. And in your -- let me back up. Do you
6 work around the Dubuque area a lot in your
7 investigations?
8 A. I have in the past, but in the most
9 recent twelve to fourteen years, very rarely.
10 Q. Does the name Shaun Lang ring a bell?
11 A. No.
12 Q. Okay. Now, it's my understanding that,
13 when this incident took place at the Heritage
14 Trail Pond, that as soon as Mr. Greve got back
15 in his car, two or three police vehicles
16 approached quickly behind; is that correct?
17 A. Yes.
18 Q. And a number of agents got out and
19 surrounded Mr. Greve and Mr. Ruff and
20 Mr. Wussing?
21 A. If Mr. Wussing is the third person. His
22 first name is Mike.
23 Q. He was the passenger in Mr. Greve's car?
24 A. If his first name is Michael, then that
25 would be true.

1 Q. And agents had their guns drawn?
2 A. I'm certain some of them did.
3 Q. And Mr. Greve was handcuffed?
4 A. Yes, he was.
5 Q. Behind his back?
6 A. Yes, he was.
7 Q. And taken to the ground?
8 A. Yes, he was.
9 Q. And how long was he on the ground?
10 A. A matter of minutes.
11 Q. It might have seemed like hours to him,
12 might not it?
13 A. I can't reflect on that.
14 Q. And then eventually, he was picked up
15 with his hands still behind his back and placed
16 in the police vehicle, correct?
17 A. Yes, it was a matter of some minutes. We
18 stood near the front of our car for -- or my
19 car for some period of time, and ultimately he
20 was placed in the passenger's front seat of my
21 vehicle.
22 Q. Still handcuffed?
23 A. Yes.
24 Q. And then he was taken to the Asbury
25 Police Station?

1 A. Ultimately, yes.
2 Q. And taken into a conference room you
3 called it; is that correct?
4 A. Yes, sir.
5 Q. And he was still handcuffed, being taken
6 into the room; was he not?
7 A. Yes, at -- actually, the cuffs were
8 removed when we were at the fire station, the
9 cuffs were moved from back to front; but the
10 cuffs for all intents and purposes were on him
11 until we arrived at the police department, yes.
12 Q. And he was taken into the interview room
13 in cuffs?
14 A. Yes.
15 Q. And so it wasn't until he was in the room
16 with officers around him, the door's shut, that
17 the cuffs were taken off, correct?
18 A. There was myself and Sergeant Egan --
19 Q. Correct.
20 A. -- and himself. And, yes, the cuffs were
21 taken off in that conference room.
22 Q. And both you and Officer Egan were armed?
23 A. I was -- I have a firearm. It wasn't
24 displayed.
25 Q. And it's my understanding that when he

1 first got to the police station, he asked to
2 use the restroom?
3 A. Yes.
4 Q. And as I recall, the restroom is not a
5 separate area; it's right off of this
6 conference room?
7 A. Yes, as a matter of fact, as you enter
8 the conference room from outside the rear door,
9 as you enter the conference room, immediately
10 to your left, there's a wall there, and that's
11 where the door is to the men's room.
12 Q. So his going to the restroom, he couldn't
13 have escaped or anything like that?
14 A. In my estimate, it's a one-way in,
15 one-way out kind of proposition; but no, he
16 couldn't have left, other than we would have
17 been able to see him.
18 Q. Right. And if the restroom had been
19 outside, one of the officers or both of you
20 probably would have gone with him, correct?
21 MS. BAUMANN: Objection, Your Honor,
22 calls for speculation.
23 THE COURT: Sustained.
24 BY MR. TAYLOR:
25 Q. You were going to make sure that he

1 didn't leave; isn't that correct?

2 A.   No, sir.

3 Q.   But the possibility existed, didn't it,

4 that if he tried to leave or wanted to leave,

5 you guys would have followed him or gone with

6 him?

7 A.   I certainly would have asked him where he

8 was going.

9 Q.   So it was clear to Mr. -- let me rephrase

10 that. You made it clear to Mr. Greve that you

11 wanted him to stay there and he was not to

12 leave until you were done talking to him,

13 correct?

14 A.   Well, to be very clear, that's one of the

15 reasons we did this Statement of Cooperation.

16 And in the very first line that we address,

17 it's very clear that he was not under arrest

18 and he could leave at any time. And that was

19 done before we asked him any questions,

20 particularly the circumstance that we're

21 talking about.

22 Q.   But you didn't explain to him,

23 specifically, he was not under arrest. You

24 just asked him to sign this form, correct?

25 A.   No, I went through each and every one of

1 those itemized listings painstakingly with him.

2 I read it with him, and read along with him,

3 and he initialed them as we went.

4 Q.   And you had him initial the part in the

5 first line that says he's not in custody,

6 correct?

7 A.   There are three circles there: Not in

8 custody, not under arrest, and free to leave at

9 any time.

10 Q.   But you -- you understand, don't you,

11 that a judge has already ruled he was in

12 custody?

13 A.   I'm not familiar with that.

14 Q.   But you made it clear to him you wanted

15 to question him, correct?

16 A.   I definitely did solicit his cooperation,

17 yes, I did, sir.

18 Q.   And you explained to him, at least in

19 some general terms, the federal sentencing

20 system?

21 A.   That is correct.

22 Q.   And you explained to him that if he

23 cooperated, there was a possibility he could

24 get his sentence reduced?

25 A.   In the terms of a downward departure

1 motion, as authorized by the United States

2 Attorney, and that is for substantial

3 assistance as provided to the Government. And

4 then, in essence, all of the things that a

5 person is able to do is submitted to the US

6 Attorney for his review. And the US Attorney

7 is the one that can authorize a downward

8 departure motion.

9     Otherwise, it's a situation where if

10 you have an offense and you're found guilty,

11 there's a prescribed penalty for that, and the

12 only way to change that is through, that I'm

13 aware of, is through a downward departure

14 motion.

15 Q.   And only the US Attorney can make that

16 motion; isn't that true?

17 A.   Yes, sir.

18 Q.   Well, was it determined that Mr. Greve's

19 passenger, Mr. Wussing, was not involved in

20 anything to do with the transaction?

21 A.   It was a separate interview.

22 Q.   Is that your understanding, however?

23 A.   I really can't comment. I don't know.

24 Q.   When Mr. Greve mentioned the person known

25 as Memphis and a person known as Fifty, did you

1 follow up and investigate to see who those

2 people were?

3 A.   No. That wasn't my responsibility.

4 Q.   And did you investigate to see whether

5 the information that he gave you was accurate?

6 A.   Basically, what I did is compiled a

7 report and submitted it to the officers that

8 were in charge of the investigation.

9 Q.   So you don't know whether or not

10 Mr. Greve was just telling you something so he

11 could get out of there, do you?

12 A.   I don't -- no, I really have no way of

13 evaluating that.

14 Q.   And if I'm correct, you're saying

15 Mr. Greve told you that he sold this Shaun an

16 8 ounce quantity of cocaine on two occasions,

17 and 4 ounces on one occasion, and 2 ounces on

18 one other occasion?

19 A.   That is correct.

20 Q.   Thank you.

21     MR. TAYLOR: That's all the questions

22 I have, Your Honor.

23     THE COURT: Any further evidence with

24 this witness?

25     MS. BAUMANN: Nothing further, Your

1 Honor.

2 THE COURT: Thank you, sir. You may

3 step down.

4 Ready for the Government's next

5 witness.

6 MS. BAUMANN: United States calls

7 Captain Greg Egan.

8 THE COURT: Hello, sir. Please raise

9 your right hand.

10 GREGORY EGAN,

11 called as a witness, being first duly sworn,

12 was examined and testified as follows:

13 THE COURT: Please come to the stand.

14 DIRECT EXAMINATION

15 BY MS. BAUMANN:

16 Q. Captain Egan, please state your name and

17 spell your last name for the record.

18 A. Gregory Egan, E-G-A-N.

19 Q. How are you currently employed?

20 A. With the Dubuque County Sheriff's Office.

21 Q. And what's your title there?

22 A. Captain.

23 Q. When did you become a captain?

24 A. In July of 2003.

25 Q. And how long have you been with the

1 Dubuque County Sheriff's Office?

2 A. About sixteen years.

3 Q. Are you currently assigned to a task

4 force?

5 A. Not at the present time.

6 Q. Were you previously?

7 A. Yes, I was.

8 Q. And what task force was that?

9 A. The Dubuque Drug Task Force.

10 Q. Were you a member of that task force in

11 2002?

12 A. Yes.

13 Q. And what was your title at the Sheriff's

14 Office then?

15 A. I was the sergeant project director,

16 supervisor of the Drug Task Force.

17 Q. How long have you been a law enforcement

18 officer?

19 A. Sixteen years.

20 Q. And prior to beginning your work as a law

21 enforcement officer, did you receive training

22 at the state academy?

23 A. Yes, I did.

24 Q. Did you successfully complete that

25 training?

1 A. Yes, I did.

2 Q. Have you had specialized narcotics

3 training since that time?

4 A. Yes. I attended a two-week school, I

5 believe it was back in 1989, that was sponsored

6 by the Drug Enforcement Administration; as well

7 as a week-long drug unit supervisor's course, I

8 believe, in 2001.

9 Q. So you maintain continuing education

10 requirements?

11 A. Yes, I have.

12 Q. And you're fully certified as a law

13 enforcement officer?

14 A. Yes.

15 Q. Were you involved in the investigation of

16 Ronald Greve?

17 A. Yes, I was.

18 Q. Do you see Mr. Greve in the courtroom

19 today?

20 A. Yes, I do.

21 Q. Could you point him out and describe what

22 he's wearing.

23 A. He's the gentleman at the defense table

24 with the light blue striped shirt, short brown

25 hair.

1 MS. BAUMANN: Your Honor, may the

2 record reflect the witness has identified the

3 Defendant?

4 THE COURT: Yes.

5 BY MS. BAUMANN:

6 Q. What was your role in the investigation

7 of Ronald Greve?

8 A. I was requested by the officers or agents

9 with the state narcotics to assist in a

10 takedown controlled delivery of cash.

11 Q. What is a takedown?

12 A. We arrange for a meeting with Mr. Greve

13 and Mr. Ruff, who was part of a prior

14 investigation that was conducted by the state

15 narcotics agents, arranged for them to --

16 arranged for Mr. Ruff to pay Mr. Greve back

17 monies that were owed for a drug transaction.

18 Our intent was to have the meeting

19 take place. We would place the individuals

20 that arrived at the scene -- we would take

21 those into custody or detain them.

22 Q. During these takedowns, are the suspects

23 placed in custody typically?

24 A. Yes.

25 Q. And are they placed in handcuffs to do

1 that?
2 **A. Yes.**
3 **Q.** Are they placed on the ground?
4 **A. Many times, yes.**
5 **Q.** Were you present on December 13 when the
6 transaction took place?
7 **A. I acted as a surveillance unit, so, yes,**
8 **I was present.**
9 **Q.** Where did the transaction occur?
10 **A. At the Heritage Pond parking lot, which**
11 **is just north of Dubuque off of Highway 52.**
12 **Q.** And what was your role, then, during the
13 surveillance of that transaction?
14 **A. To monitor audio, to overhear when the**
15 **transaction took place, and then move in on**
16 **the -- converge on the scene or on the**
17 **vehicles.**
18 **Q.** And did you converge on the scene?
19 **A. Yes.**
20 **Q.** And what happened then?
21 **A. When I arrived, I saw that agents and**
22 **officers from the task force had the three**
23 **suspects under control. They were detained,**
24 **and arrangements were made for them to be**
25 **transported to be interviewed.**

1 **Q.** Who are the three suspects?
2 **A. Mr. Greve, Shaun Ruff, and I believe Mike**
3 **Wussing was the third individual.**
4 **Q.** What happened from that point?
5 **A. My role was to assist with the interview**
6 **of Ron Greve, and arrangements were made for**
7 **him to be taken to the Asbury, Iowa, Police**
8 **Department.**
9 **Q.** Did you go to the police department?
10 **A. Yes, I did.**
11 **Q.** Did you go with the Defendant or did you
12 meet him there?
13 **A. I met him there.**
14 **Q.** What happened once you got to the police
15 department?
16 **A. I met with Special Agent Mike Dasso from**
17 **the Iowa Division of Narcotics Enforcement and**
18 **Mr. Greve.**
19 **Q.** Where did you meet?
20 **A. In a conference-type room at the police**
21 **department.**
22 **Q.** And who was all present during that
23 interview?
24 **A. Myself, Special Agent Dasso, and**
25 **Mr. Greve.**

1 **Q.** Was the Defendant in handcuffs during the
2 interview?
3 **A. No, he was not.**
4 **Q.** Was he in handcuffs up to the point where
5 he got to the police station?
6 **A. Yes.**
7 **Q.** Who is in charge of the whole interview
8 process?
9 **A. Special Agent Dasso.**
10 **Q.** What was your role then?
11 **A. Primarily as a witness.**
12 **Q.** Did you write up a report?
13 **A. No, I did not.**
14 **Q.** What happened when you first got to the
15 interview room at the police station?
16 **A. Special Agent Dasso discussed with**
17 **Mr. Greve the cooperation statement that has to**
18 **do with his cooperation to further the**
19 **investigation. Also provided him -- first off,**
20 **he read him his Miranda rights, his rights as**
21 **per Miranda, and then went into the cooperation**
22 **statement.**
23 **Q.** When you say read him his rights per
24 Miranda, what do you mean?
25 **A. The right to remain silent. Anything you**

1 say can be used against him in a court of law,
2 so on and such.
3 **Q.** And you say he read them. What did he
4 read them from?
5 **A. A small card, I believe, that he carried**
6 **in his wallet.**
7 **Q.** You witnessed this entire sequence?
8 **A. Yes.**
9 **Q.** And you said there was a cooperation
10 statement. What did that entail?
11 **A. Basically discusses or talks about the**
12 **fact of the Defendant is interested to**
13 **cooperate; that any statements or any**
14 **cooperation that he may provide to the**
15 **Government is provided to the United States**
16 **Attorney's Office to make a decision at the**
17 **sentencing time as far as a departure downward**
18 **on sentencing.**
19 **Q.** Did you force the Defendant to sign that
20 cooperation statement?
21 **A. No.**
22 **Q.** Did Agent Dasso?
23 **A. No.**
24 MS. BAUMANN: Your Honor, may I
25 approach?

1    THE COURT: Yes.

2    BY MS. BAUMANN:

3    Q.    Captain Egan, I'm putting Government

4    Exhibit 14, which has already been admitted

5    into evidence, on the screen. Do you recognize

6    this document?

7    A.    Yes, I do.

8    Q.    Placing the bottom portion of it on the

9    screen, what do you see on the bottom portion

10    there?

11    A.    I see the signature of Mr. Greve, along

12    with that of Special Agent Dasso. My

13    signature's off to the right. It's dated the

14    13th of December, at two p.m. The bottom notes

15    where the Miranda rights were provided at 1:54

16    p.m.

17    Q.    And I really only see two signatures.

18    Where is your signature on there?

19    A.    Off to the right of Special Agent

20    Dasso's, just off of that line.

21    Q.    Is it that scribble I'm pointing to right

22    now?

23    A.    Yes.

24    Q.    What happened after the cooperation

25    statement was signed by the Defendant?

1    A.    Special Agent Dasso then began to

2    interview him more in-depth about his

3    involvement with narcotics use at the outset of

4    the interview, and then more specific down to

5    the transactions that had taken place with

6    Mr. Ruff.

7    Q.    When you say Special Agent Dasso did the

8    interview, did you do any of the questioning?

9    A.    No.

10    Q.    You merely listened?

11    A.    Correct.

12    Q.    What admissions did the Defendant make

13    during the interview?

14    A.    He stated that he had arranged for the

15    delivery of two -- on two occasions of 8 ounces

16    of cocaine in exchange for $6500, one occasion

17    for 4 ounces of cocaine in exchange for $3200,

18    and another occasion where he arranged for the

19    delivery of 2 ounces of cocaine for $1600, I

20    believe.

21    Q.    And those prices you just mentioned, is

22    that what he was paying for the cocaine or

23    charging for it?

24    A.    That was what he was paying for the

25    cocaine for his source.

1    Q.    And who was his source, did he say?

2    A.    A black male that he named as -- street

3    name or nickname of Fifty.

4    Q.    Did he give any other information about

5    Fifty?

6    A.    He stated that he was a black male,

7    approximately six-foot-two, 160 pounds, with a

8    tribal style tattoo on his arm.

9    Q.    Did he make any other admissions about

10    Fifty?

11    A.    Stated that Fifty was from Rockford,

12    Illinois; that he would get the cocaine from

13    Fifty. Fifty would front the cocaine to him,

14    and he'd arrange later to make payment in

15    return for the cocaine.

16    Q.    In your experience as a law enforcement

17    officer, what does "front" mean?

18    A.    A front is typically where the source

19    provides the drugs, the narcotics, to his

20    person that's going to distribute for him

21    without a cash transaction taking place. Once

22    the cocaine in this case is sold, then the

23    money is paid back to the source.

24    Q.    Did the Defendant admit how he

25    communicated with Fifty?

1    A.    Through the use of cell phone. Initially

2    it was through the use of a pager, but then the

3    pager became nonfunctional for whatever reason,

4    and then through the use of cell phone.

5    Q.    And did he mention any locations that he

6    had met Fifty to conduct these transactions?

7    A.    He had met him at the A&W Restaurant

8    located on First Street, just off of the

9    Dubuque/Illinois -- Iowa/Illinois bridge. He

10    also met him at the Dairy Queen, which is

11    located just south of Dubuque in Key West, and

12    at an Amoco gas station in Galena, Illinois.

13    Q.    You mentioned the prices, what the

14    Defendant bought the cocaine for. Did he

15    mention how much he sold it for?

16    A.    Yes, he did.

17    Q.    And what were those prices?

18    A.    The 8 ounce quantities were sold for

19    $6800. The 4 ounce quantities were sold for

20    $3200, and the 2 ounce quantity was sold for

21    $1800.

22    Q.    And who was the Defendant selling the

23    quantities to?

24    A.    Shaun Ruff.

25    Q.    Did he know him by that full name?

1  **A.  I believe he just knew him as Shaun.**

2  Q.  And did he admit how long he had known

3  Shaun?

4  **A.  Approximately a month and a half.**

5  Q.  Did the Defendant make any admissions

6  about his own drug use?

7  **A.  Yes, he did.**

8  Q.  What did he say?

9  **A.  Stated that he began at the age of twelve**

10  **using marijuana, and that by the time he was**

11  **age seventeen, he had -- he had moved up to**

12  **harder drugs, such as LSD and cocaine.**

13  Q.  Did he make any other admissions about

14  drugs?

15  **A.  I believe that he stated that he had used**

16  **some methamphetamine on different occasions.**

17  Q.  Any other admissions?

18  **A.  Not that I can recall.**

19  Q.  How long did you and Agent Dasso meet

20  with the Defendant that day?

21  **A.  I would estimate probably for an hour and**

22  **a half.**

23  Q.  How did the interview end?

24  **A.  The Defendant was allowed to leave the**

25  **police department in his vehicle, which had**

1  **been brought by another officer to the police**

2  **station.**

3  Q.  He wasn't taken into custody?

4  **A.  No, he was not.**

5  Q.  Did you make any arrangements with him

6  prior to him leaving the police station?

7  **A.  He was to contact me so that we could**

8  **arrange to pay back the money that had been**

9  **owed -- that was owed to Fifty, to pay off the**

10  **front.**

11  Q.  And how -- how did you arrange to make

12  contact with him in the future?

13  **A.  He was provided with my cell phone.**

14  Q.  Is it common to release a suspect

15  following a transaction and an interview like

16  that which took place on December 13, 2002?

17  **A.  Yes, it is.**

18        MS. BAUMANN:  No further questions

19  for the witness, Your Honor.

20        THE COURT:  All right.

21  Cross-examination, Mr. Taylor.

22        MR. TAYLOR:  Thank you.

23

24

25

1          CROSS-EXAMINATION

2  BY MR. TAYLOR:

3  Q.  The only thing that leads you to believe

4  that Mr. Ruff owed Mr. Greve some money for

5  drugs was what Mr. Ruff told you, correct?

6  **A.  What Mr. Greve told me.**

7  Q.  But at the --

8  **A.  I believe you stated what Mr. Ruff told**

9  **me.**

10  Q.  He just said Shaun, didn't he, during the

11  interview?

12  **A.  Maybe I'm not understanding your**

13  **question.**

14  Q.  Okay.  Let me try it again.  Prior to the

15  transaction on December 13, you had no

16  understanding that Mr. Ruff owed Mr. Greve any

17  money for drugs other than what Mr. Ruff told

18  you.  That's the only information you had,

19  correct?

20  **A.  I never had spoken with Mr. Ruff.**

21  Q.  Okay.  So you had no idea whether or not

22  Mr. Ruff owed Mr. Greve money for drugs or not,

23  prior to December 13?

24  **A.  I was acting on the information that was**

25  **provided by state narcotics agents.**

1  Q.  Does the name Shaun Lang ring a bell?

2  **A.  No, it does not.**

3  Q.  You've been a drug agent in Dubuque for a

4  number of years, haven't you?

5  **A.  Yes, four years, I believe I was.**

6  Q.  Was Agent Dasso's interview of Mr. Greve

7  recorded?

8  **A.  No.**

9  Q.  Was Mr. Greve asked to sign any summary

10  of that statement or was he asked to write down

11  what information he was giving?

12  **A.  No, he was not.**

13  Q.  So we have no recorded or written

14  statement from Mr. Greve himself; it's just

15  what you and Officer Dasso remember about the

16  interview, correct?

17  **A.  It would have been -- yes, the report.**

18  Q.  At some time after the interview on

19  December 13 of 2002, did you ask Mr. Greve to

20  show you documents regarding his student loan?

21  **A.  I believe I may have, yes.**

22  Q.  And was that so he could document to you

23  why he had the $350?

24  **A.  Yes, I believe so.**

25  Q.  Was it your understanding that

1  Mr. Wussing, the passenger in Mr. Greve's car,
2  the passenger on December 13, had nothing to
3  do -- had no knowledge of this transaction?
4  A.   If my memory is correct, yes.
5  Q.   Thank you.
6       MR. TAYLOR: That's all the questions
7  I have, Your Honor.
8       THE COURT: Anything else,
9  Ms. Baumann?
10      MS. BAUMANN: Nothing further, Your
11 Honor.
12      THE COURT: Thank you, sir. You may
13 step down.
14      Members of the jury, we are right at
15 the end of our court day. Let's talk about
16 what you can expect tomorrow.
17      We're going to start tomorrow at
18 9:30, and I regret we have to start so late,
19 but I have to go to physical therapy on my
20 shoulder and I won't be able to make it back
21 over here until 9:30. So we'll start at 9:30
22 and we'll continue with the evidence.
23      I'm not sure if we will get the
24 evidence done tomorrow and start submitting the
25 case or not. But out of an abundance of

1  caution, I'm going to order some sandwiches for
2  you about noon, and we'll take a break about
3  noon so that you can refresh yourselves here
4  and not go out for lunch and then we'll keep
5  going with the case.
6       Hopefully we can finish the evidence
7  tomorrow, and maybe even put the case in. If
8  not, we'll do that on Thursday. So I would
9  like you to continue to follow the admonitions
10 of the Court, and we'll see you bright and
11 early tomorrow morning at 9:30. You can leave
12 your pads and pens on your chairs. See you in
13 the morning.
14      (Whereupon, the jury exited the
15 courtroom.)
16      THE COURT: This is United States of
17 America versus Ron Greve, Criminal Number
18 04-1008. We're outside the presence of the
19 jury with the Defendant present.
20      My thought on this will be, I'm not
21 sure how fast Mr. Mower's testimony's going to
22 go in tomorrow, but Mr. Taylor, you'll be ready
23 with your witnesses, if you decide to call
24 them, first thing in the morning?
25      MR. TAYLOR: Yes.

1       THE COURT: All right. And anything
2  else for the good of the order?
3       MS. BAUMANN: No, Your Honor.
4       MR. TAYLOR: Just one thing, Your
5  Honor. The Government hasn't offered into
6  evidence, I don't believe yet, the lab reports.
7  We have a stipulation which has been, I think,
8  read in. I would reserve the relevancy
9  objection as to those, we just waive the
10 foundation.
11      THE COURT: All right. And so those
12 go to transactions 1 and 2 -- or exhibits --
13 I'm sorry, 1 and 2, those marijuana
14 transactions.
15      MR. TAYLOR: Well, they're for all, I
16 think -- the record I hope I made was that I
17 was objecting on all the transactions prior to
18 December 13.
19      THE COURT: Okay. All right. And so
20 when those -- before that is shown to the jury,
21 then, we'll let Mr. Taylor make his objection
22 in front of the jury, and we'll decide which of
23 those come in. All right. So I will see you
24 in the morning.
25      (Proceedings concluded at 4:55 p.m.)

1            C E R T I F I C A T E

2       I, Patrice A. Murray, a Certified
   Shorthand Reporter of the State of Iowa, do
3  hereby certify that at the time and place
   heretofore indicated, a jury trial was held
4  before the Honorable Linda R. Reade; that I
   reported in shorthand the proceedings of said
5  jury trial, reduced the same to print by means
   of computer-assisted transcription under my
6  direction and supervision, and that the
   foregoing transcript is a true record of all
7  proceedings had on the taking of said jury
   trial at the above time and place.
8
9       I further certify that I am not related
   to or employed by any of the parties to this
10 action, and further, that I am not a relative
   or employee of any attorney or counsel employed
11 by the parties hereto or financially interested
   in the action.
12
13      IN WITNESS WHEREOF, I have set my
   hand this 10th day of January, 2005.
14
15      Patrice A. Murray, CSR, RPR, RMR, FCRR
        Federal Building
16      101 First Street S.E.
        Cedar Rapids, Iowa 52401
17
18
19
20
21
22
23
24
25