1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF IOWA

2

3    UNITED STATES OF AMERICA, )

4              Plaintiff,      )    CR 04-1008

5    VS.                       )    VOLUME II

6    RONALD GREVE,             )

7              Defendant.      )

FILED
U.S. DISTRICT COURT
CEDAR RAPIDS HDQTRS OFFICE
NORTHERN DISTRICT OF IOWA

JAN 1 1 2005

By:_____ DEPUTY

8                APPEARANCES:

9    ATTORNEY TERESA BAUMANN, Assistant US Attorney,
     Suite 400, 401 First Street S.E., P.O. Box

10   74950, Cedar Rapids, Iowa 52407-4950, appeared
     on behalf of the United States.

11

     ATTORNEY WALLACE L. TAYLOR, Suite 326, 118

12   Third Avenue S.E., Cedar Rapids, Iowa
     52401-1408, appeared on behalf of the

13   Defendant.

14

15

16                JURY TRIAL,

17   held before the Hon. Linda R. Reade on the 18th

18   day of August, 2004, at the Federal Building,

19   101 First Street S.E., Cedar Rapids, Iowa,

20   commencing at 9:30 a.m.

21

22

23

24        Patrice A. Murray, CSR, RPR, RMR, FCRR
                  Federal Building
               101 First Street S.E.

25            Cedar Rapids, Iowa 52401
                  (319) 286-2324

1                          INDEX

2    WITNESS              D          C          RD          RC

3    Tyler Mower         168        204        208         209

4    Edward Michel       225        229        231

5    Babette Birch       231        234        237

6

7

8                        EXHIBITS

9                                   O          R

10   Exhibit No. 3                 174        175
     Exhibit No. 4                 176        176
11   Exhibit No. 5                 178        178
     Exhibit No. 6                 183        183
12   Exhibit No. 7                 185        186
     Exhibit No. 13                199        200
13   Exhibit A                     245        245

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

UNITED STATES OF AMERICA,)
                         )
          Plaintiff,     )     CR 04-1008
                         )
     vs.                 )     VOLUME II
                         )
RONALD GREVE,            )
                         )
          Defendant.     )

APPEARANCES:

ATTORNEY TERESA BAUMANN, Assistant US Attorney,
Suite 400, 401 First Street S.E., P.O. Box
74950, Cedar Rapids, Iowa 52407-4950, appeared
on behalf of the United States.

ATTORNEY WALLACE L. TAYLOR, Suite 326, 118
Third Avenue S.E., Cedar Rapids, Iowa
52401-1408, appeared on behalf of the
Defendant.

JURY TRIAL,

held before the Hon. Linda R. Reade on the 18th
day of August, 2004, at the Federal Building,
101 First Street S.E., Cedar Rapids, Iowa,
commencing at 9:30 a.m.

Patrice A. Murray, CSR, RPR, RMR, FCRR
Federal Building
101 First Street S.E.
Cedar Rapids, Iowa 52401
(319) 286-2324

---

## INDEX

| WITNESS | D | C | RD | RC |
|---|---|---|---|---|
| Tyler Mower | 168 | 204 | 208 | 209 |
| Edward Michel | 225 | 229 | 231 | |
| Babette Birch | 231 | 234 | 237 | |

## EXHIBITS

|  | O | R |
|---|---|---|
| Exhibit No. 3 | 174 | 175 |
| Exhibit No. 4 | 176 | 176 |
| Exhibit No. 5 | 178 | 178 |
| Exhibit No. 6 | 183 | 183 |
| Exhibit No. 7 | 185 | 186 |
| Exhibit No. 13 | 199 | 200 |
| Exhibit A | 245 | 245 |

---

THE COURT: This is *United States of America versus Ronald Greve*, Criminal Number 04-1008. We are outside the presence of the jury for the purpose of making record.

Mr. Greve is here with his attorney, Mr. Taylor. Assistant United States Attorney Theresa Baumann is here on behalf of the United States.

It's my understanding, Mr. Taylor, that Marvin Kimball did not respond to your subpoena and appear this morning at nine; is that correct?

MR. TAYLOR: That's correct.

THE COURT: And as we talked yesterday, I had the clerks get a warrant ready.

THE COURT SECURITY OFFICER: He's here now.

THE COURT: He is here now? Marvin Kimball, okay. Let's check and make sure that it's "the" Marvin Kimball so we can stop the marshals if it's the right one.

THE COURT SECURITY OFFICER: Reed.

MR. TAYLOR: Reed, no. May I check, Your Honor, just a moment?

---

THE COURT: Yes. Reed is a juror.

(A discussion was held off the record.)

THE COURT: Back on the record. I stand corrected. Marshal Arechiga just let us know that Mr. Kimball has appeared late, but he's here. I've told the marshals not to execute the warrant, but to caution him that he needs to remain here until he's called as a witness.

Anything -- I'm sorry, Mr. Taylor.

MR. TAYLOR: Yes, that's fine. I did just talk with Mr. Kimball briefly, and we discussed yesterday appointing an attorney to advise him. That may be a good idea.

THE COURT: All right. And I'll ask Nikki to go across the hall and ask Denise to call somebody to come over right away to meet with Mr. Kimball.

And Nikki, when you go out in the hall, will you tell him that we're calling an attorney to come over and meet him?

THE CLERK: Yes.

THE COURT: What does Mr. Kimball look like? Is he the only guy out there?

1    MR. TAYLOR: He's the only
2    African-American.
3        THE COURT: Okay. He's the only
4    African-American in the hall.
5        THE CLERK: Okay, thank you.
6        THE COURT: Yeah. All right. Crisis
7    Number 1 of the day averted. Anything else
8    that we need to talk about before the jury
9    comes in, Mr. Taylor?
10       MR. TAYLOR: I talked to Ms. Baumann
11   this morning, and it's my understanding that
12   the Government is going to introduce a
13   videotape of the transaction at the Heritage
14   Trail Pond and also an audiotape, a separate
15   audiotape. I intend to object to the audio
16   part but not the video part. And so I think we
17   need to take that up at that time before the
18   video's actually played.
19       THE COURT: All right. Is this the
20   transaction or the occurrence where the
21   Defendant was arrested?
22       MS. BAUMANN: Yes.
23       MR. TAYLOR: Yes.
24       THE COURT: All right. And there is
25   a video and an audio of it, and the video you

1    don't object to. What number is that in the
2    witness -- or in the exhibit list?
3        MS. BAUMANN: It's Government
4    Exhibit 13, but it's my understanding that
5    Mr. Taylor is still objecting to the audio
6    portion of the videotape. We did not redact
7    the audio. It's as it was recorded.
8        THE COURT: Okay. All right. And so
9    what is your objection to Exhibit 13 audio?
10       MR. TAYLOR: Lack of foundation, it's
11   hearsay, requires speculation by the jury, and
12   Rule 403 also. It's my understanding none of
13   the participants in the conversation will be
14   testifying.
15       THE COURT: All right. How are you
16   then going to lay the foundation for
17   Exhibit 13?
18       MS. BAUMANN: Your Honor, I believe I
19   can meet the MacMillan factors by Agent
20   Taylor -- or excuse me, Tyler Mower is going to
21   testify. He was in the vehicle where the
22   recording device was located, he monitored the
23   entire transaction, and he observed visually
24   what was going on at the same time.
25       THE COURT: All right. And he'll be

1    able to testify that visually what was going on
2    comported with what he saw?
3        MS. BAUMANN: And what he heard, yes.
4        THE COURT: And he'll be able to talk
5    about the equipment and so on and so forth?
6        MS. BAUMANN: Yes.
7        THE COURT: All right. I'll take
8    that up then and see if you lay the proper
9    foundation.
10       And what other -- just the audio of
11   13, that's the thing you're objecting to?
12       MR. TAYLOR: Yes, yes. The video, I
13   think, is something that speaks for itself.
14   But the audio, I think, has some problems.
15       THE COURT: All right. Anything
16   else?
17       MS. BAUMANN: Nothing, Your Honor.
18       THE COURT: All right. If the jury's
19   ready, we're ready.
20       (Whereupon, the jury entered the
21   courtroom.)
22       THE COURT: Good morning, members of
23   the jury. We're ready to continue with the
24   case of United States of America versus Greve.
25   And the Government may continue with its

1    evidence.
2        MS. BAUMANN: Thank you, Your Honor.
3    The United States calls Inspector Tyler Mower.
4        THE COURT: Hello, sir. Please raise
5    your right hand.
6            TYLER MOWER,
7    called as a witness, being first duly sworn,
8    was examined and testified as follows:
9        THE COURT: Please come to the stand.
10          DIRECT EXAMINATION
11   BY MS. BAUMANN:
12   Q.   Inspector Mower, please state your full
13   name and spell your last name for the record.
14   A.   Tyler Mower, T-Y-L-E-R, M-O-W-E-R.
15   Q.   How are you currently employed?
16   A.   I am a federal law enforcement officer
17   with the United States Postal Inspection
18   Service out of Springfield, Illinois.
19   Q.   And prior to becoming a postal inspector,
20   what was your title?
21   A.   I was a special agent with the Division
22   of Narcotics Enforcement down out of Dubuque,
23   Iowa.
24   Q.   When did you become a postal inspector?
25   A.   Approximately a year and a half ago.

1 Q. How long were you a special agent prior
2 to that?
3 A. I was a special agent for approximately
4 three and a half years. And before that I was
5 a state police officer out of Marquette, Iowa,
6 and the Quad Cities.
7 Q. Prior to beginning your work as a state
8 police officer, did you receive training at the
9 state academy?
10 A. Yes, I did.
11 Q. Did you successfully complete that
12 training?
13 A. Yes.
14 Q. Have you been to specialized narcotics
15 training at any time?
16 A. Yes, I have.
17 Q. What has that entailed?
18 A. I attended the two-week Drug Enforcement
19 Agency school in Des Moines, Iowa. I've also
20 attended several schools in Sioux City, Iowa,
21 including a one-week undercover -- specialized
22 training in undercover drug narcotics work and
23 also basic investigator's school in Sioux City,
24 Iowa.
25 Q. You've maintained all continuing

1 education requirements?
2 A. Yes, I have.
3 Q. And you're fully certified as a law
4 enforcement officer?
5 A. Yes, I am.
6 Q. Were you involved in the investigation of
7 Ronald Greve?
8 A. Yes, I was.
9 Q. Do you see Mr. Greve in the courtroom
10 today?
11 A. Yes, I do.
12 Q. Could you point him out and describe what
13 he's wearing?
14 A. He's sitting right here. He's got the
15 blue shirt with the -- it appears to be a
16 yellow tie.
17 MS. BAUMANN: Your Honor, may the
18 record reflect the witness has identified the
19 Defendant.
20 THE COURT: Yes.
21 BY MS. BAUMANN:
22 Q. When did the investigation of the
23 Defendant begin?
24 A. On July 24 of 2002.
25 Q. And when did you become involved in the

1 investigation?
2 A. I became involved on August 29 of 2002.
3 Q. And initially what was your role in the
4 investigation?
5 A. I became the case agent on August 29 of
6 2002, because the Bear Creek Narcotics Task
7 Force decided they were going to use me in an
8 undercover capacity to try to purchase
9 narcotics from Shaun Ruff.
10 Q. And who was the case agent prior to you
11 becoming the case agent?
12 A. Steve Schroeder from the Bear Creek
13 Narcotics Task Force was the agent prior to me.
14 Q. Why aren't you currently the case agent?
15 A. I took a different position with the
16 federal law enforcement, so I passed my case
17 along to Special Agent Darrell Simmons.
18 Q. After you became involved in the
19 investigation, what generally occurred?
20 MR. TAYLOR: I'm going to object,
21 Your Honor, to any questioning of any incidents
22 prior to December 13 of 2002, for the reasons
23 stated yesterday; that it's irrelevant and
24 immaterial, and no foundation that involve
25 Mr. Greve.

1 THE COURT: I will conditionally
2 admit evidence concerning incidents prior to
3 December 13, 2002.
4 BY MS. BAUMANN:
5 Q. You can answer the question.
6 A. Okay. Could you state that again,
7 please.
8 Q. Yes. When you became involved in the
9 investigation, what generally was the direction
10 of the investigation?
11 A. When I was involved on August 19 of 2002,
12 the first transaction that I was involved in,
13 Ed Michel purchased approximately a half-ounce
14 of cocaine from Shaun Ruff in what we called
15 the old school parking lot in St. Donatus,
16 Iowa.
17 Q. When did that transaction occur?
18 A. That was on August 19 of 2002 -- excuse
19 me, that was August -- I don't recall actually.
20 I believe it was August 29, 2002. If I could
21 look at my notes, I could tell, yeah.
22 Q. Would looking at your reports refresh
23 your recollection?
24 A. Yes.
25 MS. BAUMANN: Your Honor, may I

1　approach the witness?

2　　　　THE COURT:  Yes.

3　A.　　**Thank you.  It was August 29 of 2002.**

4　BY MS. BAUMANN:

5　Q.　　Looking at your notes reflected -- or

6　refreshed your recollection?

7　A.　　**Yes, August 29, 2002.**

8　Q.　　On that date, how much money was paid for

9　the cocaine that was purchased?

10　A.　　**$560.**

11　Q.　　And about how much cocaine was purchased?

12　A.　　**Approximately one-half ounce.**

13　Q.　　During that transaction, what sort of

14　procedure was followed?

15　A.　　**During a typical drug transaction, if a**

16　**confidential informant is used, that**

17　**confidential informant is searched before and**

18　**after the transaction.  They're provided with**

19　**preserialized United States currency.  After**

20　**the transaction, they're searched again.**

21　**They're provided with a body wire, which**

22　**enables law enforcement officers to monitor the**

23　**transaction and record the conversation taking**

24　**place.  And then after the transaction as well,**

25　**the confidential informant usually provides a**

1　**statement to law enforcement officers.**

2　Q.　　Was that standard procedure used on

3　August 29 in this case?

4　A.　　**Yes, it was.**

5　　　　MS. BAUMANN:  Your Honor, may I

6　approach the witness?

7　　　　THE COURT:  Yes.

8　BY MS. BAUMANN:

9　Q.　　I'm showing you what has been marked as

10　Government Exhibit 3.  Do you recognize that

11　item?

12　A.　　**Yes, I do.**

13　Q.　　What is that?

14　A.　　**That was the half-ounce that was**

15　**purchased by Ed Michel from Shaun Ruff.**

16　Q.　　Half-ounce of what?

17　A.　　**Half-ounce of cocaine.**

18　Q.　　And other than having been repackaged by

19　the laboratory, is it in the same condition as

20　it was in when you saw it on August 29 of 2002?

21　A.　　**Yes, it is.**

22　　　　MS. BAUMANN:  Your Honor, Government

23　moves to admit Government Exhibit 3 into

24　evidence.

25　　　　MR. TAYLOR:  Objection, Your Honor!

1　foundation, hearsay, speculation, and Rule 403.

2　　　　THE COURT:  Overruled.  It's

3　admitted.

4　　　　(Whereupon, Exhibit No. 3 was

5　received.)

6　BY MS. BAUMANN:

7　Q.　　Inspector Mower, was there any other

8　transactions in this case with which you were

9　involved?

10　A.　　**Yes, on October 5 of 2002, myself and Ed**

11　**Michel once again purchased cocaine from Shaun**

12　**Ruff.  On this occasion, we purchased 4 ounces**

13　**of cocaine, in the old school parking lot in**

14　**St. Donatus, Iowa.  We purchased 4 ounces for**

15　**$3800 in preserialized United States currency.**

16　Q.　　So you actually met with Shaun Ruff

17　yourself?

18　A.　　**Yes, I did.**

19　Q.　　Did he know you were a law enforcement

20　officer?

21　A.　　**No.  I was -- I was acting in an**

22　**undercover capacity, posing as a person from**

23　**the Chicago, Illinois, area.**

24　　　　MS. BAUMANN:  Your Honor, may I

25　approach the witness?

1　　　　THE COURT:  Yes.

2　BY MS. BAUMANN:

3　Q.　　Showing you what has been marked as

4　Government Exhibit 4.  Do you recognize that

5　item?

6　A.　　**Yes, I do.**

7　Q.　　What is it?

8　A.　　**This was the approximately 4 ounces that**

9　**was purchased by myself and Ed Michel on**

10　**October 5 of 2002.**

11　Q.　　And other than having been repackaged by

12　the laboratory, is it in the same condition as

13　it was in when you received it on that date?

14　A.　　**Yes, it is.**

15　　　　MS. BAUMANN:  Your Honor, United

16　States moves to admit Government Exhibit 4 into

17　evidence.

18　　　　MR. TAYLOR:  Same objection as to

19　Exhibit 3, Your Honor.

20　　　　THE COURT:  All right.  Overruled.

21　　　　(Whereupon, Exhibit No. 4 was

22　received.)

23　BY MS. BAUMANN:

24　Q.　　Were you involved in any other

25　transactions in this matter?

1 A. Yes, I was.

2 Q. When did that occur?

3 A. It was in November. I do not recall the

4 exact date.

5 Q. Would looking at your reports help

6 refresh your recollection?

7 A. Yes, it would.

8     MS. BAUMANN: Your Honor, may I

9 approach the witness with his report?

10     THE COURT: Yes.

11 BY MS. BAUMANN:

12 Q. Does looking at your report refresh your

13 recollection?

14 A. Yes, it does.

15 Q. What was the date of that next

16 transaction?

17 A. It was November 19 of 2002.

18 Q. What happened on that date?

19 A. On November 19 of 2002, myself -- I was

20 by myself that time -- I met with Shaun Ruff at

21 the old school parking lot, St. Donatus, Iowa,

22 once again. I purchased 4 ounces of cocaine.

23 This time the purchase price was for $3900.

24 Once again I was acting in an undercover

25 capacity.

1     MS. BAUMANN: Your Honor, may I

2 approach the witness?

3     THE COURT: Yes.

4 BY MS. BAUMANN:

5 Q. Showing you what has been marked as

6 Government Exhibit 5, do you recognize that

7 item?

8 A. Yes, I do.

9 Q. What is it?

10 A. It's the 4 ounces I purchased from Shaun

11 Ruff on November 19 of 2002.

12 Q. Other than having been repackaged by the

13 laboratory, is it in the same condition as it

14 was in when you purchased it?

15 A. Yes, it is.

16     MS. BAUMANN: Your Honor, United

17 States moves to admit Government Exhibit 5 into

18 evidence.

19     MR. TAYLOR: Same objections as to

20 Exhibits 3 and 4.

21     THE COURT: All right. Overruled.

22 It's admitted.

23     (Whereupon, Exhibit No. 5 was

24 received.)

25 BY MS. BAUMANN:

1 Q. And was there an additional transaction

2 with which you were involved?

3 A. Yes, there was.

4 Q. When did that occur?

5 A. On December 12, 2002.

6 Q. And what happened on that date?

7 A. On December 12 of 2002, I arranged --

8 made arrangements with Shaun Ruff to purchase

9 approximately 1 pound of cocaine, 16 ounces of

10 cocaine. We ended up meeting at a church

11 parking lot just south of St. Donatus on

12 Highway 52.

13     Mr. Ruff arrived, some conversations

14 took place, we were weighing out the cocaine

15 for the purchase that was going to be made.

16     During the conversation with Mr.

17 Ruff, after I had observed the cocaine, I gave

18 a what we call a "takedown signal," which would

19 be a word or phrase of words to let the other

20 officers know to come in and do a takedown

21 because we weren't actually going to pay the

22 money for this transaction.

23 Q. On December 12, November 19, and

24 October 5, did you use the same standard

25 procedures for conducting a controlled

1 transaction which you previously described?

2 A. Yes, we did.

3 Q. And you said that you gave the takedown

4 signal. What exactly does that mean?

5 A. The takedown signal, it would be a phrase

6 of words or word, whatever we would come up

7 with, that all the other officers know. And at

8 that time, the other officers would come in,

9 place the person -- detain the person, place

10 them in handcuffs for officer safety, pat the

11 person down. Usually they go into interviews

12 from there.

13 Q. How many takedowns have you participated

14 in in your career?

15 A. Numerous, dozens.

16 Q. During the takedown, what typically

17 happens with the suspects?

18 A. During most takedowns, the -- when the

19 officers arrive, they're asked to lay down,

20 they go prone on the ground, hands out, hands

21 and legs apart. Officers like to see their

22 hands for officer safety, once again, to make

23 sure they're not disposing of evidence or

24 trying to harm the officers. They're proned

25 out, and then placed in handcuffs, and they're

1 patted down once again for officer safety.

2 Q. Now, on December 12, 2002, were you

3 treated as a suspect?

4 A. Yes, I was.

5 Q. What does that mean?

6 A. Myself, when the officers showed up, I

7 was actually proned out as well. The standard

8 procedure when we're doing undercover

9 operation, the -- the officer's usually proned

10 out as well, and I was proned out. One

11 handcuff, I believe, was placed on me at the

12 time as well.

13 Q. Did you ever purchase cocaine that day?

14 A. No, the cocaine was not purchased.

15 Q. Did you have preserialized currency with

16 you?

17 A. Yes, I did.

18 Q. Why didn't you purchase the cocaine?

19 A. Usually when you're dealing with the

20 larger amounts of money, just in case of -- I

21 guess, the subject you're dealing with, in case

22 there would be a rip off with the officer, we

23 didn't want to be out the 14 or 15 thousand

24 dollars, so we had some money, and as soon as

25 the -- I gave the takedown signal, we didn't

1 want the actual money -- the transaction to

2 take place just in case we lost the money

3 somehow.

4 Q. But Mr. Ruff did have cocaine with him?

5 A. Yes, he sold me the cocaine.

6 Q. And approximately how many ounces did he

7 have?

8 A. It was approximately 17 ounces.

9 MS. BAUMANN: Your Honor, may I

10 approach the witness?

11 THE COURT: Yes.

12 BY MS. BAUMANN:

13 Q. Showing you what has been marked as

14 Government Exhibit 6. Do you recognize that

15 item?

16 A. Yes, I do.

17 Q. What is it?

18 A. It's the approximately 17 ounces that

19 Shaun Ruff showed to me on December 12, 2002.

20 Q. And there is a large baggie which

21 contains other baggies. Can you explain why

22 that is?

23 A. We -- on that particular one, we were

24 trying to actually weigh the cocaine and -- on

25 a scale to make sure I wasn't being ripped off.

1 So he had actually had a package, different

2 packages, so -- for weighing purposes, and

3 actually, he was transferring some of the

4 packages that night to smaller packages so it

5 could fit on the scale.

6 Q. And then other than having been

7 repackaged by the laboratory, are those

8 packages in the same condition as they were in

9 when you saw them on December 12, 2002?

10 A. Yes, they are.

11 MS. BAUMANN: Your Honor, Government

12 moves to admit Government Exhibit 6.

13 MR. TAYLOR: Same objection as to

14 Exhibits 3, 4, and 5.

15 THE COURT: Overruled. It's

16 admitted.

17 (Whereupon, Exhibit No. 6 was

18 received.)

19 MS. BAUMANN: May I approach again,

20 Your Honor.

21 THE COURT: Yes.

22 BY MS. BAUMANN:

23 Q. I'm showing you Government Exhibit 1 and

24 Government Exhibit 2, which have already been

25 admitted into evidence. Do you recognize those

1 items?

2 A. Yes, I do.

3 Q. What is it?

4 A. It is the half-pound, the alleged -- or

5 the half-pound of marijuana that was purchased

6 from Shaun Ruff by Ed Michel on July 24 of

7 2002.

8 Q. And what is Government Exhibit 2?

9 A. Exhibit 2 is the approximately 1 pound of

10 marijuana purchased by Ed Michel from Shaun

11 Ruff on August 19 of 2002.

12 Q. Were Government Exhibits 1 through 6

13 submitted to a laboratory for analysis?

14 A. Yes, they were.

15 Q. Which laboratory?

16 A. The DCI Criminalistics Laboratory in

17 Des Moines, Iowa.

18 MS. BAUMANN: Your Honor, may I read

19 a stipulation into the record?

20 THE COURT: You may.

21 MS. BAUMANN: "The *United States of*

22 *America versus Ronald Greve*, parties's

23 stipulation regarding admissibility of

24 laboratory reports.

25 "The United States of America and the

1 Defendant, Ronald Greve, stipulate and agree
2 that the following facts are true and may be
3 considered by the Court and the jury without
4 further evidence or testimony being offered:
5 "One, criminalists from the Iowa
6 Department of Public Safety's Division of
7 Criminal Investigations Criminalistics
8 Laboratory analyzed substances in this matter.
9 The laboratory reports are admissible business
10 records pursuant to Federal Rule of Evidence
11 803(6) and 902(11).
12 "The laboratory reports include the
13 following, which are attached hereto: A lab --
14 a report dated 11/5/02 authored by Sandra
15 Stoltenow, listing Exhibits A and C; a report
16 dated 11/12/02 authored by Terry Elrow
17 (phonetic), listing Exhibit E; a report dated
18 11/12/02 authored by Stacey Schmeiser, listing
19 Exhibit A; and a report dated 2/12/03 authored
20 by Terry Elrow, listing Exhibits G, I, J,
21 K-001, K-002, and K-003."
22 Your Honor, the United States moves
23 to admit Government Exhibit 7 pursuant to the
24 stipulation.
25 MR. TAYLOR: Object as to relevance,

1 Your Honor.
2 THE COURT: Overruled. It's
3 admitted.
4 (Whereupon, Exhibit No. 7 was
5 received.)
6 MS. BAUMANN: May I publish
7 Government Exhibit 7 to the jury.
8 THE COURT: Yes.
9 BY MS. BAUMANN:
10 Q. Inspector Mower, placing Page 1 of
11 Government Exhibit 7 on the overhead
12 projection, what does this exhibit show?
13 A. Exhibit A shows the half-pound of
14 marijuana that was purchased by Ed Michel from
15 Shaun Ruff on July 24, 2002. And Exhibit C
16 shows the approximately 1 pound of marijuana
17 that was purchased by Ed Michel from Shaun Ruff
18 on August 19, 2002.
19 Q. And there are a couple of names on this
20 paper. What are those names?
21 A. Shaun Joseph Ruff and Trevor James
22 Deutmeyer.
23 Q. Who is Trevor Deutmeyer?
24 A. He was a person we originally thought was
25 supplying Shaun Ruff with marijuana at that

1 time. The investigation later showed that it
2 appeared --
3 MR. TAYLOR: Objection, Your Honor,
4 hearsay and speculation.
5 THE COURT: I think we are getting
6 into hearsay on that. You can ask another
7 question.
8 MS. BAUMANN: Thank you.
9 BY MS. BAUMANN:
10 Q. Inspector Mower, placing page 2 of the
11 report, which is Government Exhibit 7, onto the
12 screen. What does that show?
13 A. That shows the approximately half-ounce
14 of cocaine that was purchased by Ed Michel on
15 August 29 of 2002.
16 Q. And page 3 of the exhibit, what does that
17 show?
18 A. That shows the 4 ounces that myself and
19 Ed Michel purchased from Shaun Ruff on -- I
20 can't recall the date offhand.
21 Q. The next buy in this case?
22 A. Yes, the next buy.
23 Q. And finally the last page of Government
24 Exhibit 7, what does this laboratory report
25 show?

1 A. Exhibit G is the 4 ounces that I had
2 purchased from Shaun Ruff on my own. And then
3 Exhibits I, J, K-001, K-002, and K-003 were
4 part of -- or the 17 ounces that Shaun Ruff
5 showed me on December 12 of 2002.
6 Q. Now, in all of these laboratory reports,
7 where do the letter exhibit names come from?
8 A. The letter exhibit names came from the
9 DCI lab.
10 Q. So those do not correlate with your
11 own -- you have separate numbers in your
12 investigation than the laboratory does?
13 A. Correct.
14 Q. When you obtained packages of drugs from
15 suspects, are they typically submitted to
16 experts for fingerprint analysis?
17 A. Depends on, I guess, the case-by-case
18 nature. If we know exactly who we're dealing
19 with, sometimes we won't submit them because
20 we've already got the evidence on video and
21 audio and there's a hand-to-hand with an agent.
22 On other occasions, where we're just
23 dealing with a Jim Smith on the street, we
24 don't know their true identity, we'll submit
25 them and try to get fingerprints from them. Or

1 if we're trying to follow up the -- trying to
2 discover the sources, trying to discover
3 actually who the cocaine is coming from, we'll
4 submit in those instances as well.
5 Q.  In your years of being a drug
6 investigator, about what percentage of the time
7 did you see analysis coming back with positive
8 identification of fingerprints when you did
9 send it to the laboratory for analysis.
10 A.  Very rarely do we actually get a positive
11 identification on the fingerprints from
12 submitting baggies to the lab for analysis.
13 Q.  Were there identifiable prints on
14 Government Exhibits 1 through 6?
15 A.  One -- I know one fingerprint came back
16 positive.
17 Q.  Who was that fingerprint to?
18 A.  Shaun Ruff.
19 Q.  Were any of your fingerprints found on
20 any of the drugs?
21 A.  No, they were not.
22 Q.  Any other fingerprints found?
23 A.  No.
24 Q.  Was there an audio recording made during
25 the transaction between you and Shaun Ruff on

1 December 12?
2 A.  Yes, there was.
3 Q.  How was that done?
4 A.  The body wire is basically -- I wore the
5 body wire on that particular evening, so I was
6 wearing the body wire for other officers to be
7 conducting surveillance and recording the
8 conversation. They record the conversation.
9 After the transaction is done, we take the
10 cassette tape, it's heat-sealed, and then
11 placed in the evidence locker. It's usually
12 duplicated for copies and the tabs are punched
13 out so it can't be altered or dubbed over in
14 any way.
15 Q.  And what is a body wire?
16 A.  A body wire -- basically it could be
17 numerous things. It's a microphone worn by
18 either the confidential informant or the
19 undercover officer that records the
20 conversations between you and -- you and the
21 suspect.
22     MS. BAUMANN:  Your Honor, may I
23 approach the witness?
24     THE COURT:  Yes.
25     BY MS. BAUMANN:

1 Q.  Showing you Government -- what have been
2 marked as Government's Exhibits 8 and 8A.  Do
3 you recognize those items?
4 A.  Yes, I do.
5 Q.  What is Government Exhibit 8?
6 A.  Exhibit 8 is the copy of the CD of the
7 transaction between me and Shaun Ruff on
8 December 12, 2002.
9 Q.  How do you know that?
10 A.  I've listened to the CD and initialed it.
11 Q.  Whose voices are on that compact disk?
12 A.  Myself and Shaun Ruff's.
13 Q.  Does the CD truly and accurately reflect
14 the conversation that you had with him on
15 December 12, 2002?
16 A.  Yes, it does.
17 Q.  Have there been any changes, additions,
18 or deletions made to that CD since it was
19 recorded?
20 A.  No.
21 Q.  And what is the item marked as
22 Exhibit 8 A?
23 A.  Exhibit 8A is a transcript of the
24 conversation between myself and Shaun Ruff on
25 December 12 of 2002.

1 Q.  Does it accurately reflect the names of
2 the speakers on the CD?
3 A.  Yes, it does.
4 Q.  And does it accurately reflect the
5 conversation which took place?
6 A.  Yes, it does.
7     MS. BAUMANN:  Your Honor, the
8 Government moves to admit Government Exhibit 8
9 and Government Exhibit 8A for demonstrative
10 purposes only.
11     MR. TAYLOR:  We object, Your Honor,
12 on the basis of relevancy and also under Rule
13 403.
14     THE COURT:  Overruled.
15     MS. BAUMANN:  May I publish
16 Government Exhibit 8 using the software?
17     THE COURT:  You may.
18     (Whereupon, the tape was played.)
19 BY MS. BAUMANN:
20 Q.  Inspector Mower, what was happening
21 during the bulk of that conversation?
22 A.  During the majority of that, the
23 transaction, myself and Mr. Ruff were at the
24 back of my vehicle at the trunk.  We were
25 trying to weigh out the cocaine.  He wasn't for

1 sure exactly how much he had, so he was
2 actually weighing it on the scale that I
3 brought with me.
4 Q. What happened following the transaction
5 on December 12 that we just listened to?
6 A. Following the transaction, after the
7 takedown signal was given, Ruff was talked to
8 by another investigator. Ruff decided he
9 wanted to cooperate and help himself out.
10 MR. TAYLOR: Objection, Your Honor,
11 hearsay as to what Mr. Ruff said.
12 THE COURT: Overruled. Proceed, but
13 let's not get into hearsay here.
14 A. The -- Ruff was interviewed by other
15 officers. I was -- I was taken away, and Ruff
16 was interviewed subsequent about his knowledge
17 of the drug transactions that we had been
18 involved with.
19 BY MS. BAUMANN:
20 Q. And what happened next?
21 A. We attempted to make several recorded
22 telephone calls to pay the money that he owed
23 for the cocaine.
24 Q. Was there eventually a transaction that
25 took place?

1 A. Yes, there was.
2 Q. When did that occur?
3 A. The cash transaction occurred on
4 December 13 of 2002.
5 Q. And who was involved in that transaction?
6 A. Shaun Ruff and Ron Greve.
7 Q. What was your role in that transaction?
8 A. I was a part of a surveillance vehicle,
9 and I was monitoring the body wire, and
10 helping -- or another person in the vehicle was
11 filming the transaction.
12 Q. So you were in the same vehicle with the
13 recording equipment that did a videotape and an
14 audiotape?
15 A. Correct.
16 Q. How do you know that Shaun Ruff and the
17 Defendant were the two people that were
18 involved?
19 A. We had followed Shaun Ruff to the
20 vehicle. Surveillance people had actually
21 followed him to the meeting location. From
22 dealing with Shaun in the past, we know he
23 drives a green Blazer.
24 The green Blazer was parked there at
25 the meeting place. Ruff had also advised that

1 Greve drove a red-colored Honda. We watched
2 the area where Ruff was waiting for Greve.
3 Greve pulled up in a red-colored Honda. He was
4 later interviewed, and other officers
5 positively identified him as Ron Greve.
6 Q. And where did the delivery take place?
7 A. The delivery took place just north of
8 Dubuque, at the Heritage Trail parking lot.
9 Q. Was there a specific location at that
10 Heritage Trail parking lot where the delivery
11 took place?
12 A. The actual transaction, cash transaction,
13 took place in Shaun Ruff's vehicle.
14 Q. What exactly did you see from your
15 vantage point?
16 A. When we first arrived, Shaun Ruff pulled
17 in the parking lot and parked. We listened to
18 the body wire. He ended up placing a phone
19 call to Ron Greve. A few minutes later, we
20 observed -- or I observed the red car being
21 driven by Ron Greve pull up. Ron Greve exited
22 the driver's side door and entered Shaun Ruff's
23 passenger's side where I heard the conversation
24 between him and -- between Shaun Ruff and Ron
25 Greve.

1 Q. Did you see anyone else other than Ron
2 Greve enter the Blazer which was driven by
3 Shaun Ruff?
4 A. No, I did not.
5 Q. And there was an audio recording of this
6 delivery made?
7 A. Yes, there was.
8 MS. BAUMANN: May I approach the
9 witness, Your Honor?
10 THE COURT: Yes.
11 BY MS. BAUMANN:
12 Q. I'm showing you what has been marked as
13 Government Exhibits 12 and 12A. Do you
14 recognize those items?
15 A. Yes, I do.
16 Q. And what is Government Exhibit 12?
17 A. Exhibit 12 is a copy of the body wire
18 between Shaun Ruff and Ron Greve on December 13
19 of 2002.
20 Q. How do you know that?
21 A. I've reviewed the tape and my initials
22 are on it.
23 Q. Have there been any changes, additions,
24 or deletions made to that CD after the
25 conversation was recorded?

1   A.      No, there have not.

2   Q.      Was a recording preserved in a specific

3   manner?

4   A.      After the recordings are made, once again

5   they're placed in a locked evidence locker

6   where they're heat-sealed.

7   Q.      And were the tapes preserved in that they

8   could not be recorded over or deletions made?

9   A.      Yeah, as well the tabs are punched out on

10  them or on the videotapes the slide is shoved

11  over so nothing can be added or erased in any

12  way.

13  Q.      What is Government Exhibit 12A?

14  A.      12A is the transcript between Shaun Ruff

15  and Ron Greve on December 13 of 2002.

16  Q.      Does it accurately reflect the names of

17  the speakers on the CD?

18  A.      Yes, it does.

19  Q.      Does it accurately reflect the

20  conversation that took place?

21  A.      Yes, it does.

22          MS. BAUMANN:  Your Honor, United

23  States moves to admit Government Exhibit 12 and

24  Government Exhibit 12A for demonstrative

25  purposes only.

1           MR. TAYLOR:  Object, Your Honor, on

2   the basis of foundation, relevancy,

3   speculation, and Rule 403.

4           THE COURT:  All right.  Overruled.

5           (Whereupon, Exhibit Nos. 12 and 12A

6   were received.)

7           MS. BAUMANN:  May I publish

8   Government Exhibit 12 using the software?

9           THE COURT:  You may.  They are

10  admitted.

11          (Whereupon, the tape was played.)

12  BY MS. BAUMANN:

13  Q.      Inspector Mower, was there also a

14  videotape of this transaction made?

15  A.      Yes, there was.

16          MS. BAUMANN:  May I approach the

17  witness, Your Honor?

18          THE COURT:  Yes.

19  BY MS. BAUMANN:

20  Q.      Showing you what has been marked as

21  Government Exhibit 13, do you recognize that

22  item?

23  A.      Yes, I do.

24  Q.      What is it?

25  A.      It's the copy of the video between Shaun

1   Ruff and Ron Greve on December 13 of 2002.

2   Q.      How do you know that?

3   A.      I've viewed the tape and my initials are

4   on it.

5   Q.      Have there been any changes, additions,

6   or deletions made to the videotape since the

7   transaction was recorded?

8   A.      No, there have not.

9   Q.      How was the recording preserved?

10  A.      Once again, it's got -- the tabs are

11  broken out, and the slide is across the

12  videotape where it can't be altered or erased

13  and it's locked in a locked evidence locker.

14  Q.      And you're referring to the original

15  videotape?

16  A.      Correct.

17  Q.      And this is a copy?

18  A.      Correct.

19          MS. BAUMANN:  And, Your Honor,

20  Government would ask to admit Exhibit 13.

21          MR. TAYLOR:  We would object to the

22  audio portion of it, which I understand will be

23  played as well.  But we have no objection to

24  the video portion.  And the objection to the

25  audio portion would be the same as to

1   Exhibit 12.

2           THE COURT:  All right.  Overruled.

3   It's admitted.

4           (Whereupon, Exhibit No. 13 was

5   received.)

6           MS. BAUMANN:  Your Honor, may I

7   publish Government Exhibit 13 in two parts.

8           THE COURT:  Yes.

9           MS. BAUMANN:  For the record, I'm

10  playing from counter Number 2.00 to 3.20.

11          THE COURT:  And that's on Exhibit 13?

12          MS. BAUMANN:  Yes.

13          (Whereupon, the tape was played.)

14          MS. BAUMANN:  For the record, I'm

15  publishing Government Exhibit 13, at counter

16  number 10.00 to 11.59.

17  BY MS. BAUMANN:

18  Q.      Inspector Mower, I just played two

19  portions of the videotape, which is Exhibit 13.

20  Can you explain the difference in time on those

21  videotapes?

22  A.      The first portion you saw was when Task

23  Force Officer Steve Schroeder contacted Shaun

24  Ruff to attempt to actually purchase or have

25  Mr. Greve bring some more cocaine to the

1  meeting place, and then there was a
2  couple-minute gap in between that phone call
3  and when actually Ron Greve pulled into the
4  parking lot.
5  Q.    What happened during that time period
6  between the phone call and when Ron Greve
7  arrived?
8  A.    In between the phone call, he was just
9  sitting there in the parking lot. Mr. Ruff was
10 sitting in the parking lot and he was under
11 surveillance by several surveillance officers
12 at that time.
13 Q.    Following the Defendant's arrest on
14 December 13, 2002, did you arrange for anything
15 further to occur in the investigation?
16 A.    Yes, I did.
17 Q.    And what happened?
18 A.    I had Bert Carner place a recorded phone
19 call to Mr. Greve to see if we could possibly
20 purchase anything, any other narcotics that
21 might be in the Dubuque area.
22 Q.    Who is Bert Carner?
23 A.    Bert Carner was a confidential informant
24 for me at one time out of Dubuque, Iowa.
25 Q.    When did that controlled phone call take

1  place?
2  A.    On December 18, 2002.
3  Q.    Which phone was used?
4  A.    The undercover line, the Division of
5  Narcotics Enforcement undercover line, which is
6  located in our office in Dubuque, Iowa.
7  Q.    And as a case agent in the Defendant's
8  case, were you aware of the interview that took
9  place with Mr. Greve following the transaction
10 on December 13?
11 A.    Yes, I was.
12 Q.    Did you follow up on any of the
13 information he provided?
14 A.    Yes, we did.
15 Q.    And what sort of follow-up did you do?
16 A.    Mr. Greve stated that his source was by
17 the name of Fifty. I contacted several of my
18 informants that I was currently working with to
19 see if they had ever heard of a Fifty. They
20 had not heard of a Fifty. I contacted the
21 Dubuque Drug Task Force from the street crimes
22 unit officers to -- wanted to know if they had
23 ever heard of a nickname Fifty. They couldn't
24 confirm anything. I contacted narcotics
25 officers out of the Rockford Police Department

1  with any whereabouts of a Fifty. They were
2  unaware of a Fifty as well. And also checked
3  with the East Dubuque Police Department and the
4  task force over there and no one has ever heard
5  of a Fifty.
6  Q.    Is it uncommon to be able to find
7  information about a drug dealer if you only
8  have an alias to work off of?
9  A.    Excuse me, what was the question?
10 Q.    Is it common or uncommon to be able to
11 find a person if you only have their alias?
12 A.    Sometimes you can find them, if you can
13 start corroborating other evidence or other
14 names to go with it. But if you just have one
15 name and they're in a different town, it's
16 difficult to, at times, to figure out if there
17 was such a person.
18 Q.    Other than Fifty, did you investigate
19 anyone else after the interview with Mr. Greve?
20 A.    We checked into -- he said he had met --
21 at The Clubhouse in Dubuque, Iowa, where a lot
22 of people hung out at, did some checking into
23 The Clubhouse. The name -- goes by Memphis
24 Kimball. His last name is Kimball, but the
25 street name of Memphis is a name that kept

1  coming up in our investigation as far as this
2  clubhouse in Dubuque, Iowa.
3  Q.    Did you find anything that substantiated
4  anything regarding Mr. Kimball?
5  A.    Found out that supposedly Memphis, Marvin
6  Kimball I guess was his real name, he was a
7  suspect in some drug investigations in the
8  Rockford area, according to the officers in
9  Rockford. And also had some intelligence on
10 him in the Dubuque area, as well as moving some
11 cocaine in the Dubuque, Iowa, area.
12 Q.    So he was, in fact, a real person?
13 A.    Yes, he was.
14       MS. BAUMANN: No further questions at
15 this time, Your Honor.
16       THE COURT: Cross-examination.
17       MR. TAYLOR: Thank you.
18       CROSS-EXAMINATION
19 BY MR. TAYLOR:
20 Q.    So as far as you could determine, there
21 was no such person as Fifty?
22 A.    Correct.
23 Q.    And if he was from Rockford, Rockford
24 authorities didn't know of anybody who went by
25 the name of Fifty, right?

1   A.   That's correct.
2   Q.   Did you attempt to talk to Marvin
3   Kimball?
4   A.   No, I did not.
5   Q.   And it was your understanding, wasn't it,
6   that this meeting between Mr. Greve and
7   Mr. Kimball at The Clubhouse was supposed to
8   have taken place when Mr. Kimball lived in
9   Dubuque about the year 2001 or 2002?
10  A.   That's my understanding. He was in the
11  area anyway. I'm not sure where he was living.
12  Q.   When Mr. Greve was taken to the Asbury
13  Police Station and questioned, was his cell
14  phone seized?
15  A.   I do not -- I don't know.
16  Q.   Well, in attempting to follow up on some
17  of the information that Mr. Greve stated, did
18  you check to see whose names may have been in
19  the phone book, if you want to call it that, in
20  the cell phone?
21  A.   No, I did not check.
22  Q.   Okay. Do you know if anybody did?
23  A.   I do not know.
24  Q.   And at that time, at least, you were the
25  case agent, correct?

1   A.   Correct.
2   Q.   So you would have known if somebody had
3   done that?
4   A.   I should have, yes.
5   Q.   Now, you said Mr. Carner was a
6   confidential informant for you; is that
7   correct?
8   A.   Yes, he was.
9   Q:   And did that arise after he was arrested
10  for delivery of about a pound of marijuana in
11  2000?
12  A.   I don't recall the date, but after he had
13  sold me approximately 1 pound of marijuana,
14  that's correct.
15  Q.   And during that transaction, you had said
16  you were from Guttenburg; is that right?
17  A.   I don't recall.
18  Q.   And the contact for that transaction was
19  made directly with Mr. Carner; was it not?
20  A.   To purchase the 1 pound?
21  Q.   Yes, the initial contact.
22  A.   Actually, I believe it was set up through
23  another confidential informant, but I might --
24  I think I did eventually talk to him. I know I
25  met with him in person.

1   Q.   Okay. But basically the transaction was
2   made with Mr. Carner in terms of he would be
3   the one who would get the marijuana and sell it
4   to you, correct?
5   A.   Bert Carner was the one that sold me the
6   marijuana.
7   Q.   And no contact was made with Mr. Greve
8   regarding that, right?
9   A.   With the marijuana I purchased from Bert?
10  Q.   Yeah.
11  A.   No.
12  Q.   Now, I think you said that, during the
13  transaction on December 13 in the Heritage
14  Trail parking lot, that the initial part of the
15  conversation that we heard had to do with
16  Mr. Ruff trying to get Mr. Greve to come up
17  with some drugs; is that right?
18  A.   Yeah, he was instructed by Deputy
19  Schroeder to try to get Mr. Greve to bring some
20  additional cocaine at that meeting.
21  Q.   And to bring it to the meeting, correct?
22  A.   Correct.
23  Q.   And when Mr. Greve was arrested there at
24  the Heritage Trail parking lot, all he had was
25  just a personal use quantity of marijuana;

1   isn't that true?
2   A.   Yes, that's true.
3   Q.   Thank you.
4        MR. TAYLOR: That's all the questions
5   I have.
6        THE COURT: Anything else,
7   Ms. Baumann?
8        MS. BAUMANN: Yes, Your Honor.
9        REDIRECT EXAMINATION
10  BY MS. BAUMANN:
11  Q.   Inspector Mower, during the transaction
12  you conducted in an undercover capacity with
13  Bert Carner in 2000, did you set up that
14  transaction yourself?
15  A.   I don't recall if I actually set it. I
16  was introduced to Bert through, I believe,
17  another CI; but I know I actually met with Bert
18  on my own.
19  Q.   So you don't know who that other CI
20  contacted in order to get the marijuana?
21  A.   I -- I placed the phone call. I was
22  introduced to Bert from someone else, another
23  CI; but I placed the phone call to purchase the
24  marijuana from Bert Carner.
25  Q.   And is it uncommon to find a drug

1  dealer with a user amount of marijuana in their
2  pocket?
3  A.  Could you restate that, please.
4  Q.  Is it common or uncommon to find a drug
5  dealer who has a user amount of marijuana in
6  their pocket?
7  A.  Most of the time when we make arrests,
8  the drug dealers usually have a personal amount
9  of drugs, narcotics, on their person.
10  Q.  In your experience as a drug
11  investigator, why is that?
12  A.  It seems to be that most drug dealers are
13  usually drug users as well.
14      MS. BAUMANN:  No further questions,
15  Your Honor.
16      THE COURT:  Anything else,
17  Mr. Taylor?
18      RECROSS-EXAMINATION
19  BY MR. TAYLOR:
20  Q.  But at least on December 13, Mr. Greve
21  didn't have any dealer quantity on him,
22  correct?
23  A.  He had no cocaine on his person.
24  Q.  Thank you.
25      MS. BAUMANN:  That's all I have.

1      THE COURT:  Anything else?
2      MS. BAUMANN:  No, Your Honor.
3      THE COURT:  Thank you.  You may step
4  down.
5      Ready for any further evidence on
6  behalf of the United States.
7      MS. BAUMANN:  United States has no
8  further evidence, Your Honor.  I would ask for
9  a ruling on the items that have been
10  conditionally admitted.
11      THE COURT:  All right.  Do you rest,
12  then?
13      MS. BAUMANN:  Yes, Your Honor.
14      THE COURT:  All right.  Members of
15  the jury, I have to take up some legal matters
16  with the lawyers.  It will take just a few
17  minutes, and so I'll just give you a rest.  Why
18  don't you plan on coming back into the
19  courtroom about eleven o'clock.  That will give
20  us time to make -- do our legal work and then I
21  want to give my court reporter a rest and then
22  we'll pick it up again at eleven.  Please
23  remember the admonitions of the Court.
24      (Whereupon, the jury exited the
25  courtroom.)

1      THE COURT:  This is United States of
2  America versus Ronald Greve, Criminal Number
3  04-1008.  We are outside the presence of the
4  jury at the close of the Government's case to
5  make record.  Mr. Greve is personally present
6  with his attorney, Wallace Taylor.  Assistant
7  United States Attorney Theresa Baumann
8  represents the United States.
9      We can first take up the issue of the
10  things conditionally admitted.  And I think
11  those are the marijuana transactions; are they
12  not?
13      MS. BAUMANN:  I believe Mr. Taylor
14  objected to everything prior to December 13,
15  which would be all of the transactions.
16      THE COURT:  All right.  I think the
17  marijuana transactions are the ones that are of
18  the most concern to me.  The -- there is
19  circumstantial evidence that Defendant was
20  involved in the cocaine conspiracy with
21  Mr. Ruff, I believe.  But the marijuana, those
22  were in -- let me see my notes.  I can't take
23  very good notes with one arm here.  Remind me
24  of the dates of those.
25      MS. BAUMANN:  July 24 and August 19.

1      THE COURT:  All right.  What evidence
2  does the United States claim was presented in
3  this trial --
4      MS. BAUMANN:  Your Honor -- I'm
5  sorry.
6      THE COURT:  -- that links those
7  marijuana transactions to this conspiracy?
8      MS. BAUMANN:  Your Honor, as you
9  pointed out, Shaun Ruff was a member of a
10  conspiracy to distribute controlled substances
11  with the Defendant.  He distributed the
12  controlled substances which were involved on
13  July 24 and August 19.  So I believe it was
14  linked up that way.
15      Also, Bert Carner testified that the
16  Defendant had provided him with a pound of
17  marijuana, and he had delivered that as early
18  as 2000.
19      We believe for those reasons, and
20  based on the Defendant's own admissions that he
21  was involved in selling drugs, that we have
22  linked those two buys to the conspiracy.
23      THE COURT:  Well, as I recall, and
24  correct me if I'm wrong, I don't think Ruff
25  ever -- I mean, I don't think that Defendant

1 ever stated Ruff and he were involved in any
2 kind of drug conspiracy or did drugs together.
3 I think he had the last name of another person,
4 didn't he? Shaun Langley (sic) or something
5 like that.
6 　　　　MS. BAUMANN: In his admissions, he
7 admitted that he was involved with Shaun, who
8 he didn't know the last name of. In the
9 telephone call, which was Government
10 Exhibit 18, he identified the Shaun as Shaun
11 Lang. We believe all the other evidence shows
12 that he just had the wrong name, and this
13 person he referred to as Shaun was Shaun Ruff.
14 　　　　THE COURT: All right. Mr. Taylor.
15 　　　　MR. TAYLOR: Thank you, Your Honor.
16 　　　　As you've indicated, Mr. Greve never
17 mentioned the name Shaun Ruff. And in the tape
18 recording, which was a clandestine recording so
19 he didn't know it was being recorded, he
20 said -- he told them it was a Shaun Lang. And
21 there is just no evidence. Even if we assume
22 for the sake of argument that Mr. Greve was
23 correct, that he had sold Mr. Ruff some cocaine
24 on a few occasions, that doesn't necessarily
25 mean that the transactions that were introduced

1 into evidence have anything to do with the
2 cocaine that Mr. Greve allegedly sold to
3 Mr. Ruff.
4 　　　　And the testimony from, I think,
5 Officer Mower was that they understood that
6 Mr. Ruff's source was Trevor Deutmeyer. So it
7 seems to me that to say that these prior
8 transactions involve Mr. Greve is pure
9 speculation, and I think -- Ms. Baumann almost
10 admitted that when she was talking to you a
11 moment ago, that this is speculation, and I
12 don't believe that that rises to the level of
13 being admissible evidence, particularly in
14 light of Rule 403 when it would be so
15 prejudicial to admit it.
16 　　　　THE COURT: Well --
17 　　　　MR. TAYLOR: Without Mr. Ruff
18 testifying, I don't think we have any basis for
19 establishing admissibility.
20 　　　　THE COURT: Well, it seems to me that
21 there is some circumstantial evidence on the
22 cocaine in view of the fact that they're
23 setting up a transaction to pay off drugs that
24 were fronted. But the marijuana, I have a real
25 problem with. I'm having a real hard time

1 tying that up.
2 　　　　MS. BAUMANN: Your Honor, may I?
3 　　　　THE COURT: Yes.
4 　　　　MS. BAUMANN: I would point you to
5 Eighth Circuit law regarding conspiracy. An
6 instruction that you gave in United States
7 versus Kendrick states that the Defendant is
8 liable for any acts of co-conspirators which
9 occurred even if they occurred prior to him
10 entering the conspiracy.
11 　　　　Even if he didn't know Shaun Ruff at
12 the time he was making the deliveries of the
13 marijuana, he is responsible under conspiracy
14 law for the acts of his co-conspirators if he
15 later joins in that agreement, knowingly and
16 voluntarily, knowing the purpose of the
17 agreement.
18 　　　　THE COURT: And I would agree with
19 that, but I'm not sure we're talking about the
20 same conspiracy here. It seems to me, and I'm
21 trying to look at this as objectively as
22 possible, I can see your argument with the
23 cocaine, but with the marijuana, I just don't
24 find any connection between Shaun Ruff and
25 marijuana and this Defendant. I can't -- there

1 isn't even circumstantial evidence that I
2 can -- that I can hang my hat on.
3 　　　　I don't -- I don't see that this is
4 necessarily even the same conspiracy. For all
5 we know, Ruff and whoever were dealing
6 marijuana before this Defendant became involved
7 with him in the cocaine trafficking, for sake
8 of argument.
9 　　　　I'm not making a finding, obviously,
10 but I think -- I think there are potentially
11 two conspiracies here, and I don't think
12 there's any proof that Mr. Greve was in the
13 marijuana one. So I am going to make a finding
14 that the marijuana transactions should not be
15 admitted as evidence against the Defendant.
16 And so what I'm going to need you to do --
17 obviously, we've got two exhibits, 1 and 2,
18 that came in, that were conditionally admitted,
19 and then we'll have to make a statement that
20 the Court has found that there is insufficient
21 evidence to link Mr. Greve to the marijuana
22 transactions that were testified to and to
23 Exhibits 1 and 2.
24 　　　　Will that be sufficient? If you want
25 to suggest some language, I'm willing to go

1 with your language.

2     MR. TAYLOR: I guess I'm not

3 following, Your Honor.

4     THE COURT: All right. In my ruling,

5 when the jury comes back, I'm going to make a

6 finding that the Government has not proven

7 beyond a reasonable doubt Defendant's

8 connection with a conspiracy that has as an

9 object the distribution of marijuana --

10     MR. TAYLOR: Okay.

11     THE COURT: -- and that the jury

12 should disregard Exhibits 1 and 2 and any

13 testimony concerning Defendant's connection

14 with -- alleged connection with distribution of

15 marijuana by Mr. Ruff.

16     MR. TAYLOR: Yes, pursuant to your

17 ruling; I don't want to waive my objection to

18 the cocaine as well.

19     THE COURT: Yes, yes. I -- I don't

20 have any problem -- I can make the connection

21 between the cocaine, Ruff, and this Defendant.

22 I just can't make that connection, I think the

23 evidence is insufficient, with regard to the

24 marijuana.

25     MS. BAUMANN: Your Honor, while

1 preserving our objection to your ruling, I

2 would also suggest that page 1 of Government

3 Exhibit 7 somehow be redacted. That is the

4 quantity of marijuana that was involved in

5 Exhibits 1 and 2 in the laboratory report.

6     THE COURT: Okay. All right. Here's

7 what I propose to say to the jury: After

8 reviewing the evidence, the Court finds that

9 the United States has not proven beyond a

10 reasonable doubt that Defendant engaged in a

11 conspiracy with the object to knowingly and

12 intentionally distribute marijuana. Therefore,

13 the jury will disregard any testimony about the

14 marijuana distribution transactions between

15 Shaun Ruff, a confidential informant, and Agent

16 Mower on July 24, 2002, and August 19, 2002,

17 and the portion of Exhibit 7 that deals with

18 the testing of the marijuana, as well as

19 Exhibits 1 and 2. Exhibits 1 and 2 are now not

20 admitted into evidence and Exhibit 7 will be

21 redacted.

22     MS. BAUMANN: Your Honor, the only

23 comment I would have on that is that Agent

24 Mower was not involved. It was strictly

25 between the CI and Shaun Ruff on those two

1 occasions.

2     MR. TAYLOR: And Detective

3 Schroeder's testimony, I think, in that regard.

4     THE COURT: I'm sorry?

5     MR. TAYLOR: Detective Schroeder's

6 testimony in regard to the first two

7 transactions.

8     THE COURT: Okay.

9     MR. TAYLOR: Detective Schroeder I

10 think was the case agent at that time.

11     MS. BAUMANN: He was.

12     THE COURT: Okay. All right. With

13 that decision having been reached, then,

14 Mr. Taylor, I'll let you make your record at

15 the close of the Government's case.

16     MR. TAYLOR: Thank you, Your Honor.

17 We would move for directed verdict on

18 all of the portions of Count 1 of the

19 indictment. I think the Court's already ruled

20 on the second portion with regard to the

21 marijuana.

22 With regard to the cocaine, although

23 there's some circumstantial evidence, if you

24 want to stretch it, I don't think it rises to

25 the level of convincing a reasonable jury

1 beyond a reasonable doubt that Mr. Greve was

2 involved with any cocaine distribution to

3 Mr. Ruff. And in light of that, I don't

4 believe there's any evidence to support the

5 third aspect of Count 1 of the indictment

6 regarding the use of the telephone.

7     THE COURT: Ms. Baumann.

8     MS. BAUMANN: Thank you, Your Honor.

9 The Government believes it has presented

10 sufficient evidence for a reasonable jury to

11 find beyond a reasonable doubt that the

12 Defendant committed the offenses charged in the

13 indictment. Therefore, we would ask that it be

14 submitted to the jury.

15     THE COURT: All right. The motion

16 for judgment of acquittal on the remaining

17 objects of the conspiracy is overruled. I will

18 obviously in post-trial motions take a hard

19 look at the evidence, as I always do, in the

20 event of conviction.

21 All right. Mr. Meyer is in the

22 courtroom. He is an attorney that we asked to

23 come over and talk to defense witness Marvin

24 Kimball. Actually, Mr. Taylor suggested that

25 that might be a good idea.

1    Mr. Meyer, would you like to come
2  forward so it doesn't seem like you're down the
3  end of the hall talking to us.
4    MR. MEYER: Sure.
5    THE COURT: Have a chair, Mr. Meyer.
6    MR. MEYER: Okay.
7    THE COURT: Mr. Meyer, have you had
8  an opportunity to talk to Mr. Kimball?
9    MR. MEYER: I did just before I came
10  into the courtroom a few minutes ago and
11  listened to the proceedings, and I think
12  there's a couple of issues. One, why wasn't he
13  here exactly at nine o'clock; and the other is,
14  should he exercise his right to remain silent.
15  And I'm prepared to proffer what I think he
16  would say with respect to why he wasn't here
17  this morning.
18    THE COURT: That's fine.
19    MR. MEYER: He came to
20  Cedar Rapids -- he got a subpoena, I think, on
21  Monday, that Mr. Taylor issued. He came to
22  Cedar Rapids last night, checked into the Best
23  Western in order to be here on time. This
24  morning, the people at the Best Western told
25  him to go to the state courthouse, that that

1  was the courthouse he wanted to go to. He's
2  from East Dubuque and doesn't live in
3  Cedar Rapids, so he went to the state
4  courthouse, went through the metal detector and
5  went up to the third floor apparently, and
6  somebody there told him you're in the wrong
7  courthouse. So then he came over here and has
8  been waiting since I'm not sure when, about
9  9:30 or so.
10    THE COURT: I think that's about
11  right.
12    MR. MEYER: And then that's his
13  excuse for not being at this courthouse at nine
14  o'clock.
15    THE COURT: It's believable.
16    MR. MEYER: And, in fact, he does
17  have a Best Western key to the room that makes
18  me believe that he did, in fact, come here last
19  night.
20    So the other thing is whether he
21  should testify or not. I understand that there
22  are pending -- there's a pending state drug
23  charge in -- I'm not sure if it's in East
24  Dubuque or in Dubuque itself. And his
25  attorney -- I don't know who the attorney is

1  advised him that he should not testify in this
2  case because anything he said could be used
3  against him in one way or another in the
4  pending state court charge in Dubuque or East
5  Dubuque.
6    So what he planned to do was -- what
7  he intends to do is to assert his right to
8  remain silent against self-incrimination.
9    THE COURT: Mr. Taylor, would you
10  like to give Mr. Meyer some idea of where you
11  would be going with that witness so that we can
12  determine if we're even going to implicate
13  anything?
14    MR. TAYLOR: Yes, I was going to
15  suggest Mr. Meyer and I talk.
16    THE COURT: Yes, could we do that?
17  And do you have other witnesses you're going to
18  call before --
19    MR. TAYLOR: Yes.
20    THE COURT: -- Mr. Kimball?
21    MR. TAYLOR: Yes.
22    THE COURT: And then after you talk,
23  that will give Mr. Meyer an opportunity to go
24  back to his client and visit some more, and
25  then perhaps at the noon break, Mr. Meyer will

1  have a better idea of whether or not his
2  client's going to be able to testify.
3    All right. We'll see you about
4  eleven.
5    (Whereupon, a brief recess was
6  taken.)
7    THE COURT: I see that you have
8  discovered that there are only two temperatures
9  in this courthouse, too hot and too cold. We
10  don't have anything in between.
11    We're ready now to continue with the
12  case of United States of America versus Ronald
13  Greve.
14    Before we go any further, I want to
15  make the following ruling: After reviewing the
16  evidence, the Court finds that the United
17  States has not proven that Defendant engaged in
18  a conspiracy with the object to knowingly and
19  intentionally distribute marijuana. Therefore,
20  the jury is instructed to disregard any
21  testimony about the marijuana distribution
22  transactions between Shaun Ruff and a
23  confidential informant on July 24, 2002, and
24  August 19, 2002, including the testimony of
25  Agent Schroeder as to those transactions.

1    Also, you will disregard Exhibits 1
2  and 2. They will not be admitted in evidence,
3  and we will redact or take the pages out of
4  Exhibit 7 that deal with the marijuana, so the
5  marijuana is no longer a part of this case.
6    All right. Mr. Taylor, would you
7  like to present evidence on behalf of
8  Mr. Greve?
9    MR. TAYLOR: Yes, Your Honor, we
10  would.
11    THE COURT: You may proceed.
12    MR. TAYLOR: We call Edward Michel.
13    THE COURT: Hello, sir. Please come
14  forward. Raise your right hand.
15    EDWARD MICHEL,
16  called as a witness, being first duly sworn,
17  was examined and testified as follows:
18    THE COURT: Please come to the
19  witness stand.
20    DIRECT EXAMINATION
21  BY MR. TAYLOR:
22  Q.  Would you state your name for the record,
23  please.
24  A.  **Edward Joseph Michel.**
25  Q.  How do you spell your last name?

1  A.  **M-I-C-H-E-L.**
2  Q.  Where do you live?
3  A.  **Bellevue, Iowa.**
4  Q.  How long have you lived there?
5  A.  **All my life.**
6  Q.  How old a man are you?
7  A.  **Forty-four.**
8  Q.  Are you employed?
9  A.  **Yes.**
10  Q.  Where do you work?
11  A.  **I worked for a concrete company in**
12  **Davenport. I'm a cement finisher.**
13  Q.  And have you got a family?
14  A.  **Yes, I do.**
15  Q.  Tell us about that.
16  A.  **Wife, son, three daughters.**
17  Q.  In 2002, were you working with law
18  enforcement against a man named Shaun Ruff?
19  A.  **Yes, I was.**
20  Q.  And did that extend from about July of
21  2002 up through November of 2002?
22  A.  **Yes, it did.**
23  Q.  And during that period of time, did you
24  come to understand who Mr. Ruff's source was
25  for the drugs that he was selling to you?

1  A.  **Through hearsay, I did, yeah, but never**
2  **really witnessed anything in a room.**
3  Q.  And is that something Mr. Ruff told you?
4  A.  **Basically, yeah.**
5  Q.  Okay. And what did you understand to be
6  his source?
7    MS. BAUMANN: Objection, Your Honor,
8  calls for hearsay.
9    THE COURT: It sounds like hearsay to
10  me. Do you admit it's hearsay, and if so, does
11  an exception apply?
12    MR. TAYLOR: It is hearsay. I think
13  it's an admission against interest.
14    THE COURT: I don't think that we
15  have foundation for that. The objection is
16  sustained.
17  BY MR. TAYLOR:
18  Q.  Did you ever observe Mr. Ruff receive
19  cocaine from anyone?
20  A.  **Yes.**
21  Q.  And about when was that, if you recall?
22  A.  **August or September of that year,**
23  **probably. Right in that area.**
24  Q.  Okay. And do you know who -- who
25  supplied the cocaine to Mr. Ruff?

1  A.  **At that time?**
2  Q.  Now; do you know now who it was?
3    MS. BAUMANN: Objection, Your Honor,
4  confusing, and calls for hearsay.
5    THE COURT: I don't think it calls
6  for hearsay if he saw it with his own eyes.
7    Maybe you could restate the question
8  so that we don't have confusion here and get
9  into hearsay.
10    MR. TAYLOR: All right.
11  BY MR. TAYLOR:
12  Q.  Tell us basically what you observed in
13  that August or September time frame when you
14  saw drugs being delivered, specifically,
15  cocaine, to Mr. Ruff.
16  A.  **Yes.**
17  Q.  Will you describe what you saw?
18  A.  **Just a delivery being made, never really**
19  **knew who it was. Just observed it.**
20  Q.  And did you come to understand that that
21  was a Trevor Deutmeyer who made that delivery?
22  A.  **I was under that understanding at a later**
23  **date, but never really knew that at the time.**
24  **But that was also through hearsay.**
25  Q.  Do you know Trevor Deutmeyer?

1  A.   No, I do not, sir.

2  Q.   And do you remember how much cocaine it

3  was?

4  A.   It was a very minute amount, probably an

5  eighth or a quarter ounce, I think.

6  Q.   And do you recall if it could have been a

7  quarter pound?

8  A.   May have been, but --

9  Q.   Do you know Ron Greve, who sits to my

10 right?

11 A.   Just because you just said that,

12 otherwise I wouldn't -- wouldn't even know him.

13 Q.   And is this the gentleman that delivered

14 the cocaine to Mr. Ruff?

15 A.   Not at that time, no.

16 Q.   Thank you.

17       MR. TAYLOR:   That's all the questions

18 I have, Your Honor.

19       THE COURT:   Cross-examination.

20       MS. BAUMANN:   Thank you.

21             CROSS-EXAMINATION

22 BY MS. BAUMANN:

23 Q.   Mr. Michel, did you see Shaun Ruff

24 purchase any cocaine in October of 2002?

25 A.   October of 2002?  Yes, I did.

1  Q.   When was it, do you remember?

2  A.   It was at his apartment one night.

3  Q.   Who did he purchase it from?

4  A.   That person I don't know because that

5  person was outside.

6  Q.   And --

7  A.   And I just never seen that person.

8  Q.   So you didn't actually see cocaine --

9  A.   No.

10 Q.   -- change hands?

11 A.   No, not that night.

12 Q.   Did you ever see cocaine change hands

13 with Shaun Ruff and someone else after that

14 date?

15 A.   No, I did not.

16 Q.   So no time in November or December did

17 you see Shaun Ruff buy any cocaine?

18 A.   Not buy it, no.

19       MS. BAUMANN:   Nothing further, Your

20 Honor.

21       THE COURT:   Anything else,

22 Mr. Taylor?

23

24

25

1             REDIRECT EXAMINATION

2  BY MR. TAYLOR:

3  Q.   Did you ever see Mr. Ruff obtain cocaine

4  from anybody in October or November?

5  A.   No, I did not.

6  Q.   Thank you.

7        MR. TAYLOR:   That's all I have, Your

8  Honor.

9        MS. BAUMANN:   Nothing further.

10       THE COURT:   Thank you, sir.  You may

11 step down.

12       MR. TAYLOR:   Call Babette Birch.

13       THE COURT:   Good morning, ma'am.

14 Please raise your right hand.

15             BABETTE BIRCH,

16 called as a witness, being first duly sworn,

17 was examined and testified as follows:

18       THE COURT:   Please come to the stand.

19             DIRECT EXAMINATION

20 BY MR. TAYLOR:

21 Q.   Will you state your name, please.

22 A.   Babette Long, Babette Birch.

23 Q.   You're recently married?

24 A.   Yes, Saturday.

25 Q.   Where do you live?

1  A.   In Dubuque, Iowa.

2  Q.   How long have you lived in Dubuque?

3  A.   Most of my life.

4  Q.   Do you know Ron Greve?

5  A.   Yes.  He's my son.

6  Q.   Did Ron graduate from high school there

7  in Dubuque?

8  A.   Yes.

9  Q.   Did he take any further education after

10 graduating from high school?

11 A.   Ron moved in with me in 2001, September,

12 and he started going part-time at NICC.

13 Q.   Is that a community college?

14 A.   Yes.

15 Q.   And how long was he enrolled there?

16 A.   I'm not sure.  I know through -- through

17 the winter class of 2002, I believe.

18 Q.   And was he a full-time student?

19 A.   Part-time.

20 Q.   And during that time period, where was he

21 living?

22 A.   With me.

23 Q.   Okay.  Did he pay you any rent or buy any

24 food or anything like that?

25 A.   No.

1  Q.   So basically he was still living at home?

2  A.   Yes.

3  Q.   To your knowledge, did he have any

4  expenses to speak of at that point?

5  A.   No, none that I know of, other than for

6  gas to get to school and things like that.

7  Q.   During the time that he was living with

8  you in 2001, 2002, did he have any employment?

9  A.   He worked part-time at Journeys, I

10  believe, at the Kennedy Mall on and off. I'm

11  not sure how long he was there or what dates or

12  anything.

13  Q.   Did he just have a few part-time jobs

14  while he was going to school?

15  A.   Yes.

16  Q.   Did you ever see Ron flashing around a

17  lot of money?

18  A.   No.

19  Q.   Did he buy a lot of fancy things?

20  A.   No. He was usually asking me for 5 or 10

21  here and there.

22  Q.   And at what point, then, did he -- if he

23  did, leave your residence?

24  A.   Last December, I'm not sure what day. I

25  just know it was before Christmas of --

1  Q.   2003?

2  A.   Yes.

3  Q.   Okay. Was he still going to school then,

4  or --

5  A.   I'm not sure. I don't believe so. I'm

6  not sure.

7  Q.   Thank you.

8        MR. TAYLOR: That's all the questions

9  I have, Your Honor.

10        THE COURT: Cross.

11        MS. BAUMANN: Thank you, Your Honor.

12        CROSS-EXAMINATION

13  BY MS. BAUMANN:

14  Q.   Ms. Birch, are you currently employed?

15  A.   Yes.

16  Q.   How are you employed?

17  A.   At Eagle Window and Door manufacturing

18  plant.

19  Q.   And were you employed in that job in 2001

20  and 2002?

21  A.   In 2002, I was.

22  Q.   When did you start there?

23  A.   2002.

24  Q.   So your son lived with you prior to you

25  getting that job?

1  A.   Yes.

2  Q.   And were you employed prior to your

3  current job?

4  A.   Yes.

5  Q.   Where were you employed?

6  A.   CiCi's Mexican Restaurant.

7  Q.   And how much, approximately, income did

8  you have coming in when you were a -- or when

9  you worked at CiCi's?

10  A.   I made 10.25 an hour.

11  Q.   10 to 25 --

12  A.   I was a cook, yes.

13  Q.   $10 to $25 an hour?

14  A.   10.25 an hour.

15  Q.   Oh, excuse me. And did you have any

16  other people living at your home other than

17  Ron?

18  A.   My fiancee, well, my husband now.

19  Q.   And did he share the bills with you at

20  that time?

21  A.   Yes, he did.

22  Q.   You said Mr. Greve, your son, was in

23  school?

24  A.   At NICC.

25  Q.   How did he finance his education?

1  A.   School -- student loans.

2  Q.   And you said he was working at the time?

3  A.   Part-time that I know of at Journey's.

4  Q.   About how much was he earning, do you

5  know?

6  A.   I have no idea. He was an adult. I

7  didn't ask him.

8  Q.   Would you be surprised to know that in

9  the last three months of 2001, he only earned

10  $77?

11  A.   I really wouldn't know. I didn't ask to

12  see his checks.

13  Q.   Did he have a vehicle at that time?

14  A.   At one point. I'm not sure what year or

15  anything. I know he had a junk red car.

16  Q.   Was it a Honda?

17  A.   I believe so.

18  Q.   Who paid for that vehicle?

19  A.   I believe he did that with his student

20  loan money.

21  Q.   Do you know your son to distribute drugs?

22  A.   No.

23  Q.   Is it fair to say that you love your son?

24  A.   Yes.

25  Q.   How often do you communicate with him

1 now?

2 A.    Every day.

3 Q.    Would it be fair to say that he respects

4 you as his mother?

5 A.    Yes.

6        MS. BAUMANN: Nothing further, Your

7 Honor.

8        THE COURT: Anything else,

9 Mr. Taylor?

10        REDIRECT EXAMINATION

11 BY MR. TAYLOR:

12 Q.    The student loans that Ron got, did he

13 get some spending money as well?

14 A.    Yes.

15 Q.    Thank you.

16        MR. TAYLOR: That's all I have, Your

17 Honor.

18        MS. BAUMANN: Nothing further.

19        THE COURT: Thank you. You may step

20 down.

21        MR. TAYLOR: Our final witness is

22 Mr. Kimball, Your Honor.

23        THE COURT: All right. Let's --

24 Members of the jury, we need to take up another

25 short legal matter. I'm going to give you

1 another short break. I'm sorry about breaking

2 this up. Plan to come back in the courtroom

3 about 11:30, and please remember the

4 admonitions of the Court.

5        (Whereupon, the jury exited the

6 courtroom.)

7        THE COURT: Mr. Meyer, would you like

8 to come forward, sir. This is record in *United*

9 *States of America versus Ronald Greve*, Criminal

10 Number 04-1008. We're outside the presence of

11 the jury for the purpose of making record.

12        Joining Mr. Greve and his attorney,

13 Mr. Taylor, and Ms. Baumann, is attorney Mark

14 Meyer. He is representing Mr. Kimball, a

15 proposed defense witness.

16        Mr. Meyer, what -- after talking to

17 Mr. Taylor and talking to your client, what is

18 your client's decision?

19        MR. MEYER: Your Honor, my client was

20 advised prior to coming here by his attorney,

21 who is representing him in a pending state

22 matter, that it would not be in his interest to

23 testify about any matters relating to drug

24 transactions, and that's what Mr. Kimball

25 wishes to do.

1        Now, I talked to Mr. Taylor about

2 what Mr. Kimball might be called upon to

3 testify about, and I understand it's a

4 statement that Mr. Taylor's client supposedly

5 made to a police officer. And it relates to,

6 in part, some individuals or, at least an

7 individual, from Rockford, Illinois, and

8 whether or not Mr. Kimball knows that

9 individual.

10        And it's my belief that if

11 Mr. Kimball were to acknowledge that he was in

12 a particular place in Dubuque, I think it's

13 called The Clubhouse, that could tend to

14 incriminate him with respect to either whether

15 or not he's guilty of the offenses that he's

16 charged with; or if he is guilty, what the

17 punishment might be.

18        If he were to acknowledge that he

19 associates with an individual called -- or

20 named Fifty, that could also tend to

21 incriminate him, or affect his punishment if he

22 were convicted.

23        And even if the question were limited

24 to, "Do you know Mr. Greve," the other aspects

25 of what Mr. Greve supposedly told the officers

1 or officer could lead to questions that, in a

2 roundabout way, could tend to incriminate

3 Mr. Kimball.

4        So for those reasons, I would ask the

5 Court to allow Mr. Kimball to assert his right

6 to remain silent. I think there's a basis for

7 it.

8        And I just want to alert the parties,

9 he does intend to exercise his Fifth Amendment

10 right to remain silent, and I think that there

11 is a basis for him to do so.

12        THE COURT: All right. Mr. Taylor.

13        MR. TAYLOR: Thank you, Your Honor.

14        Briefly I would proffer what I would

15 expect to inquire about with Mr. Kimball.

16        As the Court heard from Agent Dasso's

17 testimony, Mr. Greve allegedly said he had met

18 a man named Memphis, who is Marvin Kimball, at

19 The Clubhouse in Dubuque in early 2002. He was

20 introduced to a man known as Fifty, and

21 allegedly Fifty was from Rockford, and brings

22 lots of drugs into Dubuque.

23        And my understanding is that

24 Mr. Kimball would say that he had moved to East

25 Dubuque in 2000 or early 2001, was not at The

1 Clubhouse in early 2002, that he knows a
2 person -- he knows of a person named Fifty, who
3 was not from Rockford, not even from Dubuque,
4 and that he has no information whatsoever that
5 this man named Fifty was involved in any sort
6 of drug activity, and also that he does not
7 know Mr. Greve.
8 　　　　And I'm not sure how that implicates
9 him in anything, and I can't visualize
10 cross-examination, but I can't visualize any
11 examination that would be within those
12 boundaries that would incriminate Mr. Kimball.
13 　　　　It's my understanding he does have a
14 pending simple possession charge in East
15 Dubuque, but that's the extent of it.
16 　　　　THE COURT: I understood somewhere, I
17 thought, that there were two controlled buys on
18 him.
19 　　　　MS. BAUMANN: There's a pending
20 investigation on him, yes.
21 　　　　THE COURT: Okay. Mr. Meyer, what --
22 knowing that that's where Mr. Taylor is going,
23 do you still feel that your client's rights are
24 in jeopardy and that he should assert his Fifth
25 Amendment right to remain silent?

1 　　　　MR. MEYER: I do, Your Honor. I
2 tried to figure out some way it could be
3 limited, but I -- for instance, "Do you know
4 Mr. Greve," and I just don't see any way
5 that that -- if he even admits that he knows
6 Mr. Greve or doesn't know Mr. Greve, if that
7 couldn't lead down a path that he didn't want
8 to go. By that I mean, a path that could tend
9 to incriminate him.
10 　　　　There is a pending charge now in
11 state court, and I understand there's another
12 investigation in Rockford, Illinois, that
13 involves Rockford, Illinois, somehow.
14 　　　　It would just be treading on pretty
15 thin ice for Mr. Kimball to be testifying in a
16 criminal case about whether or not he knows
17 about Mr. Greve who is charged with drug
18 offenses and whether he knows Fifty who
19 supposedly is a drug dealer.
20 　　　　I mean, it's just -- seems like it's
21 going to be hard to narrow the questioning so
22 that these things don't come up.
23 　　　　Plus, his attorney in the state court
24 case told him in no uncertain circumstances,
25 don't -- you don't want to be testifying in

1 this case about matters pertaining to drug
2 offenses.
3 　　　　THE COURT: All right. Any other
4 record either party wishes to make?
5 　　　　MS. BAUMANN: No, Your Honor.
6 　　　　MR. TAYLOR: No.
7 　　　　THE COURT: All right. The Court
8 does find that Mr. Kimball would exercise his
9 Fifth Amendment right not to incriminate
10 himself, and I do relieve him from his subpoena
11 and will not require him to take the stand in
12 view of Mr. Meyer's representations.
13 　　　　Anything else?
14 　　　　MR. TAYLOR: No, Your Honor.
15 　　　　THE COURT: All right. Thank you,
16 Mr. Meyer, for helping us.
17 　　　　MR. MEYER: You're certainly welcome.
18 　　　　THE COURT: When we go back on the
19 record, Mr. Taylor, then are you going to have
20 more evidence?
21 　　　　MR. TAYLOR: No.
22 　　　　THE COURT: So you'll be resting, and
23 then we have sandwiches ordered for the jurors.
24 　　　　What I would suggest we try to do,
25 since this has been a relatively short case, is

1 to try to put the instructions together. I
2 don't think we had a lot of controversy. I'll
3 have my clerk start taking out references to
4 marijuana and making the changes quickly, and
5 then hopefully we can still put this in this
6 afternoon.
7 　　　　MR. TAYLOR: If the Court please,
8 there is one other matter. I have an exhibit.
9 I've labeled it Exhibit A. And it's
10 Mr. Greve's phone records from September 13,
11 2002, through December 30. And I've --
12 pursuant to stipulation, I would offer that
13 into evidence.
14 　　　　THE COURT: All right. You're going
15 to do that in front of the jury?
16 　　　　MR. TAYLOR: Sure.
17 　　　　THE COURT: And then you'll rest, and
18 then I'll send them to have lunch. And I think
19 it isn't overly optimistic to think that we
20 could start putting this in about one o'clock.
21 Okay. All right.
22 　　　　(Whereupon, the jury entered the
23 courtroom.)
24 　　　　THE COURT: We are ready, then, to
25 continue in the case of *United States of*

1 America versus Ronald Greve.
2 And, Mr. Taylor, would you like to
3 present any other evidence?
4 MR. TAYLOR: Yes, Your Honor.
5 Defendant's Exhibit A is a record of telephone
6 calls related to Mr. Greve's telephone from
7 September 13, 2002, through December 30, 2002.
8 And pursuant to stipulation, I would offer that
9 into evidence.
10 THE COURT: Any objection?
11 MS. BAUMANN: No, Your Honor.
12 THE COURT: Received.
13 (Whereupon, Exhibit A was received.)
14 MR. TAYLOR: With that, the defense
15 rests.
16 THE COURT: All right. Will there be
17 any rebuttal evidence?
18 MS. BAUMANN: No, Your Honor.
19 THE COURT: All right. Members of
20 the jury, this closes the evidence in this
21 case. And let's talk about what our schedule's
22 going to be from this point forward.
23 At the conclusion of the evidence,
24 then the lawyers and I put together the written
25 instructions on the law, which you have to

1 follow in reaching your verdict. We've been
2 working on those even before this case began,
3 but we have to make some changes to them, and
4 that will take us a little while.
5 I would like to continue to put this
6 case in this afternoon so that you get some
7 deliberation time today, so I'm going to let
8 you have maybe a little longer lunch.
9 Sometime between now and noon,
10 sandwiches will be available for you in the
11 jury room, if you'd like to stay here and eat;
12 or if you want to go downtown, walk around,
13 that's fine with me too.
14 I think we'll be ready for you to
15 return to the courtroom about one o'clock. So
16 I'd like you to be back in the building and in
17 the jury room at one o'clock.
18 You can leave your pads and pens on
19 your chair in your envelope, and we will
20 collect those and hold those for you and bring
21 them back to the jury room so that you have
22 them when you deliberate.
23 When you return to the courtroom at
24 one o'clock, you'll have a copy of the Court's
25 instructions on the law. We will read those

1 instructions together, all but the last two
2 instructions and the verdict form. Then we'll
3 hear the final arguments from the lawyers.
4 Then we'll read the last two instructions
5 together, and go over the verdict form, and
6 then the case will be fully submitted to you.
7 You then will begin your
8 deliberations. If you have not reached a
9 verdict by five o'clock today, then you'll
10 return tomorrow morning at nine, and deliberate
11 all during the day until five o'clock, and
12 we'll provide lunch for you, because once you
13 start deliberating, you have to stay together.
14 And so that will be our schedule.
15 We'll just have you deliberate until you reach
16 a verdict and we'll supply the lunches each
17 day. So that's what you can count on, and so
18 I'm going to dismiss you at this time for
19 lunch, ask you to be ready to come back at one
20 o'clock.
21 Please continue to follow the
22 admonitions of the Court, and we'll see you in
23 just a little bit.
24 (Whereupon, the jury exited the
25 courtroom.)

1 THE COURT: All right. While they're
2 changing the instructions, let's go ahead and
3 make our additional record, if any, on motions.
4 This is United States of America
5 versus Greve, Criminal Number 04-1008. We're
6 outside the presence of the jury at the close
7 of all the evidence to make any record that the
8 lawyers wish to make. Mr. Greve is here with
9 his attorney, and Ms. Baumann is here on behalf
10 of the United States.
11 Mr. Taylor.
12 MR. TAYLOR: Thank you, Your Honor.
13 At the close of all the evidence, we
14 would reassert our motion for directed verdict
15 on the grounds previously urged.
16 THE COURT: All right.
17 MS. BAUMANN: And the Government
18 would object on the grounds previously urged.
19 THE COURT: All right. And the Court
20 rules that the motion for judgment of acquittal
21 on the remaining two objects of the conspiracy
22 is overruled.
23 If you want to take about a ten- or
24 fifteen-minute break, why don't you come back
25 here by a quarter to twelve, and let's

1 informally walk through the instructions that I
2 hope are corrected by that time, and then we'll
3 see how far we get. And we'll summon Patrice
4 when we're ready to make our final record.
5 　　　　Anything else that you want on the
6 record before I let Patrice go have a break?
7 　　　　MS. BAUMANN: No, Your Honor.
8 　　　　MR. TAYLOR: Could not think of
9 anything.
10 　　　　THE COURT: All right. See you in
11 fifteen.
12 　　　　(Whereupon, a brief recess was
13 taken.)
14 　　　　THE COURT: We're on the record in
15 *United States of America versus Ronald Greve*,
16 Criminal Number 04-1008. Defendant is
17 personally present with his attorney, Wallace
18 Taylor. Assistant United States Attorney
19 Theresa Baumann represents the United States.
20 　　　　I have just given to the lawyers a
21 copy of the Court's final jury instructions.
22 　　　　Ms. Baumann, have you received a copy
23 of my final jury instructions?
24 　　　　MS. BAUMANN: Yes, I have, Your
25 Honor.

1 　　　　THE COURT: And are you ready to make
2 your record?
3 　　　　MS. BAUMANN: I am, Your Honor.
4 　　　　THE COURT: You may proceed.
5 　　　　MS. BAUMANN: The United States has
6 no outstanding objections to the instructions
7 as they've been provided.
8 　　　　THE COURT: All right. I just
9 noticed -- one second. Go to Instruction 23.
10 There's an internal number, and it references
11 making a quantity determination as explained in
12 instruction number -- let's see.
13 　　　　MR. TAYLOR: 20, wasn't it?
14 　　　　THE COURT: No. Don't we usually
15 have another instruction on quantity? I think
16 we have a standard instruction, don't we, that
17 says "If you find the Defendant guilty, then
18 you'll determine the quantity," blah, blah,
19 blah? Can you pull up an old one for me?
20 　　　　THE CLERK: We previously used one
21 where the United States -- "In determining
22 whether the Defendant is guilty of the crime of
23 conspiracy to distribute as charged in Count X,
24 the Government is not required to prove that
25 the amount of quantity of the controlled

1 substance was as charged in the indictment.
2 The United States need only prove beyond a
3 reasonable doubt that there was a measurable
4 substance -- a measurable amount of the
5 controlled substance.
6 　　　　"However, if you find the Defendant
7 guilty of the offense, you will be asked a
8 special interrogatory about the quantity of
9 marijuana involved in the offense.
10 　　　　"The burden of proof is on the
11 Government to establish the quantity beyond a
12 reasonable doubt."
13 　　　　Did you want a more specific one?
14 　　　　THE COURT: No, we need some of that
15 language, or else we need to -- let's see, in
16 Instruction 23, third paragraph, "If you find
17 the Defendant guilty under Count 1, you are
18 being asked to make a quantity determination."
19 I think we could just stop it there. I don't
20 know that we need any further explanation, do
21 you?
22 　　　　MR. TAYLOR: Yeah. Or you might just
23 refer to the verdict form, that there's no
24 other instruction, I don't know.
25 　　　　THE COURT: Yeah, make a quantity

1 determination in Interrogatory 1. Let's just
2 do it that way. I don't think we need any
3 further instruction. "You will make a quantity
4 determination only if you find the Defendant
5 guilty of the crime of conspiracy to distribute
6 cocaine as charged in Count 1."
7 　　　　All right. Okay. We'll fix that up
8 a little bit.
9 　　　　With that change, Ms. Baumann, any
10 other objections to the instructions or the
11 verdict form?
12 　　　　MS. BAUMANN: No, Your Honor.
13 　　　　THE COURT: All right. Mr. Taylor,
14 have you had an opportunity and sufficient
15 opportunity to review the Court's proposed
16 instructions?
17 　　　　MR. TAYLOR: Yes.
18 　　　　THE COURT: And are you ready to make
19 your record?
20 　　　　MR. TAYLOR: Yes.
21 　　　　THE COURT: You may proceed.
22 　　　　MR. TAYLOR: Thank you, Your Honor.
23 　　　　We would object to Instruction Number
24 20, which refers to a quantity of drugs in a
25 conspiracy that would include personal use

1 quantities, includes the quantities that other
2 conspirators may have agreed to, and so on.
3 That apparently comes from a portion of the
4 Eighth Circuit uniform instruction. It's
5 called the Apprendi instruction.
6 And in looking at that this morning,
7 it appears that that portion is in brackets,
8 and there's a footnote to it. In the footnote
9 it says that Eighth Circuit law is unclear on
10 that. And I think that given that, and the
11 current state of the law after Blakely, that we
12 really aren't clear at all now, and that this
13 instruction should not be given.
14 With respect to the verdict form, the
15 Court could just revise to set out in the
16 interrogatory fewer guideline ranges in which
17 the jury would be allowed to find a particular
18 quantity of cocaine. But it seems to me that
19 having what's, in effect, the guideline table
20 set out in the jury instruction, in terms of
21 the interrogatory and the verdict form, is
22 confusing to the jury, maybe somewhat
23 intimidating, and may even be prejudicial in
24 the sense that they can see how it relates to
25 the sentence.

1 I don't know that they're that
2 in-depth, but they could be. Having given all
3 that, I think the better approach would be just
4 to say, "If you find the Defendant guilty,
5 determine what quantity of cocaine that he
6 agreed to distribute," and then just leave a
7 blank for them to fill in each specific
8 quantity.
9 THE COURT: All right. Do you want
10 to respond to Instruction Number 20,
11 Ms. Baumann?
12 MS. BAUMANN: Thank you, Your Honor.
13 The Government would not object to
14 deleting the "for personal use" portion of that
15 jury instruction, as that is not an issue in
16 this matter. However, the jury instruction
17 clarifies the conduct of Shaun Ruff in this
18 case and whether the Defendant is held
19 responsible for that conduct, whether it's
20 foreseeable. I think the Footnote 6 to jury --
21 Model Jury Instruction 6.21.846A.1 is
22 telling -- it discusses the Apprendi decision
23 and foreseeability in a conspiracy.
24 Given the state of the law right now,
25 this instruction, I think, is a good idea to

1 clarify what conduct the Defendant can be held
2 responsible for.
3 As far as the interrogatory, again,
4 given Blakely and the Pirani decision, which
5 was just vacated yesterday, the law is
6 certainly in flux. And I believe it's simpler
7 for the jury to decide upon a range of
8 quantity, if they do, in fact, find the
9 Defendant guilty, rather than calculating down
10 to the 10th of a gram themselves. So we
11 believe that's necessary.
12 THE COURT: All right. The Court
13 overrules the objections made by defense
14 counsel, and these are the instructions that I
15 will be giving.
16 I should have mentioned for the
17 record that prior to the attorneys receiving
18 the final packet, they had received a draft
19 packet from us by fax before the trial began
20 and we have had informal discussions and have
21 resolved some of the issues ahead of time
22 before we got to the final packet.
23 Any other record anybody wants to
24 make? If not, I'll let you have a little break
25 until one o'clock when the jury comes in. Big

1 ten minutes.
2 Anything else, Ms. Baumann?
3 MS. BAUMANN: Nothing further, Your
4 Honor.
5 THE COURT: Mr. Taylor?
6 MR. TAYLOR: No.
7 THE COURT: All right. See you in a
8 few minutes. We'll get you a new 23.
9 (This concludes the transcription of
10 the jury trial proceedings.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# CERTIFICATE

1

2      I, Patrice A. Murray, a Certified
Shorthand Reporter of the State of Iowa, do
3  hereby certify that at the time and place
heretofore indicated, a jury trial was held
4  before the Honorable Linda R. Reade; that I
reported in shorthand the proceedings of said
5  jury trial, reduced the same to print by means
of computer-assisted transcription under my
6  direction and supervision, and that the
foregoing transcript is a true record of all
7  proceedings had on the taking of said jury
trial at the above time and place.

8

9      I further certify that I am not related
to or employed by any of the parties to this
10  action, and further, that I am not a relative
or employee of any attorney or counsel employed
11  by the parties hereto or financially interested
in the action.

12

         IN WITNESS WHEREOF, I have set my
13  hand this 10th day of January, 2005.

14

15      _____
        Patrice A. Murray, CSR, RPR, RMR, FCRR
        Federal Building
16      101 First Street S.E.
        Cedar Rapids, Iowa 52401

17
18
19
20
21
22
23
24
25